stepped down as governor in 1996 after his conviction for fraud stemming from the Whitewater investigation, had investments in Asia," the *Wall Street Journal* reported. "He sent favorable reports to Mr. Singhal, who eventually invested and became a director."

29.     The Company also overpaid for equity stakes in two companies from Sino Investment LLC – an investment company controlled by Singhal. Xinhua purchased a 37% stake in Upper Step and a 61% stake in Accord Group for a total of $9.1 million in cash, 6.92 million class A shares, and 4.1 million warrants. Given the $13 per share value at the time of IPO, these deals implied a valuation for the units sold to Xinhua of $51.2 million for Upper Step and $3.81 million for Accord. A little more than six months prior, however, Upper Step and Accord were valued at only $26 million and $2.3 million respectively. Despite the fact that both companies were losing money, Xinhua paid significantly more for its shares in the companies than they were worth. Roddy Boyd, *Xinhua Exec's Pre-IPO Deals*, N.Y. Post, June 1, 2007.

30.     The above transactions were also advantageous to defendant Bush. Every time the Company makes an acquisition or issues shares, defendant Bush receives the equivalent of 3% of the value of the new shares or acquisitions in new shares. The more expensive the acquisition, the more defendant Bush profits. James Areddy and David Reilly, *Riding the Tiger*, *Wall Street Journal*, July 7, 2007.

31.     These transactions appear more egregious when viewed in the light of defendant Singhal's past corporate shenanigans. Since at least 2003, Xinhua and XFL (the parent company of Xinhua) have engaged in a number of related party transactions with Singhal's SBI. For example, in November 2003, Xinhua Financial Network announced in a press release that it had finalized a round of financing for $20 million with the assistance of SBI serving as one of two investment bankers on the deal. Further, in November 2003, Singhal, as Managing Director of SBI, then a division of

Japan's Softbank, arranged a deal on behalf of Freestar Technology Corporation to have Xinhua distribute its Internet credit card payment processing products to banks, financial institutions and Internet merchants throughout Asia, excluding Japan, according to a November 25, 2003 press release circulated by Freestar. Under the arrangement, Xinhua agreed to open offices for Freestar in Shanghai, Beijing and Hong Kong. The financial terms of the joint venture were not disclosed, based on a press release issued by SBI USA. At the time, Singhal was serving as Freestar's investment banker. And, on July 9, 2007, the *Wall Street Journal* reported that Xinhua Finance Limited paid SBI $10,000 a month in consulting fees, plus 1 percent of the value of any capital raised by Xinhua Finance. The bond offering documents noted that Singhal received $1 million from that deal.

## MATERIALLY MISLEADING STATEMENTS IN THE COMPANY'S PROSPECTUS

32.    Rather than disclose these material adverse facts, Defendants disseminated to investors and filed with the SEC a materially misleading Prospectus that stated the following regarding defendant Singhal:

> Shelly Singhal has served as our Chief Financial Officer since September 2006, and has served as a director of our parent, Xinhua Finance Limited, since July 2004. Mr. Singhal will serve as our director, commencing from the Securities and Exchange Commission's declaration of effectiveness of our registration statement on Form F-1, of which this prospectus is a part.
>
> Mr. Singhal sits on the Compensation Committee, Audit Committee and Investment Committee of our parent. Mr. Singhal founded the SBI Group, an investment company, in June 2001, serving as its Managing Director until December 2003, and as Chairman and CEO since that time. Mr. Singhal has also served as a director and member of the Compensation Committee of Small World Kids Inc. since October 2004. Mr. Singhal owns Bedrock Securities, a NASD licensed broker dealer and its sister company, Bedrock China Futures, Ltd., which is an Asian securities trading company. Mr. Singhal worked for SBI-E2 Capital, a member of Softbank Investment Group,

from 2001 to 2003. Mr. Singhal holds a B.S. degree in Business Administration from Seaver College at Pepperdine University.

33.     These statements in the Prospectus regarding defendant Singhal are materially misleading because they fail to disclose the true, adverse facts concerning defendant Singhal's background and close connections to numerous public companies that have been plundered, sued and/or have been investigated by government regulators, the SEC, or one or more attorneys general, or had findings made against them made by the NASD.

34.     The importance of defendant Singhal to the oversight of the Company cannot be understated. Accordingly, the Prospectus identifies defendant Singhal as a member of each of the three committees of the Board of Directors of the Company, including: (i) the Audit Committee; (ii) the Compensation Committee; and (iii) the Corporate Governance and Nominating Committee.

35.     As a member of the Audit Committee, defendant Singhal was responsible for the crucial oversight of Xinhua's accounting and financial reporting processes, and the audits of the financial statements of the Company -- duties that are directly called into question by the serious allegations of RICO, fraud, and NASD and SEC regulatory violations of companies defendant Singhal has been associated with. These duties specifically included, in part, the following:

> Appointing, retaining and overseeing the work of the independent auditors, including resolving disagreements between the management and the independent auditors relating to financial reporting;
>
> Pre-approving all auditing and non-auditing services permitted to be performed by the independent auditors;
>
> Reviewing annually the independence and quality control procedures of the independent auditors;
>
> Discussing material off-balance sheet transactions, arrangements and obligations with the management and the independent auditors;
>
> Reviewing and approving all proposed related party transactions;

Discussing the annual audited financial statements with the management;

Annually reviewing and reassessing the adequacy of our audit committee charter;

Meeting separately with the independent auditors to discuss critical accounting policies, management letters, recommendations on internal controls, the auditor's engagement letter and independence letter and other material written communications between the independent auditors and the management; and

Attending to such other matters that are specifically delegated to our audit committee by our board of directors from time to time.

36.     As a member of the Compensation Committee, defendant Singhal was also responsible for the oversight over the conduct and performance of other officers and directors of the Company, including defendant Bush -- again, duties that are directly called into question by the credible and serious allegations of RICO, fraud, and NASD and SEC regulatory violations. These duties specifically included, in part, the following:

Reviewing and approving executive compensation;

Reviewing periodically and managing any long-term incentive compensation plans, share option plans, annual bonuses, employee pension and welfare benefit plans;

Determining our policy with respect to change of control or "parachute" payments; and

Managing and reviewing director and executive officer indemnification and insurance matters.

37.     As a member of the Corporate Governance and Nominating Committee, defendant Singhal was also responsible for the critical oversight of the conduct of the members of the Company, as well as its Board and senior management. These duties specifically included, in part, the following:

Recommending to the board nominees for election or re-election to the board or for appointments to fill any vacancies;

Reviewing annually the performance of each incumbent director in determining whether to recommend such director for an additional term;

Overseeing the board in the board's annual review of its own performance and the performance of the management; and

Considering, preparing and recommending to the board such policies and procedures with respect to corporate governance matters as may be required to be disclosed under the applicable laws or otherwise considered to be material.

38.    In addition to the foregoing, the role of defendant Singhal as a member of the Board of Directors and as a member of each of the Board's oversight Committees was also critical to investors because the Prospectus clearly stated that one of the Company's key "Strengths," was its purported "***Strong and Experienced Management Team***." As evidence of this, the Prospectus also stated, in part, the following:

**Our Strengths**

**We believe we have the following competitive strengths:**

\*     \*     \*

**Strong and experienced management team.**

***Our management team is one of our strongest assets***. Our management team has a mix of Chinese cultural experience and international media operational skills, and brings international standards to our content offerings. Ms. Fredy Bush, our Chief Executive Officer and the Chairman of our Board, has 20 years of experience building businesses in Asia. In 2006, Ms. Bush received CNBC's Asia Entrepreneur of the Year Award. Ms. Bush***, together with our management team, focuses on innovative business and strategic initiatives and the execution of our business model.*** In addition, we employ experienced and capable managers to run our business groups and operations.

(Emphasis added).

39.     These statements in the Prospectus were materially misleading because the Prospectus failed to disclose that rather than being "one of our strongest assets," the Company's management team, included defendant Singhal and his close associations with companies accused of fraud.   The statements are also false and misleading because they fail to disclose the extent to which defendants Bush and Singhal personally profited from certain related party transactions.

40.     In addition to the foregoing, Defendants' failed to disclose that the Company's CFO had a close connection with many companies accused of stock fraud, market manipulation, securities related abuses and subject to regulatory actions.  This had a significant adverse impact on investors' ability to reasonably evaluate the purpose and effect of the Risk Disclosures contained in the Prospectus.  The risk disclosures that were directly impacted by these material omissions included, in part, the following:

> Our business depends substantially on the continuing efforts of our key executives. Our business may be severely disrupted if we lose their services.
>
> Our future success heavily depends upon the continued services of our key executives, particularly Fredy Bush, who is the Chief Executive Officer of our company. Our Chief Executive Officer also serves as the Chief Executive Officer of our parent company and will be required to devote a substantial amount of time in that capacity. We rely on the expertise of our key executives in business operations and the advertising and media industries and on their relationships with our shareholders, business partners and regulators. If one or more of our key executives are unable or unwilling to continue in their present positions, we may not be able to replace them easily or at all.   Therefore, our business may be severely disrupted, our financial condition and results of operations may be materially and adversely affected and we may incur additional expenses to recruit and train personnel. In addition, if any of these key executives joins a competitor or forms a competing company, we may lose customers and business partners, and our operating results may be adversely affected. Each of our executive officers has entered into an employment agreement with us that contains confidentiality and non-

competition provisions.  If any disputes arise between our executive officers and us, these agreements may not be enforced effectively.

Our senior management and employees have worked together for a short period of time, which may make it difficult for you to evaluate their effectiveness and ability to address challenges.

41.     Moreover, it was precisely because investors believed that these risk disclosures represented contingencies -- not present actualities related to the material omissions regarding defendant Singhal and the foreseeable consequences thereof -- that they were willing to pay a considerable premium for shares of the Company at the time of the IPO.    In fact, according to the Prospectus, investors paid a premium of over $8.00 per share, compared to the Company's "Book Value" at that time, as follows:

If you purchase ADSs in this offering, you will pay more for your ADSs than the amount paid by our existing shareholders for their ADSs on a per ADS basis. As a result, *you will experience immediate and substantial dilution of approximately $8.31 per ADS* (assuming no exercise by the underwriters of options to acquire additional ADSs), representing the difference between our net book value per ADS  as of December 31, 2006, after giving effect to this offering, and the initial public offering price of $13.00 per ADS. In addition, you may experience further dilution to the extent that our ADSs are issued upon the exercise of share options.

(Emphasis added).

42.     According to the Prospectus, in connection with the IPO, the following *Company insiders sold at least 5.249 million shares* of their privately-held Company stock, as follows:

| | Common shares Beneficially owned prior to this Offering | | Common shares being sold in this Offering | | Shares beneficially owned after this Offering | |
|---|---|---|---|---|---|---|
| | Number | % | Number | % | Number | % |
| **Directors and executive officers:** | | | | | | |
| Fredy Bush(4) | 9,365,000 | 9.6% | 1,500,000 | 1.5% | 7,865,000 | 5.8% |
| Shelly Singhal(5) | 6,414,756 | 6.6% | -- | -- | 6,414,756 | 4.7% |
| Zhu Shan | 350,000 | 0.4% | -- | -- | 350,000 | 0.3% |

| | Common shares Beneficially owned prior to this Offering | | Common shares being sold in this Offering | | Shares beneficially owned after this Offering | |
|---|---|---|---|---|---|---|
| | Number | % | Number | % | Number | % |
| Graham Earnshaw | 350,000 | 0.4% | -- | -- | 350,000 | 0.3% |
| Alex Fan | 147,093 | 0.2% | -- | -- | 147,093 | 0.1% |
| Teddy Liu Weidong | 68,430 | 0.1% | -- | -- | 68,430 | 0.1% |
| Yu Gang | 436,860 | 0.4% | -- | -- | 436,860 | 0.3% |
| Stephen Xie Wei | 1,780,799 | 1.8% | -- | -- | 1,780,799 | 1.3% |
| Aloysius T. Lawn | -- | -- | -- | -- | -- | -- |
| John H. Springer | -- | -- | -- | -- | -- | -- |
| Zhao Li | 5,817,905 | 6.0% | -- | -- | 5,817,905 | 4.3% |
| Long Qiu Yun | -- | -- | -- | -- | -- | -- |
| All directors and executive officers as a group | 24,730,843 | 25.3% | 1,500,000 | 1.5% | 23,230,843 | 17.1% |
| **Principal and selling shareholders:** | | | | | | |
| Xinhua Finance Limited | 50,054,618 | 51.3% | -- | -- | 50,054,618 | 36.9% |
| Patriarch Partners Media Holdings, LLC | 19,139,655 | 19.6% | 9,000,000 | 9.2% | 10,139,655 | 7.5% |
| Sino Investment Holdings Limited(16) | 5,514,756 | 5.7% | -- | -- | 5,514,756 | 4.0% |
| Dragon Era Group Limited(17) | 9,365,000 | 9.6% | 1,500,000 | 1.5% | 7,865,000 | 5.8% |
| Zhao Li | 5,874,493 | 6.0% | -- | -- | 5,854,493 | 4.3% |
| Honour Rise Services Limited | 6,532,071 | 6.7% | -- | -- | 6,532,071 | 4.8% |
| Dennis L. Pelino Family Trust(19) | 5,514,756 | 5.7% | 1,038,000 | 1.1% | 4,476,756 | 3.3% |

\*   \*   \*

(5)    […] The shareholders of Sino Investment are Mr. Singhal and Sino (US) LLC. Mr. Singhal holds 89.4% of the equity of Sino (US) LLC…

\*   \*   \*

(16)    […] The shareholders of Sino Investment are Mr. Shelly Singhal and Sino (US) LLC, who share investment and voting power over the shares held by Sino Investment. …. Mr. Singhal holds 89.4% of the interest of Sino (US) LLC. …

(17)    [...] Dragon Era Group Limited is owned by Fredy Bush's family trust. [...]

(19)    [...] The trustee is Mr. Dennis Pelino, who has investment and voting power over the shares held by the trust... Mr. Pelino is an independent director of our parent, Xinhua Finance Limited, and serves on its audit, compensation and investment committees. Mr. Pelino also serves on the board of Xinhua Financial Network Limited. [...].

## THE TRUTH ABOUT
## XINHUA IS BELATEDLY DISCLOSED

43.    Only weeks after the Company went public, Xinhua News Agency – whose association with the Company played a key role in its early success – sold its remaining shares of Xinhua to "counter the incorrect perception" that it controlled the Company. On April 28, 2007, Xinhua News Agency published a notice saying that it had "terminated" its relationship with the Company "as part of a campaign to distance Xinhua News Agency from many users of the Xinhua name that have "no link to news production, have a chaotic management system or even have destroyed the brand." James Areddy and David Reilly, *Riding the Tiger*, *Wall Street Journal*, July 7, 2007.

44.    On May 18, 2007, after the close of trading, Xinhua surprised investors by announcing that defendant Singhal had suddenly resigned from the Board of the Company, and the board of its parent, effective immediately. At that time, Defendants published a release that explained defendant Singhal's unscheduled departure as related to certain "other priorities," in part, as follows:

Mr. Shelly Singhal has resigned from the Boards of both companies, as well as from all executive and managerial positions. His departure is immediate.

"Mr. Singhal provided important assistance throughout the development of Xinhua Finance Ltd. and Xinhua Finance Media," commented Chairman and CEO Fredy Bush, "He remains a strong

supporter of both companies, and he has our thanks for his tireless efforts in contributing to our successes to date."

"It is a difficult decision to leave these two Companies that I have helped to grow, but there are other priorities that will require my full attention, so it is clearly the right thing to do now," Mr. Singhal wrote in a letter to the Boards, "There is a deep pool of entrepreneurial and managerial talent in place to insure continued progress. I remain a loyal and long-term follower and shareholder, and wish the two Companies well."

45.     Adding further investor shock and confusion, the following day, Saturday, May 19, 2007, at 5:19 am Eastern Standard Time, Defendants published a second release related to the immediate departure of defendant Singhal, which repeated verbatim the above language set for in the immediately preceding paragraph but which then went on to add curious new language:

*Mr. Singhal is currently the subject of a civil suit which is unrelated to Xinhua Finance. Mr. Singhal has advised that he believes this claim to be without merit and that he intends to dispute it vigorously.*

Fredy Bush added, "We wish Shelly the best and are grateful to him for his efforts on behalf of Xinhua Finance. During his time with Xinhua Finance, we believe Shelly has conducted himself with integrity and professionalism. In the meantime, *we look forward to putting this matter behind us* and focusing on what we do best-continuing to build our business in China and creating value for our shareholders."

(Emphasis added).

46.     Investors would soon know the true significance of the Singhal departure -- and they would also learn of the protest departures of Lynn E. Turner and Jonathan Weil -- after *Barron's* published an exposé that revealed defendant Singhal had a long history of alleged fraud, stock manipulation and organized corruption. The report published by *Barron's* stated the following:

34

***Barron's***

May 21, 2007 Monday

**HEADLINE: Ignoring an Inconvenient Truth**

[Last week] two of the most prestigious staffers at Glass Lewis resigned after apparently concluding that their new parent company, Xinhua Finance, would have flunked a Glass Lewis review of its corporate transparency. It turns out that Xinhua Finance Media's IPO prospectus failed to mention some awkward facts about the company's then-chief financial officer, Shelly Singhal.

The 39-year-old Singhal was simultaneously the company's CFO and an investment banker and stock broker who runs the Newport Beach, Calif., firm Bedrock Securities. And since April 2006, Singhal's firm has been under a cease- and-desist order from the National Association of Securities Dealers, as the regulators seek to suspend Bedrock for violating several SEC rules. I called Bedrock, but no one returned my message.

Singhal's name actually came up in *Barron's* May 7 issue ("New Controversy for iMergent"), where we reported that he was fighting a private civil racketeering suit in California courts for his investment activities. He got involved with Xinhua Finance as a major investor in 2003. He had previously been a major investor in a couple of companies called AremisSoft and ACLN -- which turned out to be outrageous frauds.

By coincidence, perhaps, our mention of Singhal on May 7 was followed Tuesday by a Xinhua Finance Media announcement that Singhal was moving from his role as chief financial officer of the U.S.-listed unit to become head of corporate development for the Cayman Island-based parent company's capital markets activities. Taking his place as CFO was David Wang, who had worked for Singhal's brokerage firm and investment bank.

Friday, Glass Lewis' head of research, Lynn E. Turner, resigned. Before joining Glass Lewis, Turner had been arguably the best accounting regulator to serve at the Securities and Exchange Commission. Wednesday, Glass Lewis' managing director and research editor, Jonathan Weil, resigned. He had come to the proxy advisory firm from the Wall Street Journal, where he was the first reporter to blow the whistle on Enron.

"I am uncomfortable with and deeply disturbed," Weil said in his

resignation letter, "by the conduct, background and activities of our new parent company Xinhua Finance Ltd., its senior management, and its directors. To protect my reputation, I no longer can be associated with Glass Lewis or Xinhua Finance."

Shortly after I called Xinhua Finance Friday afternoon to ask about Singhal, the company put out a press release announcing that he was resigning from the boards of both Xinhua Finance and its Nasdaq-listed subsidiary, and also leaving his management positions. "It is a difficult decision to leave these two Companies that I have helped to grow," he said in the announcement, "but there are other priorities that will require my full attention, so it is clearly the right thing to do now."

A few moments later, I was on the phone with Xinhua Finance CEO Freddy Bush. She praised Singhal's skills at dealing with regulatory regimes in the U.S., Japan and China. "Shelly's got some very unique skills," she said.

I asked if she'd known about the NASD action against Singhal's brokerage firm when putting together a prospectus for Xinhua Finance Media that omitted that fact. After a long speech about how she had relied on the best advice of the company's underwriters and lawyers, she acknowledged that, "yes," she had known about the NASD problems of Singhal's brokerage firm. Her legal advisers told her, she said, that the prospectus didn't have to make that disclosure.

"Shelly continues to believe that these allegations are without merit," she continued. She also pointed out that Xinhua Finance has thousands of employees in more than a dozen countries. And even the proxy adviser Glass Lewis will survive the resignations of its marquee names, she asserted. "Glass Lewis has a very large group of incredibly talented people. Their product is world-class."

47.    When Singhal was stripped of all associations with the Xinhua companies, Wang was promoted to the post of CFO of parent XFL. *Barron's* called Wang a "Robin to Singhal's Batman" in a May 28, 2007 article and Wang worked as recently as December 2006 at Bedrock Securities, owned by defendant Singhal.

48.    Defendant Bush, who promised to provide China with "Western-style financial information" and advised Taiwan's government on futures-trading systems, rules, and regulations in

the U.S. to establish Taiwan's first official futures market, claimed, after she and the Company failed to disclose material information in the IPO, that she "know[s] less than [she] should about American business culture and nuances." James Areddy and David Reilly, *Riding the Tiger*, *Wall Street Journal*, July 7, 2007.

49.    Other Glass, Lewis resignations stemming from the Company's acquisition by Xinhua and its failure to disclose material, adverse facts in the Prospectus, including, but not limited to, the background and business connections of defendant Singhal included Steve Kirkpatrick, former Managing Director of Research/Sales; Hope Taitz, a former sales representative in Denver; Luke Braly, a former analyst in Denver; Jackie Caldwell, the former top sales representative on the proxy side of Glass Lewis's operations in Denver; and Mike Glinsky, a former managing director in Denver.

50.    In fact, a former Glass Lewis researcher ("CW1") stated that defendant Singhal's association with AremisSoft was among his top reasons for leaving Glass Lewis. "This was a company that didn't exist; it was a total fraud. As the investment banker, I would expect him to have found that out." CW1 also stated:

> "If I had seen Cruttenden Roth up there on his resume [defendant Singhal's resume], I would have protested more loudly. It didn't occur to me until months later that he had been at Cruttenden Roth. They have a reputation for taking a lot of frauds public. I used to see one IPO pipe deal come out after another that had been borne out of Cruttenden Roth."

51.    Another former Glass Lewis researcher ("CW2") stated the reasons for his/her departure form Glass, Lewis:

> "Shelly Singhal had some actions that were pending against him, which I felt should have been disclosed in that IPO, especially because of their sensitive nature."

"Any time you can call the CFO's integrity into question and there are pending lawsuits against him, I think it would persuade your average, everyday prudent investor to invest elsewhere if they had read those disclosures."

52.     Various former Glass Lewis employees viewed Xinhua as the perfect candidate for a Glass Lewis investigative report as it was typical of the problematic companies Glass Lewis writes about.  Reasons for this include, but are not limited to:

(a)     Xinhua's corporate governance was contrary to the Glass Lewis business model. Material issues, including pending lawsuits, were not disclosed.  XFL's ownership of investor relations, public relations, and proxy solicitation firms, constituted a conflict of interest -- a problem that would destroy the Glass Lewis model which was hinged on independence.

(b)     XFL and Xinhua executives and directors sold their stock on the IPO and had allocated a large portion of Xinhua to themselves.  Former Glass Lewis employees viewed it as a failure in the governance of XFL to allow the ownership of the subsidiary to be held so disproportionately by the executives of the parent.

(c)     Xinhua's public filings made it difficult to understand how the Company was going to make money and did not clearly disclose whether the Company had contracts and the details of any such contracts.

(d)     XFL and Xinhua failed to comply with many, if not all, of Glass Lewis' proxy voting or corporate governance guidelines.

53.     At the time of Xinhua's acquisition of Glass Lewis, Arthur Levitt, former chairman of the SEC from 1993 to 2001, was serving as a special advisor to the Glass Lewis board.  Mr. Levitt was extremely upset when he found out about Xinhua's acquisition of Glass Lewis.

54.     Since the news about Xinhua became public, Glass Lewis has been losing customers and has had to pay attractive bonuses to retain its remaining research analysts.

55.     The combination of defendant Singhal's unscheduled sudden departure, the realization that Lynne E. Turner and Jonathan Weil had resigned from the Company's subsidiary in protest over the omissions related to defendant Singhal, and the fact that Defendants had known about defendant Singhal's past and had omitted it from the Prospectus, decimated the price of Company stock. Accordingly, as shares resumed trading on Monday, May 21, 2007, Xinhua's ADSs immediately fell an additional 16% off an already depressed share price, to trade at a new all-time low of $8.31 per share. Moreover, despite having gone public only weeks before at $13.00 per share, this share price decline represented a loss of over 36% from the IPO price.

56.     On September 17, 2007, Standard & Poor's ("S&P") further downgraded the credit rating of Xinhua's parent company, XFL, to "B." S&P stated: "We lowered the rating on Xinhua Finance to reflect our continued concern over the company's evolving corporate governance issues, stabilization of the senior management team and the potential business impact of the negative media coverage of the company since May."

57.     As further evidence of Xinhua's need to increase its corporate governance, on September 27, 2007 the Company hired four new directors and created a new position for an internal auditor.

## CAUSATION AND ECONOMIC LOSS

58.     In connection with the IPO, Defendants signed a materially untrue and misleading Prospectus filed with the SEC and made available to shareholders a materially untrue and misleading Prospectus. These filings were essential in allowing Defendants to complete the IPO of over 23.076

million Xinhua shares and raise approximately $300 million, and to create a public market for trading in Company stock, immediately thereafter.

59.     On May 21, 2007, after Defendants' prior misrepresentations and omissions came to be revealed and were apparent to investors, the ADSs of Xinhua declined precipitously -- evidence that the prior artificial inflation in the price of Company shares was eradicated. As a result of their purchases of Xinhua ADSs in connection with the IPO, including those who purchase ADSs traceable to the Offering in the public markets immediately thereafter, Plaintiffs and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

60.     By misrepresenting the Company's business and prospects, and by failing to reveal the true background of defendant Singhal, Defendants presented a misleading image of Xinhua's operations, business, controls and foreseeable prospects. Within the IPO Prospectus, Defendants repeatedly emphasized the ability of the Company to provide high-quality management and further stated that this was one of the key strengths of the Xinhua operations. These claims caused and maintained the artificial inflation in Xinhua's ADSs at the time of the IPO, and thereafter until the truth about the Company was ultimately revealed to investors.

61.     Defendants' materially untrue and misleading statements caused Xinhua shares to trade at artificially inflated levels from the time of the IPO, when they were offered at $13.00 per share, and thereafter until the truth about defendant Singhal and the Company was reported and exposed by *Barron's* in late-May 2007.

62.     On May 21, 2007, however, after investors learned the truth about defendant Singhal's unscheduled sudden departure, and after they realized that Lynne E. Turner and Jonathan Weil had resigned from the Company's subsidiary in protest over the omissions related to defendant Singhal, and after investors learned that Defendants had known about defendant Singhal's past and

had omitted it from the Prospectus, the price of Company shares collapsed. Thus, investors' realization of the material omissions caused by Defendants not to be included in the Prospectus had an immediate, adverse impact on the price of Xinhua ADSs.

63. These belated revelations also evidenced Defendants' prior misrepresentation of Xinhua's operations and business prospects due to Defendants' false and misleading statements. As investors and the market ultimately learned, the Company's controls, procedures, and prior business prospects had been overstated and misreported. As this adverse information became known to investors, the prior artificial inflation was immediately eliminated from Xinhua's share price, and shareholders were damaged as a result of this related share price decline.

64. As a direct result of investors learning the truth about the Company, on May 21, 2007, Xinhua's stock price collapsed to a record low of $8.31 per share, compared to the IPO price of $13.00 per share -- a decline of over 36% compared to the IPO price and a decline of over 18% compared to the trading price of Xinhua prior to this news reaching the markets. This dramatic share price decline eradicated much of the artificial inflation from Xinhua's share price, causing real economic loss to investors who purchased ADSs in, or in connection with, the Xinhua IPO.

65. In sum, as the truth about Defendants' materially untrue statements and omissions and course of conduct became known to investors, and as the artificial inflation in the price of Xinhua shares was eliminated, Plaintiffs and the other members of the Class were damaged, suffering an economic loss in an amount to be determined at trial.

66. The decline in Xinhua's stock price following the departure of defendant Singhal and following publication of the *Barron's* exposé was a direct result that the nature and extent of Defendants' misrepresentations and omissions contained in the Prospectus became known to investors and to the market. The timing and magnitude of Xinhua's stock price decline the following

day, when trading resumed, negates any inference that the losses suffered by Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to Defendants' material misrepresentations and omissions. During the same period in which Xinhua's share price fell over 18% as a result of Defendants' misrepresentations and omissions being revealed, the Standard & Poor's 500 securities index was relatively unchanged.

67.    The economic loss, *i.e.* damages suffered by Plaintiffs and other members of the Class, was a direct result of Defendants' misrepresentations and omissions being revealed to investors, and the subsequent significant decline in the value of the Company's ADSs was also the direct result of Defendants' prior misstatements and omissions being revealed.

## CLASS ACTION ALLEGATIONS

68.    This is a class action on behalf of all persons who purchased Xinhua ADSs pursuant to the March 2007 Prospectus and on behalf of all persons who purchased or acquired ADSs of Xinhua between March 8, 2007 and May 21, 2007, inclusive (the "Class"), excluding Defendants. Class members are so numerous that joinder of them all is impracticable.

69.    Common questions of law and fact predominate and include (i) whether Defendants violated the Securities Act; (ii) whether the Xinhua IPO Prospectus contained materially untrue and misleading statements and/or omitted to disclose facts necessary to make statements made not materially misleading; and (iii) the extent of and appropriate measure of damages.

70.    Plaintiffs' claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiffs will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**NO SAFE HARBOR**

71.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the untrue statements of material fact or material omissions pleaded in this complaint. The vast majority of the specific statements pleaded herein were not identified as "forward-looking statements" in the Prospectus.

72.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those untrue forward-looking statements because at the time each of those statements was made, the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false.

**COUNT I**

**FOR VIOLATIONS OF § 11 OF THE SECURITIES ACT AGAINST XINHUA, THE INDIVIDUAL DEFENDANTS, AND THE UNDERWRITER DEFENDANTS**

73.     Plaintiffs incorporate each and every allegation above as if stated herein.

74.     The Individual Defendants each signed and/or assisted in the preparation of Xinhua's Prospectus filed with the SEC and distributed it to investors. The Underwriter Defendants each permitted their names to be included on the cover of the Prospectus as the Underwriters.

75.     On or about March 9, 2007, Defendants completed an IPO of over 23.076 million ADSs of Xinhua -- including the 17.307 million shares sold by Company and 5.769 million shares sold by Company insiders -- at $13.00 per share, for total proceeds of approximately $300 million.

76.     Each of the statements alleged herein relating to Xinhua made in the March 2007 Prospectus was materially untrue or misleading when issued. The true but concealed facts were that

defendant Singhal had a long history of alleged stock manipulation, securities fraud and RICO violations that had already resulted in a string of law suits and regulatory enforcement actions -- including several shareholder class actions related to companies in which he was also an early stage investor, a RICO civil suit and a Cease and Desist Order made by the NASD. Defendant Bush also had undisclosed tax problems. Ultimately, Lynne E. Turner and Jonathan Weil resigned from the Company's subsidiary in protest over the omissions related to defendant Singhal. In addition, at that time, investors also first learned that Defendants had long-known about defendant Singhal's past and had omitted it from the Prospectus.

77.     Defendants, with the exception of Xinhua, the issuer (whose liability for the misstatements is absolute), owed to the purchasers of the ADSs, including Plaintiffs and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus at the time it became effective, to assure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

78.     Defendant Singhal and Bush of Xinhua were signatories to the Registration Statement and the Underwriter Defendants were responsible for the preparation of the Prospectus. By virtue of the material misrepresentations contained in the Prospectus, Plaintiffs and the Class have been damaged.

79.     The Underwriter Defendants owed to the purchasers of the ADSs, including Plaintiffs and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus at the time it became effective, to assure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

80.    The Underwriter Defendants were responsible for the preparation of the Prospectus. By virtue of the materially untrue statements and omissions contained in the Prospectus, Plaintiffs and the Class have been damaged.

81.    By reason of the conduct herein alleged, each Defendant violated § 11 of the Securities Act.

82.    Less than three years elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year elapsed from the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

## COUNT II

### VIOLATION OF § 12(a)(2) OF THE SECURITIES ACT AGAINST XINHUA, THE INDIVIDUAL DEFENDANTS, AND THE UNDERWRITER DEFENDANTS

83.    Plaintiffs repeat and reallege each and every allegation contained above.

84.    This Count is brought by Plaintiffs pursuant to Section 12(a)(2) of the Securities Act [15 U.S.C. § 77l(a)(2)] on behalf of all purchasers of Xinhua ADSs in connection with and traceable to the IPO. This cause of action is brought against Xinhua, the Individual Defendants, and the Underwriter Defendants.

85.    The Company, the Individual Defendants, and Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the Xinhua ADSs offered pursuant to the Prospectus.

86.    The Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. Defendants' actions of solicitation included participating in the preparation of the Prospectus which contained materially untrue statements and omissions.

## COUNT III

### VIOLATIONS OF § 15 OF THE SECURITIES ACT AGAINST
### THE INDIVIDUAL DEFENDANTS

87.     Plaintiffs repeat and reallege each and every allegation contained above.

88.     This Count is brought pursuant to § 15 of the 1933 Act against the Individual Defendants and the Controlling Defendants.

89.     Each of the Individual Defendants was a control person of the Company by virtue of his or her position as a director and/or senior officer of the Company or as a result of its large equity interest and ability to appoint multiple directors to the Board of Directors. The Individual and Controlling Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors, officers, and/or major shareholders of the Company.

90.     Each of the Individual Defendants was a culpable participant in the violations of § 11 and §12(a)(2) of the 1933 Act alleged in the Counts above, based on their ability to control the Company.  This ability stems from their management positions and/or ability to control those persons in management positions, access to information regarding the Company's operations and/or financial condition, ability to cause and direct the dissemination of that information, and/or the ability to prevent the issuance of, correct, or cause to be corrected, the misleading statements in the Prospectus.

91.     The Individual Defendants, by reason of their stock ownership and/or positions with the Company, were controlling persons of the Company and are liable under § 15 of the Securities Act.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

(i)     declaring this action to be a class action properly maintained pursuant to Rule

23(a) and (b)(3) of the Federal Rules of Civil Procedure;

(ii)    awarding Plaintiffs and other members of the Class damages together with interest thereon;

(iii)    awarding Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

(iv)    awarding Plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances

## JURY TRIAL DEMANDED

Plaintiffs hereby demands a trial by jury.

Dated: October 22, 2007

*Kim E. Miller (by permission P.E.)*

Kim E. Miller (KM-6996)
***KAHN GAUTHIER SWICK, LLC***
12 East 41th Street – 12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
Email: kim.miller@kgscounsel.com

- and -

Lewis S. Kahn
***KAHN GAUTHIER SWICK, LLC***
650 Poydras Street – Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@kgscounsel.com

U. S. Ott

U. Seth Ottensoser (UO-9703)
Gregory M. Egleston (GE-1932)
***BERNSTEIN LIEBHARD & LIFSHITZ, LLP***
10 East 40th Street, 22nd Floor
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
Email: Ottensoser@bernlieb.com
Email: Egleston@bernlieb.com

***Co-Lead Counsel for Lead Plaintiffs & the Class***

48

## **CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the attached *Consolidated Amended Class Action*

*Complaint For Violations Of Federal Securities Laws* was served upon the following counsel of

record in the actions filed this Court, First Class Mail prepaid, this 22nd day of October 2007:

**WILSON SONSINI GOODRICH & ROSATI**
Douglas Clark, Esq.
1301 Avenue of the Americas, 40th Floor
New York, New York 10019

*Attorneys for Defendants Xinhua Finance*
*Media, Ltd., Fredy Bush, and Shelly Singhal*

**CLIFFORD CHANCE US LLP**
Mark A. Kirsch, Esq.
31 West 52nd Street
New York, New York 10019

*Attorneys for Defendants JP Morgan Securities*
*Inc., UBS AG, CIBC World Markets Corp., and*
*W. R. Hambrecht Co. LLC*

GREGORY M. EGLESTON

12915v1