Douglas J. Clark (DC-8309)
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  (650) 493-9300
Facsimile:   (650) 565-5100

Gideon A. Schor (GS-5932)
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone:  (212) 999-5800
Facsimile:   (212) 999-5899

*Attorneys for Defendants*
*Xinhua Finance Media Limited, Fredy Bush*
*and Shelly Singhal*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE XINHUA FINANCE MEDIA, LTD. SECURITIES LITIGATION<br><br><br>This Document Relates To:<br><br>ALL ACTIONS | **MASTER FILE 07 Civ. 3994 (LTS)**<br><br>**XINHUA DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................. 2

    Procedural History ....................................................................................... 2

    The Parties .................................................................................................... 2

    Allegations Of The Complaint .................................................................... 3

ARGUMENT ...................................................................................................... 5

I.     THE COMPLAINT FAILS TO STATE A SECTION 11 CLAIM BECAUSE XINHUA, AS A FOREIGN PRIVATE ISSUER, LACKED ANY OBLIGATION TO DISCLOSE THE LEGAL PROCEEDINGS ALLEGED IN THE COMPLAINT ............................................................................................ 5

    A.     Foreign Private Issuers ................................................................... 5

    B.     Plaintiffs Must Plead A Specific Legal Obligation To Disclose In Order To State A Claim Under Section 11 ............................ 7

    C.     The SEC Regulations Applicable To Xinhua, As A Foreign Private Issuer, Do Not Require Disclosure Of The Information That Plaintiffs Allege Was Wrongfully Omitted .......................... 8

          1.     The Relevant Requirements Of Form F-1 Exclude Discussion Of Legal Proceedings Required To Be Disclosed On Form S-1 .................... 9

               Form F-1 .............................................................................. 9

               Form S-1 .............................................................................. 10

          2.     Disclosure Would Not Have Been Required Even If Xinhua Had Been Required To Comply With The Stricter Requirements Of Form S-1 ................................... 13

               No Relevant Bankruptcy ...................................................... 13

               No Criminal Conviction Or Being Named As Subject Of Criminal Proceeding ........................................................... 13

               No Injunction Order Against Acting As Investment Adviser, Underwriter, Broker Or Dealer, Or Engaging In Activity To Buy Or Sell Securities ................................................................. 14

               No Suspension From Acting As Adviser, Underwriter, Broker Or Dealer ..................................................................... 14

               No Judicial Determination Of Violation Of Securities Laws .................. 15

No Adjudicated Violation Of Federal Commodities Law ........................ 16

3.    The SEC's Policy Decision To Reduce Disclosure Obligations For Foreign Private Issuers Deserves Deference............................................. 17

D.    There Is No Omission Of A Required Fact Or A Fact Necessary To Make The Statements Not Misleading........................................................................... 22

1.    The Complaint Alleges No Affirmatively False Statements, And The Prospectus's Mere Listing of Singhal's Positions, Without Touting The Performance Of His Other Entities, Was Not Misleading................................................................................................. 22

2.    The Second Circuit Has Rejected Any Duty To Disclose Unproven Claims That Allegedly Concern Integrity Or Mismanagement ............... 26

3.    Disclosure Was Not Warranted Under A Theory Of Materiality In This Context Where Xinhua Was Subject To Limited Disclosure Requirements As A Foreign Private Issuer ............................................... 30

E.    There Was No Failure To Disclose Acquisitions That "Enriched Insiders" ........ 32

F.    The Allegations Fail To Comply With Rule 9(b) ................................................. 34

II.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTIONS 12 AND 15........................................................................................................................... 34

CONCLUSION.......................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alton Partners v. Xinhua*, 07 Civ. 4443 (S.D.N.Y.) (LTS) .............................................................2

*Am. High-Income Trust v. AlliedSignal*, 329 F. Supp. 2d 534 (S.D.N.Y. 2004) ............................2

*Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990).........................................................8, 25

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)...........................................................................7, 8

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) .............................22

*Chiarella v. United States*, 445 U.S. 222 (1980) .........................................................................7

*Ciresi v. Citicorp.*, 782 F. Supp. 819 (S.D.N.Y. 1991).................................................................29

*Cooperman v. Individual Inc.*, 171 F.3d 43 (1st Cir. 1999).....................................................8, 25

*Darras v. Xinhua*, 07 Civ. 4144 (S.D.N.Y.) (LTS) ......................................................................2

*DeMaria v. Andersen*, 153 F. Supp. 2d 300 (S.D.N.Y. 2001), *aff'd*, 318 F.3d 170
    (2d Cir. 2003)....................................................................................................7, 35

*De Vries v. Tower Semiconductor Ltd.*, No. 1:03 CV 04999 KMW, 2004 WL
    4088358 (S.D.N.Y. Aug. 23, 2004), *aff'd sub nom. Schiller v. Tower*
    *Semiconductor, Ltd.,* 449 F.3d 286 (2d Cir. 2006) ............................................. *passim*

*Elfenbein v. Am. Fin. Corp.*, 487 F. Supp. 619 (S.D.N.Y. 1980) .................................................28

*GAF Corp. v. Heyman*, 724 F.2d 727 (2d Cir. 1983) ........................................................ *passim*

*Geiger v. The Solomon-Page Group, Ltd.*, 933 F. Supp. 1180 (S.D.N.Y. 1996) ................. *passim*

*Glazer v. Formica Corp.*, 964 F.2d 149 (2d Cir. 1992)............................................................7, 8

*Greenhouse v. MCG Capital Corp.*, 392 F.3d 650 (4th Cir. 2004) .......................................23, 31

*Guo v. U. S. Dep't. of Justice*, 422 F.3d 61 (2d Cir. 2005).....................................................12, 13

*Haft v. Eastland Fin. Corp.*, 755 F. Supp. 1123 (D.R.I. 1991)........................................28, 29, 34

*In re Alliance Pharms. Corp. Sec. Litig.*, 279 F. Supp. 2d 171 (S.D.N.Y. 2003)..............8, 23, 24,
                                                 35

*In re Authentidate Holding Co*rp., No. 05 Civ. 5323 (LTS), 2006 WL 2034644
    (S.D.N.Y. July 14, 2006) ...............................................................................2, 7, 35

*In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) ............................. *passim*

*In re Computervision Corp. Sec. Litig.*, 869 F. Supp. 56 (D. Mass. 1994).......................28, 29, 34

*In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546 (D. Del. 2002)...................................8, 11, 12

*In re Merrill Lynch & Co., Research Reports Sec. Litig.*, 272 F. Supp. 2d 243
    (S.D.N.Y. 2003) ......................................................................................................12

*In re Merrill Lynch & Co., Research Reports Sec. Litig.*, 289 F. Supp. 2d 429
    (S.D.N.Y. 2003) ...........................................................................................7, 11, 12,
                                                                                                                    35

*In re N2K Inc. Sec. Litig.*, 82 F. Supp. 2d 204 (S.D.N.Y.), *aff'd*, 202 F.3d 81 (2d
    Cir. 2000) (*per curiam*).................................................................................7, 8, 12,
                                                                                                                    25

*In re Seachange Int'l Inc. Sec. Litig.*, No. 02-12116 DPW, 2004 WL 240317
    (D. Mass. Feb. 6, 2004)..........................................................................................25

*In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678 (S.D.N.Y. 2000) .......................2, 35

*In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158 (S.D.N.Y. 2003) ....................6, 17

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) ..........................................3

*Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55 (2d Cir. 1996) ...........................24

*Lerner v. FNB Rochester Corp.*, 841 F. Supp. 97 (W.D.N.Y. 1993)...............................24, 28, 29,
                                                                                                                    34

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767
    (LBS), 2003 WL 22882137 (S.D.N.Y. Dec. 4, 2003) ......................................31

*Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) .............................................................8

*Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182 (11th Cir. 2002) ...........................8

*Platsis v. E.F. Hutton & Co.*, 642 F. Supp. 1277 (W.D. Mich. 1986), *aff'd*, 829
    F.2d 13 (6th Cir. 1987) (*per curiam*) .........................................................31, 32

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) .....................................................34, 35

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)........................................................3

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996)....................................................................................24

*Schiller v. Tower Semiconductor, Ltd.*, 449 F.3d 286 (2d Cir. 2006)....................17, 21

*United States v. Matthews*, 787 F.2d 38 (2d Cir. 1986).............................................27, 28, 29

## STATUTES, RULES AND REGULATIONS

15 U.S.C. § 77k................................................................................................................1

15 U.S.C. § 77k(a) .......................................................................................................7, 24

15 U.S.C. § 77l(a)(2) ........................................................................................1, 35

15 U.S.C. § 78o ......................................................................................................35

Fed. R. Civ. P. 9(b) ...............................................................................................34

17 C.F.R. § 229.401(f) ......................................................................................10, 11

17 C.F.R. § 229.401(f)(1)-(6) ................................................................................11

17 C.F.R. § 239.11 ...................................................................................................5

17 C.F.R. § 239.31 ...............................................................................................5, 20

17 C.F.R. § 240.14a-3 ..............................................................................................5

17 C.F.R. § 240.15c-3 ............................................................................................14

17 C.F.R. § 240.15c3-1 ..........................................................................................14

17 C.F.R. § 240.17a-3 ............................................................................................14

17 C.F.R. § 240.17a-4 ............................................................................................14

17 C.F.R. § 240.3a12-3(b) ..................................................................................5, 17

17 C.F.R. § 240.3b-4(b) ...........................................................................................6

17 C.F.R. § 240.405 .................................................................................................6

17 C.F.R. § 249.220f ...........................................................................................5, 20

17 C.F.R. § 249.310 .................................................................................................5

## TREATISES, LAW REVIEWS AND ARTICLES

Edward F. Greene *et al.*, *U.S. Regulation of the International Securities and Derivatives Markets* (2006) ..........................................................................6

Felicia H. Kung, *The Rationalization of Regulatory Internationalization,* 33 Law & Pol'y Int'l Bus. 443 (2002) ...........................................................18

J. Areddy and D. Reilly, *Riding the Tiger*, Wall St. J., July 7, 2007 at A1 ...................................32

## MISCELLANEOUS

Form F-1, 2 Fed. Sec. L. Rep. (CCH) ¶ 6951, at 6061 ....................................5, 9, 20

Form 20-F, 5 Fed. Sec. L. Rep. (CCH) ¶ 29,701, at 21,745 ........................5, 9, 10, 20

Form S-1, 2 Fed. Sec. L. Rep. (CCH) ¶ 7121, at 6235 ...................................5, 10

Adoption of Foreign Issuer Integrated Disclosure System, Securities Act Release
    No. 33-6437, 7 Fed. Sec. L. Rep. (CCH) ¶ 72,407, at 62,029 (Dec. 6,
    1982), 1982 WL 154449 ................................................................................20

Integrated Disclosure System for Foreign Private Issuers, Securities Act Release
    No. 33-6360, [1981-1982] Fed. Sec. L. Rep. (CCH) ¶ 83,054, at 84,641
    (Nov. 20, 1981), 1981 WL 29914 ........................................................11, 18, 19

International Disclosure Standards, Exchange Act Release No. 41014, [1999
    Transfer Binder] Fed. Sec. L. Rep. ¶ 86,112, at 81,723, 1999 WL 44076
    (Feb. 2, 1999) ................................................................................................17

Rules, Registration and Annual Report Form for Foreign Private Issuers,
    Securities Act Release No. 16371, [1979-1980] Fed. Sec. L. Rep. (CCH)
    ¶ 82,363, at 82,547 (Nov. 29, 1979), 1979 WL 169934 ............................20, 21

SEC Release No. 412, 1935 WL 29303 (Nov. 6, 1935) ................................................5

Uniform Integrated Reporting Requirements, Securities Act Release No. 5949,
    1978 Fed. Sec. L. Rep. (CCH) ¶ 81,649, at 80,613 (July 28, 1978), 1978
    WL 170913 ....................................................................................................21

## INTRODUCTION

This securities action arises from the initial public offering ("IPO") of securities by a foreign private issuer, Xinhua Finance Media Ltd. ("Xinhua"), on March 9, 2007. Xinhua is a diversified media company headquartered in Shanghai, China. Plaintiffs assert claims primarily under Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77l(a)(2), respectively, against Xinhua, CEO Fredy Bush and former CFO Shelly Singhal (collectively, the "Xinhua Defendants"), as well as Xinhua's underwriters. The essence of the suit is the omission from the registration statement and prospectus of certain background information concerning Singhal. That information comprised a list of lawsuits and proceedings that were brought against other entities with which Singhal was associated and that are completely unrelated to Xinhua. Although the Consolidated Amended Complaint (the "Complaint" or "CAC") cites to a litany of legal matters, conspicuously absent is a citation to a single judgment or injunction ever issued against *Singhal*. Indeed, by citing numerous suits against *other* entities and individuals, the Complaint relies almost purely on a theory of guilt by association. Nonetheless, Plaintiffs allege that, by "misrepresenting the Company's business and prospects, and by failing to reveal the true background of defendant Singhal, Defendants presented a misleading image of Xinhua's operations, business, controls and foreseeable prospects." CAC ¶ 60; *id.* ¶ 63. These allegations fail because Defendants had no duty to disclose this information as a matter of law.

As a foreign private issuer, Xinhua is subject to distinct regulations that impose disclosure obligations far more limited than those imposed on domestic issuers. The regulations applicable to Xinhua consequently required no disclosure of the litigations and proceedings cited in the Complaint. *See* Section I.A.-C., *infra*. Furthermore, the allegations surrounding the other entities are so completely attenuated from Xinhua and even Singhal himself that, had Xinhua been a domestic issuer and hence subject to much more stringent disclosure obligations, the regulations would still require no disclosure here. *See* Section I.C.2., *infra*. Finally, the

statements that were made in the registration statement and prospectus were not made misleading by the omission of the information alleged in the Complaint. *See* Section I.D., *infra*. Because Plaintiffs do not and cannot plead any duty of disclosure that was triggered by either applicable SEC regulations or the statements that were made, the claims under Sections 11, 12(a)(2) and 15 must be dismissed for failure to state a claim.

## STATEMENT OF FACTS

**Procedural History.** The first complaint was filed in this Court on May 22, 2007. Thereafter, several other complaints were filed. Some but not all of the earlier complaints included fraud claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). *See, e.g.*, *Darras v. Xinhua*, 07 Civ. 4144 (S.D.N.Y.) (LTS) (filed May 25, 2007); *Alton Partners v. Xinhua*, 07 Civ. 4443 (S.D.N.Y.) (LTS) (filed May 30, 2007). On July 25, 2007, the Court signed an Order consolidating the actions and setting for August 20, 2007, a hearing for the appointment of lead plaintiff and counsel. *See* Dkt. No. 14 (July 26, 2007 Order Consolidating Cases and Setting Schedule for Appointment of Lead Plaintiff). After that hearing, the Court appointed the Yen-Li Group as Lead Plaintiffs and required that a consolidated complaint be filed. *See* Dkt. No. 20 (August 22, 2007 Stipulation and Order Appointing Lead Plaintiffs and Approving Selection of Lead Counsel). Lead Plaintiffs filed the Complaint on October 22, 2007.

**The Parties.** Xinhua operates a diversified media company in the People's Republic of China. CAC ¶ 10. Xinhua has five business groups. *Id.*[1] The media production group operates

---

[1] *See also* Declaration of Gideon A. Schor ("Schor Dec."), Ex. 3 (excerpted final prospectus filed March 9, 2007) at p. 1. On a motion to dismiss, a court may consider documents integral to the complaint or incorporated therein by reference. *In re Authentidate Holding Co*rp., No. 05 Civ. 5323 (LTS), 2006 WL 2034644, at *1 (S.D.N.Y. July 14, 2006); *In re Ultrafem Inc. Sec. Litig*., 91 F. Supp. 2d 678, 685 n.6 (S.D.N.Y. 2000). This is true even where the document referenced in the complaint is not fully integrated into the complaint. *Geiger v. The Solomon-Page Group, Ltd.*, 933 F. Supp. 1180, 1182-83 (S.D.N.Y. 1996) (citations omitted). The Court may also consider documents filed with the Securities and Exchange Commission ("SEC"), and/or documents that plaintiffs either possessed or knew about and upon which they relied. *Am. High-Income Trust v. AlliedSignal*, 329 F. Supp. 2d 534, 538, 540 (S.D.N.Y. 2004) (citing

(continued...)

in-house production studios that create and produce business, educational and entertainment programs. *Id.* The broadcasting group distributes Xinhua's programming within China through Inner Mongolia Satellite Television, and produces and syndicates the *Fortune China* series of financial programs, among other things. *Id.* Xinhua also operates a print group, which sells advertising and provides management and information consulting services to *Money Journal* and *Economic Observer*. *Id.* The advertising group creates and places advertising for television, print media and campus billboards. *Id.* The market research group provides services to Xinhua's advertisers. *Id.* Xinhua generates revenue principally by selling advertising on broadcast and print distribution platforms; selling advertising space on newspaper and magazine pages; selling produced television programs; providing advertisement production services; and providing research services. *Id.* Its outlets reach an estimated 210 million potential television viewers, a potential listening audience of 33 million people, and the readers of leading magazines and newspapers. *Id.* Fredy Bush is the CEO and Chairman of Xinhua. CAC ¶ 11(a). Shelly Singhal was CFO and a director of Xinhua until May 15 and 18, 2007, respectively. *Id.* ¶ 11(b).

**Allegations Of The Complaint.** American Depositary Shares ("ADSs") were sold pursuant to Xinhua's IPO on March 9, 2007. CAC ¶ 19. Xinhua filed Amendment No. 2 to its Form F-1 on March 5, 2007. Schor Dec., Ex. 1 (Amend. No. 2 to Form F-1). Its registration statement was declared effective on March 8, 2007. Schor Dec., Ex. 2 (Notice of Effectiveness). The final prospectus was filed on March 9, 2007. CAC ¶¶ 19-20. (For purposes of this Motion, the registration statement and final prospectus are collectively referred to as the "Prospectus.") Singhal resigned on May 15, 2007, from his position as CFO. *Id.* ¶ 11(b). On May 18, 2007, the Company announced his resignation from the boards of Xinhua and its parent. *Id.* On May 21,

---

(...continued from previous page)
*Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000)); *Ultrafem*, 91 F. Supp. 2d at 685 n.6; *Geiger*, 933 F. Supp. at 1182-83 (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991)).

2007, *Barron's* published an article reporting that the Prospectus "failed to mention some awkward facts about the company's then-chief financial officer, Shelley Singhal." *Id.* ¶ 46. The article mentioned several entities with which Singhal was associated, and referred to one entity, Bedrock Securities, against which a Cease and Desist Order was imposed by the National Association of Securities Dealers (the "NASD"[2]). *Id.* The article also mentioned an unrelated civil lawsuit pending against Singhal. *Id.* The article stated that Singhal had resigned from Xinhua the prior week, and that Lynn E. Turner and Jonathan Weil had earlier resigned from Glass Lewis, a Xinhua affiliate; Turner had been head of research, and Weil had been managing director and research editor. *Id.* Plaintiffs claim that Xinhua's share price fell in response to the *Barron's* article. *Id.* ¶ 3.

Plaintiffs fail to mention that the *Barron's* article, in reporting the Cease and Desist Order against Bedrock Securities, erroneously stated that, "since April 2006, Singhal's firm has been under a cease-and-desist order." CAC ¶ 46. In fact, that Order was lifted in December 2006, well before the IPO. *See id.* ¶ 25(a).

The Complaint asserts that the Prospectus failed to disclose the above proceedings; other proceedings involving entities with which Singhal was or is associated, CAC ¶¶ 25(a)-(ii); a personal tax dispute between Bush and the Internal Revenue Service, *id.* ¶¶ 25(jj)-(kk); and business relationships between Xinhua or its parent and several entities from which Singhal and Bush purportedly profited or for which Xinhua purportedly overpaid, *id.* ¶¶ 26-31. Plaintiffs assert a Class Period from March 9, 2007, to May 21, 2007. *Id.* ¶ 1. Unlike some of the predecessor complaints, the Complaint makes no fraud claims under Section 10(b) of the Exchange Act. The Complaint asserts claims under Sections 11, 12(a)(2) and 15 of the Securities Act against the Xinhua Defendants and the underwriters. *Id.* ¶¶ 1, 11-13.

---

[2] The NASD, now known as the Financial Industry Regulatory Authority, is a self-regulatory organization registered with the SEC pursuant to the Exchange Act.

**ARGUMENT**

I. **THE COMPLAINT FAILS TO STATE A SECTION 11 CLAIM BECAUSE XINHUA, AS A FOREIGN PRIVATE ISSUER, LACKED ANY OBLIGATION TO DISCLOSE THE LEGAL PROCEEDINGS ALLEGED IN THE COMPLAINT**

   A. **Foreign Private Issuers**

In defining disclosure obligations under the U.S. securities laws, the SEC has long distinguished between domestic issuers and foreign private issuers.[3]  For numerous categories of disclosure – registration of public securities offerings, periodic financial reporting, and proxy disclosure, among others – the SEC has created different requirements for the two kinds of issuers.  Thus, the SEC requires domestic issuers to file Form S-1 for registration of securities offerings, Form 10-K for annual reports, and Form 14A for proxy disclosure.[4]  By contrast, the SEC requires foreign private issuers to register securities offerings using Form F-1 and to make annual reports on Form 20-F.[5]  The SEC wholly exempts foreign private issuers from proxy reporting requirements.[6]  Courts and commentators alike have recognized that the purpose of

---

[3] The distinction dates back at least to 1935, when the SEC exempted foreign private issuers from Sections 14(a) and 16 of the Exchange Act, concerning proxy disclosure and reporting of insiders' stock trading.  *See De Vries v. Tower Semiconductor Ltd.*, No. 1:03 CV 04999 KMW, 2004 WL 4088358, at *4 (S.D.N.Y. Aug. 23, 2004) (citing SEC Release No. 412, 1935 WL 29303, at *1 (Nov. 6, 1935)), *aff'd sub nom. Schiller v. Tower Semiconductor, Ltd.*, 449 F.3d 286 (2d Cir. 2006).

[4] *See* 17 C.F.R. § 239.11 (requiring filing of S-1); Form S-1, 2 Fed. Sec. L. Rep. (CCH) ¶ 7121, at 6235-6239; 17 C.F.R. § 249.310 (requiring Form 10-K); 17 C.F.R. § 240.14a-3 (requiring Form 14A).  *See also* Schor Dec., Ex. 4 (Form S-1 blank with instructions and requirements).  The most recent version of Form S-1 became effective on November 7, 2006.  *See* 2 Fed. Sec. L. Rep. (CCH) ¶ 7121, at 6235.  All SEC forms cited herein are available on Westlaw in the FSEC-FORMS database.

[5] *See* 17 C.F.R. § 239.31 (requiring foreign private issuers to use Form F-1); Form F-1, 2 Fed. Sec. L. Rep. (CCH) ¶ 6951, at 6061-6065; 17 C.F.R. § 249.220f (requiring foreign private issuers to use Form 20-F); Form 20-F, 5 Fed. Sec. L. Rep. (CCH) ¶ 29,701, at 21,745-21,786.  The most recent versions of Form F-1 and Form 20-F became effective, respectively, on December 1, 2005, 2 Fed. Sec. L. Rep. (CCH) ¶ 6951, at 6061, and February 20, 2007, 5 Fed. Sec. L. Rep. (CCH) ¶ 29,701, at 21,745.  *See* Schor Dec., Exs. 5 and 6 (Form F-1 blank with instructions and requirements, and Form 20-F blank with instructions and requirements).

[6] *See* 17 C.F.R. § 240.3a12-3(b) (exempting foreign private issuers from proxy disclosure); *De Vries*, 2004 WL 4088358, at *4.  Foreign private issuers are exempt from numerous other provisions applicable to domestic issuers:  Section 16 of the Exchange Act, which prohibits

(continued...)

-5-

creating a separate regime of disclosure for foreign private issuers is to lessen the disclosure

burden on such issuers and thereby to encourage such issuers to offer securities in the U.S.

markets.  *See, e.g.*, *De Vries*, 2004 WL 4088358, at *3 (citing authorities); Section I.C.3., *infra*.

Xinhua is a foreign private issuer.  It is a corporation organized under the laws of the

Cayman Islands and headquartered in Shanghai, China.  CAC ¶ 10;[7] *see In re Vivendi Universal,*

*S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 171 (S.D.N.Y. 2003) (defendant corporation organized

under French law is foreign issuer).  Moreover, not only did it register its offering of securities

using Form F-1, but it is also required to make its annual report on Form 20-F.[8]  Schor Dec., Ex.

1 (Amend. No. 2 to Form F-1) at pp. 209-10 & II-4; *De Vries,* 2004 WL 4088358, at *2 (fact that

company filed, *inter alia,* SEC Form 20-F, which is used solely by foreign private issuers,

demonstrates that company is foreign private issuer).

Consistent with the SEC's regime of reduced disclosure obligations for foreign private

issuers, the SEC's regulations applicable to Xinhua, as argued *infra* in Sections I.B. and I.C., did

not require disclosure of its officers' and directors' legal proceedings, as alleged in the

Complaint.  The absence of such a disclosure requirement is fatal to Plaintiffs' claim under

Section 11 of the Securities Act.

---

(...continued from previous page)
certain insiders from profiting from short-term trading in the issuer's stock and requires
disclosure of such insiders' purchases and sales of the issuer's stock; Form 10-Q, which requires
quarterly financial reporting; Form 8-K, which requires current reporting of certain material
events; and Regulation FD, which requires an issuer's intentional disclosure of material
information to be public rather than selective.  *See* Edward F. Greene *et al*., *U.S. Regulation of
the International Securities and Derivatives Markets* (2006) at § 3.03[2][a], [b], [c], pp. 3-16--17
(foreign private issuers are not required to file reports on Form 10-Q or Form 8-K); *id.* at §§ 3.05
& 3.06 at pp. 3-25--26 (exemption from Sections 14(a) and 16); *id.* at § 3.09[8] at p. 3-95
(exemption from Regulation FD).

[7] Schor Dec., Ex. 1 (Amend. No. 2 to Form F-1) at pp. 209-10 & II-4; 17 C.F.R. § 240.405
(Rule 405 of Securities Act); 17 C.F.R. § 240.3b-4(b), (c) (Rule 3b-4(b), (c) of Exchange Act).

[8] Form 20-F is the analogue, for foreign private issuers, of Form 10 (registration under the
Exchange Act) and Form 10-K (annual reporting under the Exchange Act).

**B.    Plaintiffs Must Plead A Specific Legal Obligation To Disclose In Order To State A Claim Under Section 11**

Section 11 of the Securities Act creates a private remedy for any purchaser of a registered security if any part of the registration statement, when such part became effective, "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 11 imposes liability on an issuer of securities and its directors and officers if "a company fails to provide required information or includes misleading statements in the registration statements." *Authentidate*, 2006 WL 2034644, at *6.

To state a claim under Section 11, plaintiff must allege that defendant had a legal obligation to disclose the allegedly omitted information. *In re Merrill Lynch & Co., Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 434 (S.D.N.Y. 2003) (citations omitted). A "material omission . . . is actionable if the omitted facts (1) were required by SEC regulations to be stated therein, or (2) were necessary to make the disclosures in the registration statement not misleading." *In re N2K Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 207 (S.D.N.Y.), *aff'd*, 202 F.3d 81 (2d Cir. 2000) (*per curiam*); *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003).

The Second Circuit has long acknowledged that the securities laws do not require disclosure of a fact simply because it is material. Instead, there must be an independent obligation triggering the duty of disclosure. In *Glazer v. Formica Corp.*, 964 F.2d 149 (2d Cir. 1992), the Court affirmed summary judgment against plaintiffs under Section 10(b) on the ground that the defendant corporation did not have a duty to disclose negotiations leading to a leveraged buyout, rather than on the ground that preliminary negotiations were or were not material. *Id.* at 155-56. The Court emphasized that the Supreme Court and other circuit courts have clearly distinguished between materiality and the duty to disclose. *Id.* at 156 (citing, *inter alia*, *Chiarella v. United States*, 445 U.S. 222, 235 (1980) ("'a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information'") (citation omitted); *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("'[s]ilence, absent a duty to disclose, is

not misleading under Rule 10b-5'") (citation omitted); *Backman v. Polaroid Corp*., 910 F.2d 10, 12 (1st Cir. 1990) (*en banc*) ("'Even if information is material, there is no liability under Rule 10b-5 unless there is a duty to disclose it.'") (citation omitted)).[9]  The *Glazer* Court held that "the mere fact that exploration of merger or LBO possibilities may have reached a stage where that information may be considered material does not, of itself, mean that the companies have a duty to disclose."  964 F.2d at 157.

Courts have applied this same principle to claims under Sections 11 and 12(a)(2).  *See In re Alliance Pharms. Corp. Sec. Litig*., 279 F. Supp. 2d 171, 182 (S.D.N.Y. 2003) ("The securities laws do not require a corporation 'to disclose a fact merely because a reasonable investor would like very much to know the fact'"; there must be a "duty to disclose specific information") (citations omitted); *Cooperman v. Individual Inc.*, 171 F.3d 43, 49-50 (1st Cir. 1999) ("an issuer of securities owes no absolute duty to disclose *all* material information"; plaintiffs must demonstrate that the "securities law imposes on defendants a 'specific obligation' to disclose information of the type that plaintiffs claim was omitted") (emphasis added).[10]

**C.    The SEC Regulations Applicable To Xinhua, As A Foreign Private Issuer, Do Not Require Disclosure Of The Information That Plaintiffs Allege Was Wrongfully Omitted**

Relevant SEC regulations "answer the question as to what material facts are required to be stated in an issuer's registration statement and prospectus."  *N2K*, 82 F. Supp. 2d at 207; *Geiger*, 933 F. Supp. at 1184.  As shown below, the relevant disclosure obligations for a foreign

---

[9]  *See also Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000) ("Even non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information."); *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 552 (D. Del. 2002) ("defendant 'is not required to disclose a fact merely because a reasonable investor would like to know that fact'" under Section 14(e)) (citations omitted).

[10]  *See also Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1190 (11th Cir. 2002) (to require *all* material facts to appear in the prospectus "is simply to wholly ignore and render superfluous [Section 11's] qualifying language 'required to be stated therein or necessary to make the statements therein not misleading'"; such a requirement would lead to "registrants burying the 'shareholders in an avalanche of trivial information – a result that is hardly conducive to informed decisionmaking'") (citing, *inter alia*, *Basic,* 485 U.S. at 231).

private issuer are markedly fewer and narrower than for a domestic issuer.  In particular, foreign private issuers – unlike domestic issuers – have no obligation to disclose their officers' and directors' legal proceedings.

> **1.     The Relevant Requirements Of Form F-1 Exclude Discussion Of Legal Proceedings Required To Be Disclosed On Form S-1**

**Form F-1.**  Form F-1 refers to Regulation S-K and Form 20-F for the requirements applicable to the content of registration statements of foreign private issuers under the Securities Act.  Form F-1, General Instructions, Section II.B, 2 Fed. Sec. L. Rep. (CCH) ¶ 6951, at 6062.  Item 4 of Form F-1, "Information with Respect to the Registrant and the Offering," requires the registrant to furnish the information required by Part I of Form 20-F.  Form F-1, Item 4(a).  *Id.* at 6063.  Part I of Form 20-F includes Items 1 through 13, which impose various disclosure requirements.  Form 20-F, 5 Fed. Sec. L. Rep. (CCH) ¶ 29,701, at 21,751-3 - 21,775.  Item 6 provides a description of the registrant's disclosure requirements concerning its directors, senior management and employees.[11]  Form 20-F, Item 6.  Item 6 requires the foreign private issuer to provide information concerning its directors and senior management that includes the name, business experience, functions and areas of experience in the company and principal business activities performed outside the issuing company, as well as other principal directorships.  Form 20-F, Item 6.A.1-5.  *Id.*  Item 6 further requires the company to disclose the directors' and senior management's compensation for the last financial year, unless such disclosure is not required in the company's home country and is not otherwise publicly disclosed by the company.  Form 20-F, Item 6.B.1.  *Id.*

The only provision that could potentially require disclosure of litigation involving officers and directors is Item 8.A.7 of Form 20-F, which requires the company to provide, under the rubric "Financial Information" (Item 8), information on "any legal or arbitration proceedings,

---

[11] *See also* Item 1 of Form 20-F, "Identity of Directors, Senior Management and Advisors," which requires the foreign private issuer to provide "the names, business addresses and functions of the company's directors and senior management."  Form 20-F, Item 1.A.

including those relating to bankruptcy, receivership or similar proceedings and those involving

any third party, which may have, or have had in the recent past, *significant effects on the*

*company's financial position or profitability*," including "governmental proceedings pending or

known to be contemplated."  Form 20-F, Item 8.A.7 (emphasis added).  Instructions to Item

8.A.7 specify that this Item also requires disclosure of any material proceeding in which any

director, or any member of senior management, is either "*a party adverse* to [the company] or

[its] subsidiaries or *has a material interest adverse* to [the company] or [its] subsidiaries."  *Id*.

Nowhere does Form F-1 or Form 20-F require the disclosure of any proceeding or

litigation in which any director, or any member of senior management, was involved at any time

(unless an officer or director is a party adverse to the company).  Nor does Form F-1 require the

foreign private issuer to report any orders, judgments or decrees entered against any director or

member of senior management for violation of any law.  Thus, there are no allegations in the

Complaint that would trigger disclosures under Item 8.A.7.  Although citing numerous lawsuits,

the Complaint does not allege that any such lawsuit involves Xinhua as a party or threatens

Xinhua's financial position or profitability.  The Complaint does not allege any proceeding in

which Singhal or Bush is adverse to Xinhua.

**Form S-1.**  In stark contrast to foreign private issuers such as Xinhua, domestic issuers

are subject to the more specific and detailed disclosure requirements contained on Form S-1.  2

Fed. Sec. L. Rep. (CCH) ¶ 7121, at 6235-6239.  In particular, Item 11(k) of Form S-1 requires

disclosure of the information specified in Item 401(f) of Regulation S-K.[12]  Item 401(f), entitled

"Involvement in Certain Legal Proceedings," requires a registrant to disclose its officers' and

directors' involvement in certain legal proceedings.  *See* 17 C.F.R. § 229.401(f).  Of critical

significance here, Form F-1 does not require compliance with Item 401(f); indeed, Form F-1

does not even mention Item 401(f).

---

[12] *See* Form S-1, Item 11(k), 2 Fed. Sec. L. Rep. (CCH) ¶ 7121, at 6237-2; Regulation S-K, Item 401(f), 17 C.F.R. § 229.401(f), Schor Dec., Ex. 7 (Item 401(f)).

Item 401(f) requires a domestic issuer to describe in its registration statement particular types of "involvement in certain legal proceedings" for executive officers and directors where such proceedings (1) occurred in the past five years and (2) are "material to an evaluation of the ability or integrity" of any such officer or director. 17 C.F.R. § 229.401(f), Schor Dec., Ex. 7 (Item 401(f)). Item 401(f)(1)-(6) enumerate six types of legal proceedings to be described if applicable. *See* 17 C.F.R. § 229.401(f)(1)-(6). The omission of these disclosure requirements from Form F-1, and the inclusion of such requirements on Form S-1, is dispositively significant. *See Digital Island*, 223 F. Supp. 2d at 552 (comparing regulation's requirement that certain specific categories of information be disclosed with regulation's non-requirement that types of transactions at issue be disclosed). Because Form F-1 does not require disclosure of such involvement in legal proceedings, no duty to disclose that information arose under SEC regulations.[13]

*Merrill Lynch*, 289 F. Supp. 2d 429, is instructive. There, plaintiffs sued a mutual fund that invested in the common stock of some companies covered by Merrill Lynch analysts. According to plaintiffs, the fund's registration statements and prospectuses failed to disclose that the fund's broker-dealer affiliate provided investment banking services to companies in which the fund invested and that the broker-dealer's consultants received lucrative incentives for selling shares of the fund. The Court reviewed the information whose disclosure was required by SEC Form N-1A. The Court held that there was no duty to disclose where "Form N-1A requires disclosure about investment strategies and risk [but] [n]o portion of Form N-1A requires disclosure of the investment banking relationships between the companies whose stocks were

---

[13] Form F-1 and revised Form S-1, which were both proposed in 1981 and both adopted in 1982, were part of a single "comprehensive effort [by the SEC] to develop an integrated disclosure system." Integrated Disclosure System for Foreign Private Issuers, Securities Act Release No. 33-6360, [1981-1982] Fed. Sec. L. Rep. (CCH) ¶ 83,054, at 84,641 (Nov. 20, 1981), 1981 WL 29914, at *1. The contemporaneity and common origin of the two forms further demonstrates that the SEC acted intentionally in excluding from Form F-1, while including on Form S-1, the requirement that the registrant disclose its officers' and directors' legal proceedings.

purchased by a Fund and the broker-dealer affiliate of the Fund's investment adviser." *Id.* at

434.  The Court stated that, "given the extensive regulatory regime governing mutual funds and

what they must disclose, the absence of a specific directive requiring the particular disclosure

these Plaintiffs want presents a serious obstacle to their claim which they cannot overcome." *Id.*

(citing *Digital Island*, 223 F. Supp. 2d at 552 (dismissing Section 14(e) claim where information

required for documents in question was specifically set forth in two SEC regulations, and no

portion of those regulations required disclosure)).  The Court then rejected the wrongful

omission claim concerning the receipt by Merrill Lynch financial consultants of lucrative

incentives to sell fund shares:

> [T]here is no SEC regulation or other legal authority that would require a mutual
> fund to disclose such information.  The information required to be disclosed in
> mutual fund registration statements and prospectuses is specifically set forth in
> SEC Form N-1A. . . .  [F]inancial incentives to MLPF & S brokers for selling
> Fund shares are not required to be disclosed in Form N-1A as part of the Fund's
> "material investment strategies and risk information."

289 F. Supp. 2d at 436.[14]

Similarly, in *Geiger*, the Court dismissed a claim under Section 11 for failure to disclose

that individual selling shareholders were employed as brokers by the underwriter.  The Court

noted that "Item 507 of Regulation S-B requires disclosure of any affiliation with the [issuer]"

but does not require disclosure of any relationship between the selling shareholders and the

underwriter.  933 F. Supp. at 1186.  The Court's decision "is supported by the absence of any

requirement in Item 507 of Regulation S-B that relationships between selling security holders

and the underwriter be disclosed." *Id.* at 1187.[15]

In short, given Form S-1's requirement to disclose officers' and directors' legal

proceedings, Form F-1's wholesale omission of the same requirement demonstrates that foreign

---

[14] *See also In re Merrill Lynch & Co., Research Reports Sec. Litig.*, 272 F. Supp. 2d 243,
248-49 (S.D.N.Y. 2003).

[15] *See N2K*, 82 F. Supp. 2d at 208-09 (dismissing claim under Section 11 where interim
financial information for quarter was not explicitly required by SEC regulation).

private issuers have no duty to disclose such information.  *See Guo v. U. S. Dep't. of Justice*, 422 F.3d 61, 64 (2d Cir. 2005) (applying maxim of *expressio unius est exclusio alterius* to agency regulations).

**2.    Disclosure Would Not Have Been Required Even If Xinhua Had Been Required To Comply With The Stricter Requirements Of Form S-1**

As shown below, even if Xinhua had been a domestic issuer filing Form S-1 and thus had been subject to the requirements of Item 401(f) of Regulation S-K, Xinhua would still not have been required to disclose the additional information alleged to be wrongfully omitted.

**No Relevant Bankruptcy.**  Item 401(f)(1) requires disclosure where a bankruptcy petition was filed – within five years before the S-1 filing – by or against:  an executive officer or director of the registrant; a general partnership of which such person was a general partner within two years before such bankruptcy filing; or a corporation or entity of which such person was an executive officer within two years before such bankruptcy filing.  Regulation S-K, Item 401(f)(1).  Although the Complaint cites to the bankruptcy of two corporations, Singhal is not alleged to have been an officer of either entity.  *See* CAC ¶ 25(gg) (Small World Kids, Inc.; Singhal alleged to have been director); *id.* ¶ 25(v) (Metropolitan Mortgage & Securities, Co.; Singhal alleged to have been underwriter).  Moreover, neither bankruptcy satisfied Item 401(f)'s temporal requirements.  Small World Kids filed for bankruptcy on August 2, 2007, several months *after* Xinhua's IPO.  CAC ¶ 25(ii); *cf.* Item 401(f) & (f)(1) (requiring disclosure of bankruptcy that occurred "during the *past* five years" (emphasis added)).  Metropolitan filed for bankruptcy in February 2004, four years *after* Singhal underwrote Metropolitan's January 2000 offering.  *Id.* ¶ 25(v); *cf.* Item 401(f)(1) (requiring disclosure where individual's involvement in bankrupt corporation was "within two years before" bankruptcy filing).

**No Criminal Conviction Or Being Named As Subject Of Criminal Proceeding.**  Item 401(f)(2) requires disclosure where the registrant's executive officer or director was convicted in a criminal proceeding or was a named subject in a pending criminal proceeding.  Regulation S-

-13-

K, Item 401(f)(2).  Plaintiffs allege no criminal convictions or proceedings against the individual Defendants.

**No Injunction Order Against Acting As Investment Adviser, Underwriter, Broker Or Dealer, Or Engaging In Activity To Buy Or Sell Securities.**  Item 401(f)(3)(i)-(iii) require disclosure where the registrant's executive officer or director was the subject of an order, decree or judgment, not subsequently reversed, suspended or vacated, enjoining him from (a) acting as any type of investment adviser, underwriter, broker or dealer; (b) engaging in any type of business practice; or (c) engaging in any activity in connection with the purchase or sale of any security or commodity, or in connection with any violation of Federal or State securities laws or any Federal commodities laws.  Regulation S-K, Item 401(f)(3)(i)-(iii).  The Complaint alleges no such orders, decrees or judgments against the individual Defendants.

**No Suspension From Acting As Adviser, Underwriter, Broker Or Dealer.**  Item 401(f)(4) requires disclosure where the registrant's executive officer or director was the subject of an order, decree or judgment, not subsequently reversed, vacated or suspended, suspending him for more than 60 days from acting as any type of investment adviser, underwriter, broker or dealer.  Regulation S-K, Item 401(f)(4).  The Complaint alleges no such orders, decrees or judgments against the individual Defendants.

The Complaint does allege that Singhal was the owner, controller and CFO of Bedrock Securities and that Bedrock Securities was subject to a temporary Cease and Desist Order by the NASD for asserted violation of SEC Records Rules (*i.e.,* Rule 17a-3, 17 C.F.R. § 240.17a-3, and Rule 17a-4, 17 C.F.R. § 240.17a-4), the SEC Net Cap Rule (*i.e.,* Rule 15c3-1, 17 C.F.R. § 240.15c3-1), and the SEC Customer Protection Rule (*i.e.,* Rule 15c3-3, 17 C.F.R. § 240.15c3-3).  CAC ¶ 25(a).  The Cease and Desist Order resulted from several alleged regulatory violations by Bedrock concerning the maintenance of current books and records, the keeping of sufficient net capital, and the holding of customers' margin securities and maintenance of sufficient reserve bank accounts.  By December 2006, Bedrock had fully complied with all of these requirements.

Accordingly, the NASD lifted the Cease and Desist Order on December 14, 2006 – months *before* Xinhua's IPO. CAC ¶ 25(a). Thus, at the time of the IPO, there was no Cease and Desist Order against Bedrock, let alone Singhal. *Id.* Indeed, the Complaint does not even allege that the Order was issued against *Singhal*, and the Order, which was against *Bedrock*, was in no way equivalent to suspending Singhal from the activities listed in Item 401(f)(4).

**No Judicial Determination Of Violation Of Securities Laws.** Item 401(f)(5) requires disclosure where the registrant's executive officer or director was found by a court in a civil action or the SEC to have violated any Federal or State securities law. Regulation S-K, Item 401(f)(5).[16] The Complaint conspicuously fails to cite to a single judicial or SEC finding that either Singhal or Bush violated Federal or State securities laws.

Indeed, with one exception described below (CAC ¶¶ 25(e)-(l)), the Complaint's dozens of allegations (*id.* ¶¶ 25(a)-(d), (m)-(jj); 26-31) are completely irrelevant to Singhal, Bush and Xinhua as a matter of law. *See* CAC ¶ 25(m) (AremisSoft and ACLN, Ltd. were sued in class action shareholder lawsuits; no allegation that Singhal was defendant or was found to have violated any law); *id.* ¶ 25(q)-(r) ("history of nine regulatory events and 29 arbitration proceedings" against Roth Capital Partners LLC ("Roth Capital"), which was successor to two entities, Cruttenden Roth Inc. and Roth Capital Partners Inc., that employed Singhal; no allegation that Singhal was defendant or respondent, or was found to have violated any law).[17]

---

[16] Items 401(f)(4) and (5) should be contrasted with Item 401(f)(1). Under subsections (4) and (5), a legal proceeding, to trigger a disclosure obligation, must be against the individual himself, not merely against an entity with which the individual is associated; by contrast, under subsection (1), a legal proceeding against the entity rather than the individual may indeed trigger a disclosure obligation. Had the SEC desired the disclosure obligations of Items 401(f)(4) and (5) to be triggered by legal proceedings against the entity rather than the individual, it would have so stated.

[17] *See also* CAC ¶ 25(t) (class actions against Aviation Distributors Inc. and Cruttenden Roth Inc.; no allegation that Singhal was defendant or was found to have violated any law); *id.* ¶ 25(u) (securities class action against Partsbase, of which Singhal was allegedly "co-lead underwriter" while at Roth Capital; no allegation that Singhal was defendant or was found to have violated any law); *id.* ¶ 25(x) (securities class action, since settled, against Suprema Specialties, Inc., its accounting firm and Roth Capital; no allegation that Singhal was defendant or was found to have (continued...)

The Complaint makes no allegation that Singhal was a defendant, respondent or target, or that Singhal had been found to have violated any law.[18]

The Complaint cites to only a single action where Singhal is a named defendant. The case was originally filed in California state court on February 21, 2007, and alleges civil RICO violations. However, the case is in the preliminary stages, and the Complaint cites no judicial findings, much less adverse judgments, against Singhal. CAC ¶ 25(e)-(l) (*National Account Management*).

Further asserting mere guilt by association, the Complaint makes allegations that are even more attenuated from any of Item 401(f)'s conditions for a disclosure obligation. Paragraphs 25(bb)-(ff) are typical. There, the Complaint alleges that Singhal became a director at Chell Group Corporation in 2001. The Complaint then proceeds to make accusations against *others* at Chell. The Complaint asserts that, in 2002, "Canadian authorities filed criminal charges against long-time director Adrian Towning, who sat on the board with defendant Singhal." CAC ¶ 25(cc). The Complaint further alleges that Cameron Chell, the initial chairman and CEO, "was kicked out of the brokerage industry in November 1998 and charged under the Criminal Code of Canada with knowingly causing his assistant to forge a client's account-opening signature." *Id.* ¶ 25(ff). These events predated Singhal's purported directorship at Chell by three years. *Id.* In sum, all of these inflammatory allegations are self-evidently irrelevant. Accordingly, no disclosure was required under Item 401(f)(5).

**No Adjudicated Violation Of Federal Commodities Law.** Item 401(f)(6) requires disclosure where the registrant's executive officer or director was found by a court in a civil

---

(...continued from previous page)
violated any law); *id.* ¶ 25(y)-(aa) (iMergent under investigation by SEC for "past two years," and state attorneys general currently suing and investigating iMergent; Singhal alleged to have resigned as director in May 2002 and, in any event, is not alleged to have been defendant or to have been found to have violated any law).

[18] Although Plaintiffs cite to Bush's litigation of a civil tax matter in U.S. Tax Court, that action ultimately settled. CAC ¶ 25(jj)-(kk).

action or by the Commodity Futures Trading Commission to have violated any Federal

commodities law.  Regulation S-K, Item 401(f)(6).  There is nothing of the sort here.

>    **3.    The SEC's Policy Decision To Reduce Disclosure Obligations For
>          Foreign Private Issuers Deserves Deference**

The SEC's policy decision to impose less onerous disclosure obligations on foreign

private issuers such as Xinhua – and in particular to omit the requirement of legal-proceeding

disclosure for officers and directors – deserves judicial deference in this case.  Indeed, in an

analogous context, that policy decision was recently upheld in *De Vries*, 2004 WL 4088358.

There, plaintiffs argued that SEC Rule 3a12-3(b), 17 C.F.R. § 240.3a12-3(b), which exempts

foreign private issuers from complying with Section 14(a) of the Exchange Act, exceeded the

SEC's rule-making authority.  Other courts had previously upheld the exemption.  *See Vivendi*,

381 F. Supp. 2d at 171 (dismissing claim under Section 14(a), and holding that SEC Rule 3a12-

3(b) expressly exempts foreign private issuers from compliance with, and hence liability under,

Section 14(a)).  This Court, rejecting plaintiffs' argument, held that the SEC had not exceeded its

authority and that defendant was exempt from Section 14(a).  The Second Circuit affirmed.  *See*

*Schiller*, 449 F.3d at 304 (noting SEC's conclusion that rule authorizing exemption "was not

inconsistent with the public interest or the protection of investors").

In analyzing the policy underlying the exemption for foreign private issuers, this Court

focused on the SEC's specific purpose of encouraging foreign issuers to offer securities in the

U.S. markets.  While noting the SEC's acknowledged mission of investor protection, the Court

gave great weight to the "SEC's overarching goal of providing American investors with a wide

range of foreign investment opportunities."  *De Vries*, 2004 WL 4088358, at *3 (citing

International Disclosure Standards, Exchange Act Release No. 41014, [1999 Transfer Binder]

Fed. Sec. L. Rep. ¶ 86,112, at 81,723, 1999 WL 44076, at *2 (Feb. 2, 1999)).  As the Court

observed, a particular concern for the SEC in regulating foreign issuers is to avoid saddling such

issuers with "regulatory burdens" that will drive them from the U.S. markets – with the

consequence that American investors would nonetheless invest, but in foreign markets lacking

-17-

the protections of the SEC.  2004 WL 4088358, at *3 n.8.  The Court stated:

> The SEC has long recognized that in the absence of truly international disclosure requirements, foreign companies whose investment opportunities are available to Americans may need to be held to a different disclosure standard from domestic companies in order to remain consistent with, *inter alia*, their own country's disclosure rules.

*Id.* at *3 (citing, *inter alia*, Felicia H. Kung, *The Rationalization of Regulatory Internationalization,* 33 Law & Pol'y Int'l Bus. 443 (2002) (hereafter "Kung")).[19]  As the Court also noted, the exemption from Section 14(a) was adopted at a time when few foreign issuers listed their stocks on American exchanges.  Despite opportunities over the years to modify or eliminate its exemption of foreign private issuers – especially as reporting requirements for other issuers increased – the SEC maintained the exemption.  The history of the exemption and Congress's reaffirmation of the SEC's authority to make exemptions to Section 14(a) provided "strong support for the conclusion that the rule is not arbitrary, capricious or manifestly contrary to the statute."  *De Vries*, 2004 WL 4088358, at *4.

While *De Vries* concerned disclosure on Form 14 rather than on Form F-1, the *De Vries* Court's reasoning – stressing respect for the SEC's policy decision to reduce disclosure requirements for foreign private issuers – should govern here as well.  Form F-1, which Xinhua, as a foreign private issuer, was required to use, does *not* require the legal-proceeding disclosure that is required by Form S-1 and that is at issue in the Complaint.  *See* Section I.C.1., *supra.*  The SEC's rationale for this reduced disclosure obligation mirrors the rationale for the exemption from compliance with Section 14(a).

In the Release proposing Form F-1, the SEC observed at the outset that "the registration and reporting requirements of foreign issuers are significantly different from those to which domestic issuers are subject."  1981 WL 29914, at *2.  The SEC also noted that Forms 20-F and

---

[19] *See also* Kung at 452 ("the foreign integrated disclosure system permits *less detailed and sometimes aggregate information* in certain areas to avoid subjecting a foreign registrant to a dual set of disclosure requirements that may conflict with requirements imposed by its home regulator" (emphasis added)).

6-K, which are filed by foreign private issuers, "require less information than the Forms 10-K, 10-Q, and 8-K," filed by domestic issuers.  1981 WL 29914, at *66 n.12.  The SEC then explained its determination to require the precise level of disclosure called for by Form F-1.  The SEC stated that it sought to create a "balance" between "two competing policies":  one advancing the goal of investor protection through disclosure, and one advancing the public interest through creation of "an opportunity to invest in a variety of securities, including foreign securities."  *Id.* at *4.  An implication of the latter policy, the SEC explained, "is that the imposition on foreign issuers of the *same* disclosure standards applicable to domestic issuers could *discourage* offerings of foreign securities in the United States, thereby depriving United States investors of the opportunity to invest in foreign securities."  *Id.* (emphasis added); *see id.* (noting that "public interest would be best served by *encouraging* foreign issuers to register their securities with the [SEC]") (emphasis added).[20]

The SEC concluded that its new integrated disclosure system for foreign private issuers, including Form F-1, represents a "pragmatic balance of the various policy interests mentioned above and protects investors as well as being in the public interest."  1981 WL 29914, at *9. Regarding differences in disclosure requirements for domestic and foreign private issuers, the SEC stated:  "The few areas in which differences in the disclosure requirements exist are those in which the domestic disclosure requirements *could be a significant impediment to foreign issuers registering their securities*.  The [SEC] is aware that United States investors, if they are so inclined, can invest in foreign securities directly in foreign markets.  Therefore, *discouraging registration may not be in the public interest* because the disclosure in the foreign market may be

---

[20] Characterizing Form F-1 as a "short form," the SEC also stated that permitting foreign private issuers to file Form F-1 was made possible by the then-recent adoption of Form 20-F, which "has substantially increased the amount of disclosure contained in the annual reports of foreign issuers . . . pursuant to the Exchange Act with the result that an integrated system is now feasible."  1981 WL 29914, at *3.  As discussed *infra,* Form 20-F has *never* required a foreign private issuer to disclose its officers' or directors' legal proceedings.

less than that required in filings with the [SEC] even with the proposed accommodations." *Id.* (emphasis added).

The SEC adopted Form F-1 on December 4, 1982.[21]  Since then, the SEC has amended Form F-1 *ten times*, but has never seen fit to add any requirement that a foreign private issuer disclose its officers' and directors' legal proceedings.[22]  Nor has Congress added such a requirement.

The history of Form 20-F reflects similar policy-balancing.  *See* Rules, Registration and Annual Report Form for Foreign Private Issuers, Securities Act Release No. 16371, [1979-1980] Fed. Sec. L. Rep. (CCH) ¶ 82,363, at 82,547 (Nov. 29, 1979), 1979 WL 169934, at *2, *5 (In Release adopting Form 20-F, SEC stated:  "Overall, the Commission has endeavored to act in a way consistent with the harmonization of international standards, seeking to require the disclosure of material information while acknowledging legitimate concerns raised by differing national requirements and practices.").  The then-newly adopted Item 5 of Form 20-F (now Item 6 of Form 20-F) required a foreign private issuer to make only a limited disclosure regarding its officers and directors, namely, "a list of the names and positions with [the] registrant for each director and officer."  *Id.* at *6.

In 1999, the SEC revised Form 20-F to incorporate the IOSCO[23] International Disclosure

---

[21] *See* Adoption of Foreign Issuer Integrated Disclosure System, Securities Act Release No. 33-6437, 7 Fed. Sec. L. Rep. (CCH) ¶ 72,407, at 62,029 (Dec. 6, 1982), 1982 WL 154449, at *54765 (noting, as in proposing release, that SEC sought to "balance" two policies of protecting investors through disclosure and promoting public interest "by encouraging foreign issuers to register their securities with the [SEC]").

[22] *See* 2 Fed. Sec. L. Rep. (CCH) ¶ 6951, at 6061 (listing amendment history of Form F-1); 17 C.F.R. § 239.31 (same).  Similarly, since the adoption of Form 20-F in 1979, the SEC has amended Form 20-F *dozens of times,* but has never required a foreign private issuer to disclose its officers' and directors' legal proceedings.  *See* 5 Fed. Sec. L. Rep. (CCH) ¶ 29,701, at 21,745 (listing amendment history of Form 20-F); 17 C.F.R. § 249.220f (same).  Nor has Congress imposed such a requirement.

[23] The International Organization of Securities Commissions ("IOSCO") was formed in 1974 to facilitate cross border offerings and listings by multinational issuers.  The facilitation was

(continued...)

Standards for Cross-Border Offerings and Initial Listings by Foreign Issuers, which represent the international consensus on the type of disclosure required when foreign issuers publicly offer securities. International Disclosure Standards, Securities Act Release No. 7745, [1999-2000 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 86,208, at 82,365 (Sept. 28, 1999), 1999 WL 770251, at *1. The IOSCO Standards do *not* provide for disclosure of the legal proceedings involving a foreign private issuer's officers and directors. Although the SEC has revisited Form 20-F on dozens of occasions, *see* n.22, *supra,* the SEC has not imposed the obligation to disclose officers' and directors' legal proceedings that Form F-1 has always excluded.[24]

Several factors demonstrate that the SEC's decision not to require such legal-proceeding disclosure on Form F-1 "was not inconsistent with the public interest or the protection of investors," *Schiller*, 449 F.3d at 304:  the SEC's recognition that avoiding such a requirement would not only further foreign participation in American markets but also provide consistency

---

(...continued from previous page)

accomplished by enhancing comparability of information, while ensuring a high level of investor protection. IOSCO International Disclosure Standards for Cross-Border Offerings and Initial Listings by Foreign Issuers at 3. IOSCO is composed of approximately 183 securities regulatory organizations from around the world. http://www.iosco.org.

[24] It also bears noting that a year before the SEC adopted Form 20-F for securities registration and annual reporting by *foreign* private issuers, the SEC consolidated in Item 401(f) of Regulation S-K the legal proceedings disclosure requirements for securities registration and annual reporting of *domestic* issuers that have already existed with respect to *domestic* issuers in various filings under the federal securities laws for many years. Uniform Integrated Reporting Requirements, Securities Act Release No. 5949, 1978 Fed. Sec. L. Rep. (CCH) ¶ 81,649, at 80,613 (July 28, 1978), 1978 WL 170913, at *1 (integrating legal proceedings disclosure requirements for *domestic* issuers in Item 401(f) of Regulation S-K); Rules, Registration and Annual Report Form for Foreign Private Issuers, Securities Act Release No. 16371, [1979-1980] Fed. Sec. L. Rep. (CCH) ¶ 82,363, at 82,547 (Nov. 29, 1979), 1979 WL 169934, at *1 (adopting Form 20-F).

While Item 401(f) of Regulation S-K has required significant disclosure of legal proceedings involving the registrant's officers and directors, Form 20-F has required only limited disclosure regarding a foreign issuer's officers and directors and has required *no* disclosure of legal proceedings involving such officers and directors. *See* Section I.C.1., *supra.* The contemporaneous adoption of Item 401(f) and Form 20-F further demonstrates that, for foreign private issuers, the SEC intentionally omitted the requirement to disclose legal proceedings involving officers and directors.

with international requirements; the SEC's careful and reasonable balancing of the need to limit disclosure requirements for foreign private issuers against the need for investor protection; and the SEC's preservation of this disclosure limitation over time, notwithstanding the repeated opportunity to modify it.  Under these circumstances, it would not be appropriate for the Court to second-guess the SEC's policy decision regarding the appropriate level of disclosure for foreign private issuers.  Significantly, this Court in *De Vries* stated that its role was not to substitute its own view for the considered decision of the SEC:  "It is not the Court's role to question the wisdom of either the SEC's rule or Congress's inaction . . . ."  *De Vries*, 2004 WL 4088358, at *4; *see id.* at *3 (deferring to SEC's policy decision under *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)).

In sum, the SEC decided not to impose on foreign private issuers in Form F-1 the obligation to disclose officers' and directors' legal proceedings that is imposed on domestic issuers in Form S-1.  That decision followed a long-standing and reasonable policy of carefully balancing investor protection against minimization of disclosure burdens on foreign private issuers.  Thus, the SEC's decision should receive deference here.

**D.    There Is No Omission Of A Required Fact Or A Fact Necessary To Make The Statements Not Misleading**

As the preceding Sections demonstrate, the SEC regulations applicable to Xinhua did not require the legal-proceeding disclosure asserted in the Complaint.  Plaintiffs do not allege otherwise.  Instead, Plaintiffs allege that statements within the Prospectus were rendered false and misleading by the absence of such legal-proceeding disclosure.  *See, e.g.*, CAC ¶¶ 21-22, 32-33.  This allegation fails as well.

**1.    The Complaint Alleges No Affirmatively False Statements, And The Prospectus's Mere Listing of Singhal's Positions, Without Touting The Performance Of His Other Entities, Was Not Misleading**

Significantly, Plaintiffs do not allege that any of the pertinent statements in the Prospectus were false.  The Complaint quotes the Prospectus:

-22-

> Shelly Singhal has served as our Chief Financial Officer since September 2006, and has served as a director of our parent, Xinhua Finance Limited, since July 2004. Mr. Singhal will serve as our director, commencing from the Securities and Exchange Commission's declaration of effectiveness of our registration statement on Form F-1, of which this prospectus is a part.

> Mr. Singhal sits on the Compensation Committee, Audit Committee and Investment Committee of our parent. Mr. Singhal founded the SBI Group, an investment company, in June 2001, serving as its Managing Director until December 2003, and as Chairman and CEO since that time. Mr. Singhal has also served as a director and member of the Compensation Committee of Small World Kids Inc. since October 2004. Mr. Singhal owns Bedrock Securities, a NASD licensed broker dealer and its sister company, Bedrock China Futures, Ltd., which is an Asian securities trading company. Mr. Singhal worked for SBI-E2 Capital, a member of Softbank Investment Group, from 2001 to 2003. Mr. Singhal holds a B.S. degree in Business Administration from Seaver College at Pepperdine University.

CAC ¶ 32. Plaintiffs do not allege, for example, that Singhal did not hold a B.S. degree from Seaver College or that he did not work at SBI-E2 Capital from 2001 to 2003.[25]

Plaintiffs' theory, rather, is that the above recitations "are materially misleading because they fail to disclose the true, adverse facts concerning defendant Singhal's background and close connections to numerous public companies that have been plundered, sued and/or have been investigated by government regulators, the SEC, or one or more attorneys general, or had findings made against them made by the NASD." CAC ¶ 33.[26] Notably, Plaintiffs misstate the import of the statements about Singhal. The Complaint asserts that the Prospectus "included biographies of each of its executives, including Defendants Singhal and Bush, *that purported to highlight their positive contributions to or affiliations with other companies, both past and present*." CAC ¶ 21 (emphasis added). These statements in the Prospectus did not discuss

---

[25] *See Geiger*, 933 F. Supp. at 1185 ("In this case, there is no allegation that any statement in the prospectus was untrue. The names of the Unaffiliated Selling Shareholders and the number of shares owned by each were disclosed accurately, as was the fact that the Unaffiliated Selling Shareholders were not affiliated with SPG."); *compare Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 654, 656 (4th Cir. 2004) (affirming dismissal of claims under Sections 11 and 10(b) where, although registration statements and prospectus falsely stated that CEO held college degree, false statement was immaterial as matter of law).

[26] *See Alliance*, 279 F. Supp. 2d at 182 ("A threshold requirement for a Section 11 and Section 12(a)(2) claim based on a failure to disclose information is the presence of an affirmative statement that is made misleading by the material omission.").

Singhal's contributions to any other company.  These statements did not even mention the success or performance of SBI Group, Small World Kids Inc., Bedrock or SBI-E2 Capital, the four entities with which Singhal is associated.  Nor did the statements address, much less discuss, how Singhal's efforts led to their performance.  The Prospectus merely recited Singhal's roles or titles in Xinhua and some of the entities with which he has a relationship.[27]

The question before the Court, then, is whether the accurate recitation of the fact of Singhal's positions at Xinhua and the four mentioned entities triggered a duty to disclose certain entities' legal proceedings or financial difficulties alleged in the Complaint.  In other words, was the statement of Singhal's positions misleading when it did not also describe the legal proceedings in which certain of those entities were involved?  *See* Section 11(a), 15 U.S.C. § 77k(a) (conditioning liability on, *inter alia,* whether the registration statement, when such part became effective, "omitted to state a material fact . . . necessary to make the statements therein not misleading").  The answer is that no duty of disclosure was triggered:  Because the Prospectus did not tout, or even address, the performance of those entities, the simple recitation of Singhal's positions in those entities was not misleading.

As discussed in Section I.B., *supra,* courts have held that Section 11 imposes no duty on issuers to disclose all information, even if the information is material.  *Alliance*, 279 F. Supp. 2d

---

[27] Plaintiffs also allege that the Prospectus referred to Xinhua's "strong and experienced management team."  CAC ¶ 38.  Courts have dismissed similar statements as inactionable complaints about mismanagement, which the securities laws are not intended to remedy.  *See* Section I.D.2., *infra; Lerner v. FNB Rochester Corp.*, 841 F. Supp. 97, 101-02 (W.D.N.Y. 1993) (dismissing Section 11 claim where holding company's registration statement described its newly acquired banking offices as providing "'sound, stable deposit in an established community' and 'further establish[ing] First National's presence in the southern quadrant of the county,'" and where subsequently holding company entered into consent order as result of poor condition of its loan portfolio).

Moreover, the statement is inactionable puffery.  *See Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (affirming dismissal of Section 11 claim; statements that "'business strategies [would] lead to continued prosperity' . . . . consist of precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable") (citing, *inter alia, San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996)).

at 182; *Cooperman*, 171 F.3d at 49-51.  In *Cooperman*, plaintiffs asserted a Section 11 claim where the prospectus failed to disclose that a fundamental conflict existed between the CEO/founder/director and the board majority concerning the company's business model. Although the conflict led to the CEO's departure several months after the prospectus was issued, causing the stock price to plummet, and the conflict was material, the First Circuit held that Section 11 imposed no duty to disclose the fact of the conflict.  The statements in the prospectus, particularly the discussion of the company's business model and use of proceeds, including moneys spent for acquisitions, were true.  They did not become affirmatively misleading for failure "to disclose information about the extent to which each individual Board member supported that model."  *Id.* at 51.[28]

Similarly, the statements that the Prospectus made about Singhal's positions in other entities were true and did not become materially misleading because additional facts about those entities – such as certain legal proceedings – were not also disclosed.  *See Backman,* 910 F.2d at 16 (duty to make complete and accurate disclosure "does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise."). Indeed, the Prospectus did even not mention, let alone trumpet, the performance of those entities. Thus, the absence of a statement about the entities' legal proceedings did not render the simple list of Singhal's positions misleading – particularly when the Complaint did not allege that Singhal was a defendant or respondent, or that any finding adverse to Singhal had been made, in any of those legal proceedings.  *See* Section I.C.2., *supra*.

---

[28] *See In re Seachange Int'l Inc. Sec. Litig.*, No. 02-12116 DPW, 2004 WL 240317, at *8 (D. Mass. Feb. 6, 2004) (where issuer disclosed fact of pending litigation as required by Item 103 of Regulation S-K, it was not required to disclose projection of likely adverse outcome – because it knew that it was infringing adversary's patent – where prospectus "contained no statements suggesting that SeaChange would prevail . . . or implying that the impact of the litigation on the company would be positive"); *N2K*, 82 F. Supp. 2d at 209 (dismissing claim under Section 11 where failure to disclose first quarter results and net losses did not render false and misleading risk disclosure that earnings might fall below expectations in future).

### 2. The Second Circuit Has Rejected Any Duty To Disclose Unproven Claims That Allegedly Concern Integrity Or Mismanagement

Plaintiffs' allegations boil down to a claim that the undisclosed information about the entities with which Singhal was associated impacted on Singhal's integrity and competence to serve as an officer and director of Xinhua. *See* CAC ¶ 22. That integrity, according to Plaintiffs, was important to Xinhua, given Singhal's membership on Xinhua's Audit, Compensation and Corporate Governance Committees. *Id.* ¶¶ 34-37. Second Circuit law rejects this claim.

In *GAF Corp. v. Heyman*, 724 F.2d 727 (2d Cir. 1983), a bitter proxy contest for control of GAF Corporation arose between the incumbent group and an insurgent camp led by defendant Heyman. Following election of the insurgent slate, the District Court enjoined the insurgent slate from assuming the directorships and required a re-solicitation of proxies and a new election. *Id.* at 728. The District Court had held that the insurgents violated Section 14(a) of the Exchange Act by failing to disclose pending federal litigation against Heyman brought by his sister for breaches of fiduciary duty concerning his conduct of a family real estate business. *Id.* Heyman allegedly diverted partnership assets and failed to provide access to financial information. *Id.* at 735. Plaintiff asserted that matters bearing on Heyman's integrity and character were at issue in the proxy contest and that the pending lawsuit against him was material to those issues: "[That a] candidate for a position as a corporate fiduciary is a defendant in a pending lawsuit, charging him with improper self-dealing and other fiduciary misconduct, is necessarily important to stockholders called upon to decide who should be entrusted with the stewardship of their collective investment." *Id.* at 738.

Reversing, the Second Circuit reviewed Item 401(f) of Regulation S-K, concerning legal proceedings that must be disclosed in a proxy statement. The same provision governs disclosure in a registration statement filed by domestic issuers on Form S-1. *See* Sections I.C.1. and I.C.2., *supra.* The Court found that Item 401(f) did not require disclosure of "unproven allegations" made in the unrelated federal action. 724 F.2d at 739. The Court found this particularly significant because the "regulation does provide us with the Commission's expert view of the

types of involvement in legal proceedings that are most likely to be matters of concern to shareholders in a proxy contest." *Id.* The Court stated:

> In our view, the regulation's emphasis on orders, judgments, decrees, and findings in civil proceedings, in stark contrast to its express coverage of all pending criminal proceedings, strongly suggests that regardless of how serious they may appear on their face, unadjudicated allegations in a pending civil action against a director-nominee should not automatically be deemed material.

*Id.* at 739. The Court emphasized that the litigation "*did not in any way involve GAF.*" *Id.* at 740 (emphasis added) (citations omitted); *see id.* at 742-43. In acknowledging that the proxy rules "do not require management to accuse itself of antisocial or illegal policies," the Second Circuit warned that otherwise "the litigation ubiquitous in every proxy contest would thus become a forum for litigating, possibly relitigating, the issues in any pending or prior suit involving a director-nominee." *Id.* at 743 (citation omitted). Furthermore, the Court rejected the "boundlessness of the disclosure requirement imposed by the district judge," *id.*:

> Vast numbers of allegations arguably implicate a prospective director's 'integrity and fitness.' The ruling below, if left intact, would lead to a situation where proxy contestants, in order to minimize the risk of having an election set aside, would have to include in their solicitation materials descriptions, explanations, and denials regarding allegations in derivative actions, class actions, matrimonial disputes, and a host of other legal matters, all unrelated to the business of the subject corporation.

*Id.*

The Second Circuit made this point again in *United States v. Matthews*, 787 F.2d 38 (2d Cir. 1986). In *Matthews*, the Court reversed a criminal conviction based on the defendant-corporate officer's failure to disclose in a proxy statement that he was a member of a conspiracy to bribe the New York State Tax Commission to obtain favorable rulings for the corporate employer. *Id.* at 39. Again, the Court reviewed the specific disclosure requirement in Item 401(f), which mandated disclosure only of a criminal conviction for certain conduct occurring within the preceding five years. *Id.* at 43-44. Matthews had had no such conviction. *Id.* The Court then reviewed the statements that Matthews made about himself in the proxy statement, which simply recited his age and roles at the corporation. *Id.* at 45. Tellingly, none of these

statements required the sort of disclosure asserted by the government. *Id.* The Court found it significant that courts "almost universally have rejected efforts to require that management make qualitative disclosures that were not at least implicit in the Commission's rules." *Id.* at 48. The Court concluded that "a candidate for election [is not required] to accuse himself of antisocial or illegal activities." *Id.* at 48 (citing *GAF*, 724 F.2d at 740). Furthermore, the Court warned, proxy rules "should not be used 'as an avenue for access to the federal courts in order to redress alleged *mismanagement or breach of fiduciary duty* on the part of corporate executives.'" *Matthews*, 787 F.2d at 48 (citation omitted) (emphasis added).

Other cases have applied these principles to Section 11 claims. *See Lerner*, 841 F. Supp. at 101-02 (dismissing Section 11 claim where registration statement allegedly "'falsely portrayed the Company as [a] strong and stable institution,'" which is equivalent of complaint about mismanagement); *In re Computervision Corp. Sec. Litig.*, 869 F. Supp. 56, 62 n.4 (D. Mass. 1994) (dismissing claims under Sections 11 and 12 based on alleged failure to disclose that company's financial condition was being "'negatively affected by the diversion of management's attention from the day-to-day operations of the Company to the Offering'"); *Haft v. Eastland Fin. Corp.*, 755 F. Supp. 1123, 1125, 1133 (D.R.I. 1991) (dismissing claim under Section 11 that company "'represented itself to the investing public as a highly successful bank which was well managed,'" where essence is complaint about corporate mismanagement); *accord*, *Elfenbein v. Am. Fin. Corp.*, 487 F. Supp. 619, 628 (S.D.N.Y. 1980) (granting summary judgment under Sections 11 and 12(a) where alleged failure to disclose existence of possible tax liability is allegedly equated with cases in which corporate officers concealed immoral or illegal conduct).[29]

This Court acknowledged and adhered to the foregoing principles in *In re Citigroup, Inc.*

---

[29] Whether viewed as an attack on management's integrity, fitness to serve or competence, allegations of failure to disclose corporate mismanagement are regarded in the same vein. *See GAF*, 724 F.2d at 742-43 (allegations implicating defendant's integrity and fitness to serve); *Matthews*, 787 F.2d at 48 (addressing failure to disclose management ethics and integrity and alleged mismanagement); *Haft*, 755 F. Supp. at 1131 (addressing failure to disclose possible mismanagement or incompetence).

*Securities Litigation*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004).  There, investors asserted claims

under Section 10(b) against Citigroup for engaging in transactions with Enron and Worldcom in

purported violation of the risk management policies described in its SEC filings.  *Id.* at 371-74.

The Court dismissed the claims, stating that "allegations of mismanagement, even where a

plaintiff claims that it would not have invested in an entity had it known of the management

issues, are insufficient to support a securities fraud claim under section 10(b)."  *Id.* at 375.  The

Court also rejected the claim that Citigroup failed to disclose that its revenues "were derived

from 'unsustainable and illegitimate sources.'"  *Id.* at 377.  The Court reiterated that a company

is "not required to 'accuse itself of antisocial or illegal policies.'"  *Id.* (citing, *inter alia*, *GAF*,

724 F.2d at 740).  Nor does the law "'impose a duty to disclose uncharged, unadjudicated

wrongdoing or mismanagement.'"  *Citigroup*, 330 F. Supp. 2d at 377 (citing *Ciresi v. Citicorp.*,

782 F. Supp. 819, 823 (S.D.N.Y. 1991)).  The Court also dismissed claims that Citigroup failed

to disclose litigation risks associated with its "Enron-related, analysis/investment banking and

reporting activities," stating that defendant "was not required to make disclosures predicting such

litigation."  330 F. Supp. 2d at 377 (citations omitted).[30]

The Complaint here does not allege anything other than "uncharged, unadjudicated

wrongdoing or mismanagement."  *Id.*  The Complaint does not contain a single allegation that

there has ever been an adverse judgment or finding made against Singhal.  *See* Section I.C.2.,

*supra.*  Moreover, the import of the Complaint is that the omitted information somehow reflects

on Singhal's integrity and hence his "ability to serve as an officer or director" of Xinhua.  *See,*

*e.g.,* CAC ¶¶ 22, 34-37.  But this is effectively a mismanagement claim, which is not cognizable

under Section 11.  *See GAF,* 724 F.2d at 739, 743; *Matthews*, 787 F.2d at 48; *Lerner*, 841 F.

Supp. at 101-02; *Computervision*, 869 F. Supp. at 62-63; *Haft*, 755 F. Supp. at 1131, 1133;

---

[30] *See Ciresi*, 782 F. Supp. at 823 (dismissing claims under Sections 11, 12 and 14(a):  "With respect to the allegation that defendants had a duty to disclose the 'utter failure of the [director] defendants to fulfill their stewardship responsibilities,' the law does not impose a duty to disclose uncharged, unadjudicated wrongdoing or mismanagement") (citations omitted).

*Citigroup*, 330 F. Supp. 2d at 375, 377.  In sum, all of the Complaint's assertions concerning unproven allegations that allegedly implicate integrity and mismanagement fail to state a Section 11 claim.

3.    **Disclosure Was Not Warranted Under A Theory Of Materiality In This Context Where Xinhua Was Subject To Limited Disclosure Requirements As A Foreign Private Issuer**

Plaintiffs' disclosure claims fare no better under a general theory of materiality.  The Second Circuit has made crystal clear that the disclosure obligations set forth in SEC regulations inform a determination of materiality in context.  *See GAF*, 724 F.2d at 739 ("While this court and others have indicated that compliance with Schedule 14A does not necessarily guarantee that a proxy statement satisfies Rule 14a-(9), . . . the regulation does provide us with the Commission's expert view of the types of involvement in legal proceedings that are most likely to be matters of concern to shareholders in a proxy contest."  (citations omitted)).  In *Geiger*, the Court dismissed claims under Section 11 where the regulations did not require disclosure of a relationship between individual selling shareholders in the offering and their employment status with the underwriter.  Plaintiff argued that the undisclosed relationship was material because "it changes the perception of [the underwriter's] impartiality and credibility."  933 F. Supp. at 1186. There, as here, plaintiff alleged that, following the offering, the press reported the information omitted from the prospectus.  *Id.* at 1183-84.  Specifically, *The New York Times* reported that the selling shareholders were employed as brokers by the underwriter and thus had an affiliation with the issuer.  *Id.* When the previously undisclosed relationship was published, the stock price fell from $5.62 to $4.25.  *Id.*  The Court rejected plaintiff's claim on several grounds.  In relevant part, the Court found that the absence of a disclosure requirement in the SEC regulations was important, even if not completely dispositive:

> The absence of a regulation requiring disclosure, in the face of the detailed requirements of what information about selling shareholders must be disclosed, is some evidence that the information the plaintiff seeks to require is not in fact material. . . .  The fact that the SEC does not require disclosure of this fact . . . reflects the SEC's expert view that such disclosure is not required.

-30-

*Id.* at 1187-88.  The stock's reaction to the news disclosure did not change the result.  *Id.* at 1188.[31]

For policy reasons, as explained in Section I.C.3., *supra*, the SEC has not required of foreign private issuers the legal-proceeding disclosure that is required of domestic issuers.  It would make no sense to hold the omitted information material when the SEC has already made a judgment that the same information is not required to be disclosed in offerings by foreign private issuers.[32]  In other words, having made all disclosures required by Form F-1 (and even Form S-1, *see* Section I.C.2., *supra),* Xinhua should not be held to an even more onerous standard on a theory that the disclosure that the SEC explicitly did *not* require was nonetheless material and hence mandatory.  The District Court made this point in *Platsis v. E.F. Hutton & Co*., 642 F. Supp. 1277 (W.D. Mich. 1986), *aff'd,* 829 F.2d 13 (6th Cir. 1987) (*per curiam*).  There, the District Court granted judgment to defendant and dismissed claims under Sections 11 and 12

---

[31] The Fourth Circuit in *Greenhouse* ruled that a false statement about the CEO's education was immaterial as a matter of law, and that a misrepresentation may be immaterial even where it "induces reactions from investors that . . . might make the misrepresentation appear material." 392 F.3d at 656.  The Court stated:  "It must be thus:  public reaction or fear of future revelations simply cannot be an 'untrue statement,' nor can it be 'made' by the defendant or 'contained' in SEC filings."  *Id.* at 656 n.8; *Citigroup,* 330 F. Supp. 2d at 375 ("allegations of mismanagement, even where a plaintiff claims that it would not have invested in an entity had it known of the management issues, are insufficient to support a securities fraud claim under section 10(b)").

[32] This case is distinguishable from *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767 (LBS), 2003 WL 22882137 (S.D.N.Y. Dec. 4, 2003).  There, a registration statement stated that the company's CFO (formerly its CEO) was simultaneously President, CEO and Director (and formerly General Counsel) of another corporation, Intercell. The Court declined to dismiss plaintiff's Section 11 claim because the registration statement did not also disclose that Intercell had filed for bankruptcy and that the CFO had personally submitted to a consent decree with the SEC "permanently enjoining him from committing further securities violations and temporarily barring him from practicing before the SEC."  *Id.* at *4. Here, in contrast, Xinhua, as a foreign private issuer, was not required to make a legal-proceeding disclosure regarding Singhal.  *See* Section I.C., *supra*.  Moreover, the Prospectus identified Singhal's role at Bedrock only as an "owner," and made no mention of any officer roles at Bedrock.  CAC ¶ 32.  Nor was Bedrock subject to bankruptcy proceedings.  *Id.* ¶ 25(a). In addition, the Cease and Desist Order alleged in the Complaint concerned a records rule issue, was issued against Bedrock and not Singhal personally, and terminated before the IPO.  *Id.* There has never been an allegation in this case that Singhal was the subject of an SEC order barring him or enjoining him in any fashion.

where SEC regulations exempted oil and gas partnerships from providing oil and gas reserve data. 642 F. Supp. at 1294-97. Plaintiff claimed that the offering materials failed to provide this information. *Id.* at 1296. The District Court stated:

> As a matter of law, materials specifically exempted from disclosure by the Securities and Exchange Commission cannot, by their omission from offering documents, form the basis of a [12(a)(2)] violation. At the very least, the existence of the exemption is evidence that the information sought by plaintiff is not 'material' and probably misleading.

*Id.*; *see id.* at 1301; *see also De Vries*, 2004 WL 4088358, at *4 n.9 (rejecting argument that issuer loses statutory exemption from compliance with Section 14(b) should issuer choose to provide proxy statements not otherwise required, where "the rule unambiguously exempts foreign private issuers from Section 14(a)").

## E.    There Was No Failure To Disclose Acquisitions That "Enriched Insiders"

The remaining allegations in the Complaint relate to what Plaintiffs characterize as "Material Omissions That Enriched Insiders." CAC ¶¶ 26-31. Plaintiffs refer to the acquisition of two entities, Upper Step and Accord Group, alleging that in each acquisition payments were made in part to Sino Investment, of which Singhal was owner. *Id.* ¶¶ 26, 29.[33]

Xinhua's disclosures concerning these acquisitions were more than sufficient. The Prospectus disclosed that Xinhua is a holding company that acquires other companies to build its platform of products and services. Schor Dec., Ex. 3 (Prospectus) at pp. 51, 62-63. The

---

[33] Notably, Plaintiffs try to allege that the individual Defendants received benefits from *Xinhua's parent* or another *subsidiary of the parent*. *See, e.g.,* CAC ¶ 25(c) ("numerous shares of XFL stock owned by Fredy Bush were transferred into the name of Bedrock and then sold during several trading days when black-out periods were in effect"); *id.* ¶ 31 ("Xinhua Financial Network announced in a press release that it had finalized a round of financing for $20 million with the assistance of SBI serving as one of two investment bankers on the deal [and Singhal was managing director of SBI]."

In addition, Plaintiffs erroneously cite an article in the *Wall Street Journal* for the purported proposition that Bush received additional shares from Xinhua when Xinhua made acquisitions. CAC ¶ 30. This is a false characterization even of what the article states. Contrary to the allegations in the Complaint, the article stated that Fredy Bush received additional shares from *defendant's parent*, not Xinhua, *when defendant's parent* made new acquisitions. *See* Schor Dec., Ex. 8 (J. Areddy and D. Reilly, *Riding the Tiger*, Wall St. J., July 7, 2007) at A1.

Prospectus disclosed that the "PRC [People's Republic of China] laws and regulations currently impose different levels of restrictions or prohibitions on investment of private capital, including foreign capital, in the media industry. . . .  Our subsidiaries in China are limited in their abilities to engage in operations in the media, advertising and market research industries.  Accordingly, we operate our businesses in China primarily through contractual arrangements with our affiliated entities and the contractual arrangements we and our affiliated entities have with third parties." *Id.* at 3.  The two acquisitions at issue, Upper Step and Accord Group, were used to form Xinhua's broadcasting group. *Id.* at 63.  More particularly, the reason for acquiring Upper Step is that its subsidiaries and affiliated entities had a partnership with Shanghai Camera Media Investment Co., Ltd., which is the content and advertising provider to Inner Mongolia Satellite Television. *Id.* at 63, 78.  Similarly, Accord Group's affiliated entity, Century Media Advertising, has a partnership with China Radio International's exclusive advertising agent to provide content to and sell advertising for the EasyFM stations of Beijing and Shanghai. *Id.*

Xinhua disclosed its acquisition of equity interests at various times and percentages in Upper Step and Accord Group, and the consideration paid, including, *inter alia*, to Xinhua's parent and to Sino Investment Holdings. *Id.* at 5, 62-63, 142-43, 146-47, 170, 175-76, F-34, F-46.  Xinhua disclosed Singhal's beneficial ownership in Sino Investment. *Id.* at 166, 167.  In Xinhua's discussion of related party transactions, and in its financial statements, Xinhua again described its acquisition of Upper Step and Accord Group, transactions with Sino Investment, and Sino's relationship to Singhal. *Id.* at 170, 172, F-28-29, F-34, F-51.

Xinhua thus fully disclosed the nature of and payments for the acquisitions.  The essence of Plaintiffs' allegations is that Xinhua is guilty of mismanagement. *See* CAC ¶ 29 (Xinhua "overpaid for equity stakes");[34] *id.* ¶ 31 (the "transactions appear more egregious when viewed in

---

[34] Notably, the Complaint erroneously applies a post-offering price to the pre-offering shares used in consideration for these acquisitions. *Compare* CAC ¶ 29 ("impl[ying] a valuation" "given the $13 per share value at the time of IPO") *with* Schor Dec., Ex. 3 (Prospectus) at p. 63 (price of common shares used in consideration was $3.659).

the light of defendant Singhal's past corporate shenanigans").  These claims fail for the same

reasons discussed above in Section I.D.2.  *See Lerner*, 841 F. Supp. at 101-02; *Computervision,*

869 F. Supp. at 62-63; *Haft,* 755 F. Supp. at 1131, 1133; *Citigroup,* 330 F. Supp. 2d at 375, 377.

> ### F.    The Allegations Fail To Comply With Rule 9(b)

Because many of the Complaint's allegations sound in fraud, Federal Rule of Civil

Procedure 9(b) governs.[35]  The Complaint should be dismissed for failure to allege with

specificity how the omission of the litany of events concerning Singhal and Bush, and Xinhua's

parent, rendered any part of the Prospectus materially misleading; how, if at all, Plaintiffs were

damaged as a result of benefits allegedly received by insiders; or how matters concerning

Xinhua's parent or a different subsidiary are relevant at all.

## II.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTIONS 12 AND 15

Plaintiffs' claim under Section 12(a)(2), *see* CAC ¶¶ 83-86, fails for two reasons.  First,

the Lead Plaintiffs *did not purchase in the IPO* or from Defendants but rather bought their ADSs

from others and on the secondary market.  Lead plaintiff Li bought ADSs from May 3 to 17 at

$12.55-$11.74, and lead plaintiff Lin bought from May 11 to 15 at $11.88-$8.70.[36]  Lead

plaintiff Yen bought ADSs from April 5 to 26 at $10.14-$10.11, and lead plaintiff O'Callaghan

bought on May 21 at $9-$9.15.[37]  These purchases could not have been made in the IPO.  *See*

---

[35] *Compare Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) ("Plaintiffs assert that their Section 11 claims 'do[] not sound in fraud' but the wording and imputations of the complaint are classically associated with fraud:  that the Registration statement was 'inaccurate *and* misleading;' that it contained '*untrue* statements of material facts;' and that 'materially *false* and *misleading* written statements' were issued") *with* CAC ¶¶ 9, 39, 63 (statements are "false and misleading"); *id.* ¶¶ 2, 7, 9, 11, 11(a), 11(b), 18, 25(aa), 32, 33, 39, 58, 60, 61, 63, 69, 76, 77, 79, 86, 90 (statements are "misleading"); *id.* ¶¶ 25(o), 25(w), 39, 63, 72 (statements are "false"); *id.* ¶¶ 7, 11, 11(a), 11(b), 18, 25(u), 58, 61, 65, 69, 71, 72, 76, 80, 86 (statements are "untrue").  *See also id.* ¶¶ 46 (Bush "had known about the NASD problems of Singhal's brokerage firm").

[36] *See* Dkt. No. 13 (July 23, 2007 Declaration of Gregory M. Egleston in support of Motion of Shaokali Li and Wu Lin for Consolidation, Appointment as Lead Plaintiffs, and Approval of Their Choice of Lead Counsel, Ex. 1).

[37] *See* Dkt. No. 5 (July 23, 2007 Declaration of Kim E. Miller in support of Motion of Yen Group to Consolidate Related Actions; to be Appointed Lead Plaintiff; and to Approve Proposed
(continued...)

CAC ¶ 19 ("On March 9, 2007, Xinhua completed the sale of 23,076,923 ADSs priced at $13.00 per share"). *See also id.* ¶ 9 (Lead Plaintiffs purchased "ADSs pursuant and/or traceable to the . . . Prospectus in connection with the IPO"). This is insufficient to state a claim under Section 12. *See DeMaria v. Andersen*, 153 F. Supp. 2d 300, 307-08 (S.D.N.Y. 2001), *aff'd*, 318 F.3d 170, 173 n.3 (2d Cir. 2003); *Ultrafem*, 91 F. Supp. 2d at 693-94.

Second, Section 12(a)(2) requires a prospectus that "includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . . ." 15 U.S.C. § 77l(a)(2). To state a claim under Section 12(a)(2), the Complaint must allege a legal obligation to disclose the allegedly omitted information. *Alliance,* 279 F. Supp. 2d at 182; *Merrill Lynch*, 289 F. Supp. 2d at 434 (citations omitted). As stated in Section I, *supra*, there was no duty to disclose the information alleged. This claim fails on the same grounds.[38]

## CONCLUSION

For the reasons set forth above, the Complaint should be dismissed.

Dated:  December 21, 2007

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: /s/ Gideon A. Schor
    Gideon A. Schor (GS-5932)

---

(...continued from previous page)
Lead Plaintiff's Choice of Counsel, Ex. A).

[38] Plaintiffs' claim under Section 15, 15 U.S.C. § 78o, CAC ¶¶ 87-91, likewise fails. Section 15 "is necessarily predicated on a primary violation of securities law." *Rombach,* 355 F.3d at 177-78. Where there is no primary violation of Section 11 or 12, there is no claim under Section 15. *Id.* at 178; *Authentidate*, 2006 WL 2034644, at *7; *Merrill Lynch,* 289 F. Supp. 2d at 437.