# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ) | |
| ) | MASTER FILE 07 Civ. 3994 (LTS) |
| IN RE XINHUA FINANCE MEDIA, LTD. ) | |
| SECURITIES LITIGATION ) | |
| ) | |
| ) | |
| ) | |
| ) | JURY TRIAL DEMANDED |
| ) | |

CONSOLIDATED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Lead Plaintiffs Leo Yen, James O'Callaghan, Shaokali Li, and Wu Lin ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, make the following allegations upon personal knowledge as to themselves and their own acts, including their purchases of Xinhua Finance Media Ltd. ("Xinhua" or "the Company") American Depositary Shares ("ADSs"), and upon information and belief as to all other matters. The allegations herein that are made upon information and belief are based, *inter alia*, upon the investigation made by and through Plaintiffs' counsel, which included the review and analysis of various public statements and filings made by Xinhua and its senior officers with the Securities and Exchange Commission ("SEC"); reports of securities analysts concerning the Company; press releases; news articles; and other media reports regarding Xinhua, as well as interviews of persons with knowledge regarding the events described herein.

NATURE OF ACTION

1.    Plaintiffs bring this action pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), on behalf of all persons who purchased or acquired ADSs of Xinhua between March 9, 2007 (the date that Xinhua conducted its initial public offering (the

"IPO") and May 21, 2007, inclusive. The IPO was comprised of 23.076 million ADSs, each of which consisted of two shares of Xinhua common stock. In the IPO, 17.307 million ADSs sold by the Company and an additional 5.769 million ADSs were sold by Company insiders.

2.       Xinhua, several of its senior executives, and the Underwriters involved in the IPO -- including J.P. Morgan Securities Inc. ("JP Morgan"), UBS AG ("UBS"), CIBC World Markets Corp. ("CIBC") and WR Hambrecht & Co., LLC ("WR Hambrecht") – are each charged with allowing the inclusion of materially untrue and misleading statements in the Registration Statement and Prospectus (the "Prospectus") issued in connection with the IPO, in direct violation of the Securities Act. Specifically, each defendant failed to conduct an adequate due diligence investigation into the Company prior to the IPO and failed to reveal the true material facts that, at the time of the IPO, would have entirely undermined the market's confidence in the Company's senior officers and directors. For example, undisclosed in the Prospectus was that the Company's CFO, Shelly Singhal ("Singhal"), was simultaneously an owner and investment banker in charge of Bedrock Securities ("Bedrock") and, that between April 2006 through December 2006, prior to the IPO, Bedrock had been under a "Cease-and-Desist" order by the National Association of Securities Dealers ("NASD") for violating SEC regulations. The regulatory inquiry of Bedrock is still ongoing. Also, at the time of the IPO, Defendants also failed to reveal, *inter alia*, that defendant Singhal was defending private charges of civil racketeering in a lawsuit in California, and that he had previously been an inside investor in and/or lead investment banker for several other companies that had been sued by investors and/or had been subject to regulatory or governmental inquiries or investigations. Furthermore, defendant Singhal failed to disclose that he had close connections with many companies accused of stock fraud, market manipulation, securities related abuses and subject to regulatory actions (*see infra* at ¶ 25). The omission of material facts from the Prospectus take on

additional significance because the Company has engaged in several related-party transactions with defendant Singhal and his related entities.

3.    It was not until May 21, 2007, however, that investors learned the truth about the Company after an exposé on Singhal appeared in a *Barron's* report. As a result, shares of the Company reached a new trading low of $8.31 per share -- a decline of over 36% compared to the IPO price of $13.00 per share. Investors' shock concerning defendant Singhal was compounded by *Barron's* report that the head of research at the Company's wholly-owned subsidiary Glass Lewis & Co. ("Glass Lewis"), Lynn E. Turner, and its managing director and research editor, Jonathan Weil, had both resigned from the subsidiary in protest over Defendants' material omissions from the Prospectus. Ironically, Glass Lewis is the leading provider of independent, global proxy research. Shareholders and institutional investors from across the globe rely on Glass Lewis' objective, cogent analysis of corporate governance issues, economic and financial matters and M&A transactions that come before shareholders for a vote.

4.    The importance of these resignations to investors cannot be understated because, according to *Barron's*, prior to joining Glass Lewis, Lynn E. Turner had been perhaps the best accounting regulator to serve at the SEC. Jonathan Weil, who also resigned, had previously served as staff member of the *Wall Street Journal*, where he was nationally recognized for being the first reporter to blow the whistle on Enron. Mr. Weil stated in a resignation letter, *"I am uncomfortable with and deeply disturbed by the conduct, background and activities of our new parent company Xinhua Finance Ltd., its senior management, and its directors. To protect my reputation, I no longer can be associated with Glass Lewis or Xinhua Finance."* (Emphasis added).

## JURISDICTION AND VENUE

5.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2).

6.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

7.     Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v. Many of the acts and transactions giving rise to the violations of the federal securities laws complained of herein, including the preparation and dissemination to the investing public of materially untrue and misleading statements, occurred, in part, in this District. Further, defendant Xinhua and/or the Individual Defendants (defined below) and Underwriter Defendants – JP Morgan, UBS, CIBC and WR Hambrecht – conduct business in, and the violations of the Securities Act took place in this District.   Moreover, Xinhua ADSs were ultimately listed for trading on the NASDAQ Market Exchange, also based in this District. Finally, the Individual Defendants conduct business in and many of the acts giving rise to the violations complained of herein took place in this District.

8.     In connection with the acts, transactions and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

### Lead Plaintiffs

9.     Lead Plaintiffs Leo Yen, James O'Callaghan, Shaokali Li, and Wu Lin purchased Xinhua ADSs pursuant and/or traceable to the Company's materially false and misleading Prospectus in connection with the IPO and were damaged thereby.  The relevant purchases are set

forth in Plaintiffs' certifications submitted in their lead plaintiff applications, incorporated herein by reference.

Issuer Defendant

10.    Defendant **XINHUA FINANCE MEDIA, LTD.** is a corporation organized under the laws of the Cayman Islands and headquartered in Shanghai, China.    According to the Company's Prospectus, Xinhua operates as a diversified media company in the People's Republic of China. The Company operates five divisions: Media Production, Broadcasting, Print, Advertising, and Research. The Media Production division operates in-house production studios that create and produce various programs, including business, entertainment, educational, and animation shows.  The Broadcasting division engages in the distribution of its programming through Inner Mongolia Satellite Television; production and syndication of the Fortune China series of financial programs, including Fortune Morning 7 a.m., a popular financial news program in China; and production and distribution of bilingual content for China Radio International's EasyFM stations in Beijing and Shanghai. The Print division has the right to sell advertising and provides management and information consulting services to Money Journal magazine and the Economic Observer newspaper. The Advertising division operates an advertising agency that creates and places advertising for television, print media, and campus billboards. This division also purchases the rights to be an advertising agent for television shows broadcast by Beijing Television Station and other television stations; and in the Beijing, Shanghai, and Tianjin real estate pages of the Economic Observer, as well as other newspapers. The Research division operates a market research group that provides research services on products, advertisements, and markets that include market characteristics, consumer preferences, and opinions with respect to advertising and media content, and business and technology issues as needed for each project.

Individual Defendants

11.    The individuals identified as defendants in subparagraphs (a) - (b) below, are referred to collectively herein as the "Individual Defendants." The Individual Defendants are each liable for the untrue statements contained in, and omissions from, the materially untrue and misleading Prospectus, as alleged herein, as those statements were "group-published" information. The Individual Defendants include the following:

(a)    Defendant **LORETTA FREDY BUSH** ("Bush") is, and was at all relevant times, Chief Executive Officer and Chairman of the Board of Directors of the Company. Defendant Bush signed the materially untrue and misleading Prospectus filed with the SEC. Also in connection with the IPO, defendant Bush sold at least 1.5 million shares of her personally-held Xinhua ADSs to reap over $19.5 million in gross proceeds. In addition, an entity named as Dragon Era Group Ltd. -- reported to be owned by Fredy Bush's family trust -- sold an additional 1.5 million IPO shares to reap an additional $19.5 million in connection with the IPO.

(b)    Defendant **SHELLY SINGHAL** ("Singhal") was, at the effective time of the IPO, Chief Financial Officer and a member of the Board of Directors of the Company. Defendant Singhal signed the materially untrue and misleading Prospectus filed with the SEC. On May 15, 2007, defendant Singhal resigned as CFO and became the director of corporate development. On May 18, 2007, after the close of trading and the day before an exposé on Singhal's troubling background, history, and affiliations was printed in *Barron's*, the Company announced that Singhal "resigned from the Boards of both companies, as well as from all executive and managerial positions. His departure is immediate."

__Underwriter Defendants__

12.    In connection with the IPO, the following investment banks acted as Underwriters of the IPO -- distributing over 23.076 million shares of Xinhua ADSs to investors and initiating the first public market for Xinhua ADSs. Excluding the oversubscription allotment of an additional 3.461 million shares to be sold by Company and insiders, the distribution of the Xinhua shares awarded Underwriters in the IPO occurred, as follows:

| Name | Number of ADSs |
|---|---|
| Defendant J.P. Morgan Securities Inc. | 13,846,153 |
| Defendant UBS AG | 6,923,077 |
| Defendant CIBC World Markets Corp. | 923,077 |
| Defendant WR Hambrecht & Co. LLC | 923,077 |
| Non-Party ABN AMRO Bank N.V., Hong Kong Branch and N M Rothschild & Sons (Hong Kong) Limited, each trading as ABN AMRO Rothschild.[1] | 461,539 |
| TOTAL | 23,076,923 |

13.    In connection with the IPO, the Underwriter Defendants were paid approximately $21 million in gross fees -- paid indirectly by purchasers of the Company's shares. The Underwriter Defendants were paid at least $0.91 per share in connection with the sale of the 23.076 million ADSs, not including ADSs sold pursuant to the exercise of the Underwriter's over-subscription option, as follows:

| | Per ADS | Total |
|---|---|---|
| Initial public offering price | $ 13.00 | $ 299,999,999 |
| Underwriting discounts and commissions | $ 0.91 | $ 21,000,000 |
| Proceeds to Xinhua Finance Media, before expenses | $ 12.09 | $ 209,252,789 |

[1]    As a result of the comparatively smaller number of shares that ABN AMRO distributed in the IPO, and because these shares were primarily distributed by ABN AMRO to investors outside the United States, this underwriter has not, at this time, been named as a defendant herein.

Proceeds to the selling shareholders, before expenses     $1,12.09     $ 697,47,210

14.     Shareholders paid approximately $21.0 million in combined fees to compensate the Underwriter Defendants for conducting a purported significant "due diligence" investigation into Xinhua in connection with the IPO. The Underwriter Defendants' due diligence investigation was a critical component of the IPO and was supposed to provide investors with important safeguards and protections.

15.     The due diligence investigation that was required of the Underwriter Defendants should have included a detailed investigation into Xinhua sales, accounting, controls and procedures. It also required defendants to conduct background checks for each of the members of the Board and for senior officers of the Company. A reasonable due diligence investigation would have extended well beyond a mere casual view of Xinhua's books, records, and the résumés of the Individual Defendants. The failure of the Underwriter Defendants to conduct an adequate due diligence investigation was a substantial contributing factor leading to the harm complained of herein.

16.     In addition to the foregoing, because of the Underwriter Defendants' and Individual Defendants' positions with the Company, they each had access to the adverse undisclosed information about Xinhua's officers and directors via access to internal corporate documents (including the Company's operating plans, budgets, and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith and/or other information that would have reasonably been uncovered in connection with an adequate and reasonable due diligence investigation into the backgrounds of the Company's key officers and directors.

17.     As officers and controlling persons of a publicly-held company whose ADSs were, and are, registered with the SEC, and were traded on the Nasdaq stock market exchange (the "Nasdaq"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company and its officers and directors, so that the market price of the Company's publicly-traded ADSs would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions made in connection with the issuance of approximately $300 million ADSs in March 2007 violated these specific requirements and obligations.

18.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company at the time of the IPO. Each Individual Defendant was provided with copies of the documents alleged herein to be materially untrue or misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.

## BACKGROUND TO THE IPO

19.     On March 9, 2007, Xinhua completed the sale of 23,076,923 ADSs priced at $13.00 per share to raise gross proceeds of approximately $300 million. Of these shares, 17,307,923 were sold by the Company and 5,769,000 were sold by certain selling shareholders, including defendants Bush and Singhal. These shares priced directly in the middle of the $12.00 to $14.00 range for this market debut and, the day of the Xinhua IPO, defendant Bush rang the closing bell on the Nasdaq.

20.     The same day these shares were sold to the public, Defendants also filed a copy of the Company's Prospectus with the SEC, pursuant to Form 424(B)(4). The Registration Statement was also filed that same day.

9

21.    Xinhua's Prospectus stated that the Company's strengths included its "[s]trong and Experienced Management Team" and stated that its management team is ones of its "strongest assets." Xinhua claimed to have audit and compensation committees with important oversight responsibilities as well as certain "independent" directors. The Prospectus also included biographies of each of its executives, including defendants Singhal and Bush, that purported to highlight their positive contributions to or affiliations with other companies, both past and present.

22.    Unbeknownst to investors, however, at that time, Defendants failed to disclose in the Prospectus, *inter alia*, that defendant Singhal, the Company's Chief Financial Officer and a member of the Board of Directors of the Company, was the owner of a brokerage firm in California that had been the subject of state and regulatory proceedings that impacted directly on his ability to serve as an officer or director of a public corporation. Defendants further failed to disclose various other disturbing, material associations between defendant Singhal and other companies, including problematic related party transactions involving companies being investigated and profits for defendant Singhal that were not adequately disclosed. Defendants also omitted to disclose in the Prospectus various additional, material, true adverse facts, as discussed in the section immediately below.

23.    On May 21, 2007, *Barron's* published an exposé entitled "Ignoring An Inconvenient Truth" that revealed Singhal had a long history of close ties and/or direct involvement with numerous companies against whom charges of stock manipulation and organized corruption have been levied. This material, adverse history was omitted from the Prospectus.

24.    On this news, and as a direct result of investors learning the truth about the Company, Xinhua's stock price collapsed to a record low of $8.31 per share, compared to the IPO price of

$13.00 per share -- a decline of over 36% compared to the IPO price and a decline of over 18% compared to the trading price of Xinhua prior to this news reaching the markets.

## MATERIAL ADVERSE FACTS OMITTED
## FROM THE COMPANY'S PROSPECTUS

25.     The material, adverse facts omitted from the Prospectus include the following:

**Bedrock Cease-and-Desist Order And Related Transactions With Defendant Bush**

(a)    A "Cease and Desist" Order was issued by NASD in April 2006 for violation of several SEC rules, related to Newport Beach, California based Bedrock. These rules include: SEC Records Rule 17A-3, 17A-4, SEC Net Cap Rule 15C3-1 and Customer Protection Rule 15C3-3. The order was not lifted until December 2006 and *the regulatory inquiry is still ongoing*. At the time the Prospectus for the IPO was filed, defendant Singhal was simultaneously the Company's CFO and also owned and controlled Bedrock.

(b)    Upon information and belief, Xinhua Finance Limited ("XFL"), the parent company of Xinhua Finance Media, Ltd., was Bedrock's primary client, and, therefore, any issue affecting Bedrock has a material relationship with XFL.

(c)    For example, sometime subsequent to April 2004, Bedrock set up a clearing relationship with UBS to sell XFL stock because Bedrock itself was restricted under its NASD license to trade in foreign stocks. Upon information and belief, in February 2006, numerous shares of XFL stock owned by Fredy Bush were transferred into the name of Bedrock and then sold during several trading days when black-out periods were in effect for the stock. The total windfall of the trades was $13 million. The proceeds of the sale

were wired to Bedrock from UBS. Shortly afterward, Bedrock sent a wire to defendant Bush in the amount of $13 million minus Bedrock's commission.

(d)    Bedrock has terminated and/or withdrawn its registration as a broker dealer as of July 31, 2007.

### Civil Racketeering Charges Against Defendant Singhal

(e)    At the time of the IPO, defendant Singhal was targeted by a lawsuit filed in California entitled *National Account Management Inc., et al v. Shelly S. Singhal et al*, 8:2007cv00333, which alleges that he had engaged in civil racketeering and organized corruption related to other, undisclosed investment activities (the "RICO Action").[2] The RICO Action alleges that defendant Singhal masterminded a "pump and dump" scheme in connection with penny stock, Perfisans Holdings Inc. ("Perfisans"). The plaintiffs in the RICO Action – National Account Management Services Inc. ("NAM") and Business Growth Funding Inc. ("BGF") – allege that Singhal manipulated the market for his own gain by illegally causing the plaintiffs' shares to be cancelled while trading his own shares of stock in Perfisans. The plaintiffs also allege that in December 2003 they entered into a agreement with defendant Singhal's company, SBI-USA LLC ("SBI"), under which they were to deposit a combined total of 747,000 shares of stock of Perfisans into an escrow account held by SBI.[3] SBI held itself out to be an experienced investment banking firm, and its fee as the escrow agent was $4,000 plus .5 percent of the value of the deposited shares upon their sale.

---

[2]    The RICO Action, originally filed in state court in California approximately one month prior to Xinhua's IPO, includes RICO and conspiracy-to-commit-securities fraud allegations against Singhal and related parties. On March 21, 2007, the case was transferred to the United States District Court, Central District of California.

[3]    SBI has also conducted a number of related party transactions with Xinhua.

(f)    Defendant Singhal assured the plaintiffs that the Perfisans share certificates were safely held by SBI and would not be released without the plaintiffs' authorization and instruction.  In the months thereafter, SBI had the plaintiffs execute documents for opening brokerage accounts, as well as executing Form 144s, for the purpose of publicly selling the shares.

(g)    However, the shares were never sold.  Instead, defendant Singhal informed the plaintiffs that his assistant had "mistakenly" sent the share certificates to a third party named Richard Hue, who secretly controlled Perfisans. Defendant Singhal subsequently reported that Hue refused to return the share certificates; that Perfisans was cancelling the share certificates; and that he was being threatened by Hue with physical violence. Although defendant Singhal assured the plaintiffs that he would retain legal counsel to file a lawsuit against Perfisans and Hue seeking return of the share certificates, he never pursued litigation.

(h)    Instead, the plaintiffs allege in their RICO Action that the share certificates were wrongfully and illegally cancelled by Perfisans and Hue and with the full knowledge of defendant Singhal. The plaintiffs also state that during the time they were deprived of the control of the shares, the market price exceeded $2.00 per share reaching a value in excess of $1.6 million.

(i)    Moreover, according to the RICO Action, during this time, and "unbeknownst to Plaintiffs, Singhal had been trading his own shares of stock in Perfisans while trying to avoid the impact of the sale of the Plaintiffs' shares to the market, thereby manipulating the market for his own personal gain. Ultimately, it is believed that Singhal caused the Plaintiffs shares to be cancelled so that he would benefit with his own shares of stock. In

13

essence, Singhal used his enterprise known as SBI to convince Plaintiffs to entrust him and turn over their shares of stock, while he obviously intended to hold back the effect on his shares of the placing of the 747,000 shares of Plaintiffs on the market. To this day, Shelly Singhal and his affiliates have refused to return the shares of stock or value even though they realized a windfall of profits." According to a review of the case file, the action is currently in settlement negotiations.

(j)    In addition, the plaintiff's RICO case statement filed with the court on April 25, 2007, further referred to defendant Singhal as the "mastermind of the RICO activity" and that Singhal and his associates "failed to disclose they owned personal shares of Perfisans stock so they could 'pump and dump' their own personal shares."

(k)    The RICO case statement further alleges that defendant Singhal, through the use of his SBI enterprise, has been engaged in a pattern of making illegal usurious loans ("loan sharking") in violation of the California Constitution, Article 15.

(l)    None of this information was disclosed in the Prospectus.

**Defendant Singhal's Connections To AremisSoft and ACLN**

(m)    Prior to becoming an early investor in Xinhua, in 2003, defendant Singhal was also an investor in and lead investment banker for AremisSoft and ACLN, Ltd. ("ACLN"). AremisSoft and ACLN have been described in the press as "outrageous frauds," and both companies have been sued for securities fraud in class action shareholder litigations, among other legal or regulatory actions.

(n)    Defendant Singhal was a lead investment banker for ACLN, a Cyprus corporation that engaged in what the SEC called an exceptionally bold and elaborate fraud, resulting in losses of hundreds of millions of dollars to investors in the U.S. and abroad. In March

14

2002, the SEC shut down trading in shares of ACLN, marking the first time in 20 years that the SEC had halted the shares of a stock trading on the New York Stock Exchange. When the SEC issued its full report later that year, it described ACLN as being little more than a shell and a complete fraud.

(o)    Defendant Singhal was an investor in AremisSoft and the lead investment banker for that company's IPO. According to *Barron's*, AremisSoft is "a Cyprus-based computer consultant that swindled hundreds of millions of dollars from investors through false financial reports and stock manipulation." Bill Alpert, *Can Xinhua Get its House in Order?*, *Barron's*, May 28, 2007. U.S. prosecutors said that company executives inflated revenue with bogus foreign contracts in India and Bulgaria and sold close to $300 million worth of their own shares before the company's stock plunged from $20 to $1 per share.

## Personal Profits for Defendant Singhal Through SBI And Other Related Entities

(p)    Since at least 2003, Xinhua and XFL (the parent company of Xinhua) have engaged in a number of related party transactions with Singhal's related companies. These transactions resulted in material personal profits for defendant Singhal, according to various press reports (*see, e.g.*, ¶ 31).

## Defendant Singhal's Connections To Cruttenden Roth Inc. and Roth Capital Partners Inc.

(q)    Defendant Singhal was employed by Roth Capital Partners LLC ("Roth Capital") – specifically its previous incarnations, Cruttenden Roth Inc. ("Cruttenden") and Roth Capital Partners Inc. – from a period beginning in July 1995 through December 2000.

(r)    While Xinhua's Prospectus only makes a generic reference that defendant Singhal had been associated with "an investment banking firm in Orange County, California," in fact, defendant Singhal was Managing Director of Roth Capital. Defendant Singhal held

the position of Managing Director of Corporate Finance responsible for several areas within Roth, including its E-Commerce Group from 1995 to 2000 and serving as manager of Roth Capital Partners Bridge Fund. Roth Capital Partners has a history of nine regulatory events and 29 arbitration proceedings, according to its NASD report.

(s)   During defendant Singhal's involvement with Roth Capital, hundreds of thousands of dollars of fines were assessed against it in arbitration proceedings centering on allegations ranging from stock churning to breach of fiduciary duty and fraud. Regulatory sanctions against Roth Capital include inadequate supervisory procedures at the firm, late reporting, and failure to submit required financial statements.

(t)   An April 4, 1998 article in the *Los Angeles Times* stated that Cruttenden (the predecessor of Roth Capital) "has been tainted by the collapse of some of the companies it took public." The article reported that Cruttenden underwrote the initial stock offering of Aviation Distributors Inc. ("Aviation"), which settled three class actions in 1998 charging Aviation officials with falsifying sales figures. Cruttenden was also named as a defendant.

(u)   Importantly, while at Roth Capital, defendant Signhal served as co-lead underwriter in connection with the March 20, 2000 IPO of a Boca Raton, Florida-based company called Partsbase.com. ("Partsbase"). The following year, Partsbase was the subject of a securities class action suit alleging that the company had made untrue statements in its prospectus regarding the number of paying members of its services. Roth Capital and PMG Capital Corp. were also named as defendants in the suit and charged with securities violations.

(v)    Defendant Shingal also served as lead underwriter to Metropolitan Mortgage & Securities, Co.'s ("Metropolitan") January 2000 offering. Metropolitan filed bankruptcy in February 2004 following government scrutiny of its financial statements. Specifically, the SEC alleged that Metropolitan, either directly or through its subsidiaries, disguised the fact that it had financed all or most of the purchase price of various real estate deals, so that it could improperly book the paper profits immediately. In addition, on January 20, 2004, a securities class action was filed against Metropolitan and other parties including Roth Capital. A motion to dismiss filed by Roth Capital is currently pending.

(w)    In April 1999, defendant Singhal served as the lead investment banker in AremisSoft's IPO, according to the company's prospectus on file with the SEC. AremisSoft, a Cyprus-based computer consultant, defrauded investors out of hundreds of millions of dollars through false financial reports and stock manipulation. The AremisSoft fraud was uncovered in the summer of 2001. U.S. prosecutors said company executives inflated revenue with bogus foreign contracts in India and Bulgaria and sold close to $300 million worth of their own shares before the company's stock plunged from $20 to $1 per share. *Barron's* reported that defendant Singhal was a major investor in AremisSoft, although defendant Singhal responded in a follow-up press report that he owned less than 1 percent.

(x)    Roth Capital was among three investment banks that underwrote a $41.5 million secondary offering for Suprema Specialties, Inc. ("Suprema"), a New Jersey cheese maker which almost immediately unraveled amid allegations that it had inflated sales of $560 million in a series of fake transactions with customers. In September 2007, Roth Capital

17

along with other underwriters and Suprema's accounting firm agreed to pay $19 million to settle a class-action lawsuit.

**Defendant Singhal's Connections To iMergent**

(y)    Defendant Singhal assisted Donald L. Danks ("Danks") in forming a predecessor company to "iMergent" when defendant Singhal was with Roth Capital. Until recently, defendant Singhal and Danks shared office space within Bedrock and Danks is a close associate of Singhal. Defendant Singhal was elected to the iMergent board in November 2000. In May 2002, iMergent announced defendant Singhal's resignation from the post for reasons that were not publicly disclosed.

(z)    While Managing Director of Technology Investment Banking at Bluestone Capital Corp., a broker dealer, defendant Singhal entered into an agreement in November 2000 to provide financial advisory services to iMergent.

(aa)    For the past two years, iMergent has been under an SEC investigation and is facing private and public lawsuits. In 2005, iMergent was forced to restate its financial data from 2002 to 2005 and change its accounting from an accrual to a cash system. The restatement turned results for iMergent's 2003 and 2004 fiscal years into losses. In 2001 through early 2002, iMergent retained vFinance Investments, Inc. and SBI-E2 Capital USA Ltd -- entities at which defendant Singhal was a principal and managing director, respectively -- to act as financial advisor and placement agent for a private placement of unregistered securities that closed during May 2002. iMergent also engaged SBI-E2 Capital as a consultant for various other financial services, including the drafting of a fairness opinion on a proposed merger. iMergent has already paid hundreds of thousands of dollars in refunds and legal expenses to defend itself against charges of deceiving

customers in Texas, California, Indiana and Australia. Disgruntled clients allege that iMergent's how-to-do-business-on-the-Internet workshops are simply high-pressure sales sessions without any benefit, according to a May 7, 2007 report in *Barron's*. In addition, iMergent is facing a current suit by the Illinois Attorney General accusing the company of misleading clients. A spokeswoman for the Florida State Attorney General's office told *Barron's* in May 2007 that it is pursuing an active investigation. *Barron's* also learned that investigations of iMergent's business practices are at early stages in Oregon and Maryland.

### Defendant Singhal's Involvement with Chell Group Corp.

(bb) Defendant Singhal was also involved with Chell Group Corporation ("Chell"), a company delisted by Nasdaq, which faced allegations of criminal activity involving its top officers. Based in Canada and formerly operating through Chell Merchant Capital Group, the company conducted its business primarily by funding application service providers, offering financing, consulting and other administrative services. In July 2001, the company – a penny stock – elected defendant Singhal to the board in connection with his role to provide corporate finance and M&A services to the company. In a press statement, defendant Singhal said: "I am excited by the prospects that the Chell Group offers. Cameron [Chell, chairman and CEO] and his team have a strong track record . . . ."

(cc) In October 2001, Chell formally announced it had retained defendant Singhal's SBI E 2 Capital USA to provide corporate finance and M&A services to accelerate Chell's growth plans. In a press release, Singhal stated: "Their strong vision will be the key to success in making strategic acquisitions . . . . My team and I are very pleased to partner with this exciting group . . . ." The press release further elaborated that defendant Singhal

was Managing Director and Executive Vice President of Investment Banking at SBI E-2 Capital USA, a new US investment bank arm of Japan's Softbank Investment Group.

(dd)  By June 2002, Chell Group had been delisted by the NASDAQ.  That year, Canadian authorities filed criminal charges against long-time director Adrian Towning, who sat on the board with defendant Singhal, and the United States Federal Trade Commission, in a parallel American probe, filed a civil complaint against Towning and his associates.

(ee)  Towning and his associates were charged with employing 400 people in a telemarketing scheme in a series of boiler rooms in Ontario and Quebec that sold business services that were never ordered or delivered.  The telemarketing charges came 4 ½ months after Towning had replaced company founder Cameron Chell as chairman of the board of Chell Group after Cameron Chell was stripped of all management control.

(ff)   Cameron Chell's loss of control of the company was the result of an investigation by the Ontario Securities Commission into the activities of a notorious penny stock promoter, Mark Valentine, a close associate of Cameron Chell's, according to press reports. Valentine was sited for his handling of dubious domestic and offshore dealings in Chell Group, among other entities promoted by Cameron Chell.  In August 2002, Valentine was arrested in a Canadian-American governmental undercover operation involving fraudulent penny stock dealings.  A December 18, 2002 article in *Canada StockWatch* further notes that Cameron Chell was kicked out of the brokerage industry in November 1998 and charged under the Criminal Code of Canada with knowingly causing his assistant to forge a client's account-opening signature.

**Defendant Singhal's Undisclosed Profitable Transactions**
**To The Detriment of Small World Kids, Inc.**

(gg)  In October 2004, defendant Singhal was appointed to the board Small World Kids, Inc., ("Small World"), a $28 million publicly-traded company based in California which was a developer and manufacturer of specialty toys and educational products for children. As of October 2006 and at the time of the company's public offering to sell approximately 20 million shares of common stock by various shareholders, defendant Singhal – personally and through various entities he controlled – owned 32.1 percent of Small World.  At year-end 2006, defendant Singhal's stake in the company stood at close to 25 percent.

(hh)  In October 2006, Small World stated that it had awarded "four year immediately exercisable warrants to purchase 100,000 shares of common stock exercisable at $5.00 per share to SBI Advisors (controlled by Singhal)" as a placement fee for a $1 million loan defendant Singhal had arranged.  The lender was Hong Kong League Central Credit Union, which appears to be affiliated with defendant Singhal based on the fact that his name was listed on the signature line with this company's name in SEC documents filed by Small World.

(ii)  While the Prospectus disclosed defendant Singhal was a director and member of the compensation committee of Small World, it omitted to disclose the foregoing facts, and that defendant Singhal benefited from his transactions with Small World amid a severe financial crisis at the company and a history of a lack of profitability.  On August 2, 2007, Small World filed for bankruptcy protection.  According to press reports, in the months leading up to its bankruptcy, the company lived increasingly hand-to-mouth and sought

further short-term borrowings with more stringent requirements. By the spring of 2007, Small World was in dire financial straits. Singhal is currently on the board.

### Defendant Bush's Tax Problems Regarding Her Original Investment in the Company

(jj)   Defendant Bush's original investment in Xinhua drew scrutiny from the Internal Revenue Service ("IRS").   In court filings, the agency claimed that Ms. Bush "fraudulently and with intent to evade tax, purchased her interest in (Xinhua Finance's predecessor company) using loans, offshore entities and conduits." Mr. Kung, who helped set up that company, was involved in those transactions, the IRS alleged. (Mr. Kung later received, for "consulting work," 630,000 warrants to purchase stock in Xinhua Finance Media at well below the offering price). The IRS claimed that Ms. Bush failed to report a $1 million dividend connected with these transactions. Ms. Bush denied the agency's allegations, including the claim that she owed $3 million in back taxes and penalties. The matter ended up in U.S. Tax Court.

(kk)   A *Forbes* article dated July 2, 2007, entitled *The American Boss of a Chinese News Outfit Makes News Herself*, also discusses defendant Bush's tax problems:

> Loretta Fredy Bush, the high-profile American-born head of Shanghai's Xinhua Finance Media, recently settled long-running litigation with the U.S. government by acknowledging she had filed personal tax returns understating her liability by 97%. She also admitted in court documents that she "incorrectly" stated on those returns that she had no authority over or interest in any foreign financial accounts. In the civil settlement, filed in U.S. Tax Court in Washington, Bush agreed that her combined liability for 1999 and 2000, including penalties, was $853,717, or 36 times the $23,501 she'd declared. Any interest that Bush owed came on top of this settlement amount.
>
> Word of the settlement surfaces at a difficult time for Bush and XFM, an offshoot of the official Chinese propaganda agency, Xinhua, which aspires to become the major provider of Chinese-

themed financial data and news. XFM's chief financial officer just left amid claims that the company did not disclose he'd previously run a brokerage firm under a cease-and-desist order from regulators. Bush felt compelled to announce she would "continue enhancing" corporate governance. An executive of U.S. proxy adviser firm Glass Lewis, which an XFM affiliate also headed by Bush bought last year, resigned, charging a lack of corporate transparency. Since XFM's U.S. public offering in March, at two shares for each American Depositary Receipt, the twofers have fallen 40% to a recent $7.79. Shareholders have filed lawsuits.

*    *    *

[...] Bush filed her Tax Court lawsuit in 2005. She asserted that her numbers were accurate as filed.

The IRS said Bush hid taxable income by calling it loans and transfers of assets for others. The two tax years at issue, during which Bush listed addresses in Hawaii, coincided with her early planning for Xinhua Financial Network, an affiliate she later would head. Bush, the feds stated, "fraudulently and with intent to evade tax purchased her interest ... using loans, offshore entities and conduits." In a filed reply Bush flatly denied this. The eventual tax settlement included penalties for inaccuracy and late filing but not for fraud. As for her failure to declare foreign accounts two years running, Bush blamed her accountant.

In support of its case the IRS filed in court dozens of documents, including faxes, e-mails, account statements and other internal material depicting considerable wheeling and dealing by Bush. The trove contains references to Cayman Islands entities, purported efforts to hide business ownerships and the movement of funds across national borders using traveler's checks. A 2001 organizational chart for "Bush Holdings" listed 37 businesses, although an XFM spokesman says she was a consultant working for clients. Bush signed a construction contract for a Hawaiian ranch that on one page called her a co-owner with a man listed on another page as owning the property as part of a "Mr. and Mrs." She filed a court response denying they ever had been married. The XFM spokesman says the man was just a friend and that Bush was the sole owner.

*    *    *

23

### Material Omissions That Enriched Insiders

26.    In 2006, Xinhua incorporated some new acquisitions into its media subsidiary, but first passed them through newly-created entities – including the strangely named "Upper Step" – that were owned by insiders, including defendant Bush, and by Chinese corporations. Upper Step lost money in 2006, according to a May 24, 2007 *New York Post* article. The Prospectus also described Upper Step as "having no operations" until it entered into some "strategic partnerships." Nevertheless, the transactions had the effect of "enriching insiders and 'stepping up' the value of those assets when they finally reached Xinhua Finance Media's balance sheet. In this manner, Xinhua effectively gave $19 million to Singhal and a long time business partner of Bush's named Dennis Pelino." Bill Alpert, *Can Xinhua Put Its House in Order?*, Barron's, May 28, 2007. The relationship between defendants Pelino and Bush is also not disclosed in the Prospectus, as "Pelino [not only] actually co-founded Xinhua Finance with Bush and has been her business partner since 1989," according to the *Barron's* May 28 report.

27.    Defendant Singhal's shareholdings and compensation package at the Xinhua Finance Media subsidiary were second only to Fredy Bush's, *Barron's* reported in a May 28, 2007 article. "He has been so integral to the formation of Bush's company that investors should consider why she put him in charge of Xinhua Finance's audit committee, its compensation and investments." Defendant Singhal started helping Bush put together Xinhua Finance in 2003, according to the *Barron's* article.

28.    A July 9, 2007 article in the *Wall Street Journal* reported that defendant Singhal first became interested in the Company in 2002. "In 2002, former Arkansas Gov. Jim Guy Tucker flew to Hong Kong to check up on defendant Bush on behalf of an acquaintance, California investment banker Singhal. Defendant Singhal was considering investing and knew that Mr. Tucker, who

24

stepped down as governor in 1996 after his conviction for fraud stemming from the Whitewater investigation, had investments in Asia," the *Wall Street Journal* reported. "He sent favorable reports to Mr. Singhal, who eventually invested and became a director."

29.    The Company also overpaid for equity stakes in two companies from Sino Investment LLC – an investment company controlled by Singhal. Xinhua purchased a 37% stake in Upper Step and a 61% stake in Accord Group for a total of $9.1 million in cash, 6.92 million class A shares, and 4.1 million warrants. Given the $13 per share value at the time of IPO, these deals implied a valuation for the units sold to Xinhua of $51.2 million for Upper Step and $3.81 million for Accord. A little more than six months prior, however, Upper Step and Accord were valued at only $26 million and $2.3 million respectively. Despite the fact that both companies were losing money, Xinhua paid significantly more for its shares in the companies than they were worth. Roddy Boyd, *Xinhua Exec's Pre-IPO Deals*, N.Y. Post, June 1, 2007.

30.    The above transactions were also advantageous to defendant Bush. Every time the Company makes an acquisition or issues shares, defendant Bush receives the equivalent of 3% of the value of the new shares or acquisitions in new shares. The more expensive the acquisition, the more defendant Bush profits. James Areddy and David Reilly, *Riding the Tiger*, *Wall Street Journal*, July 7, 2007.

31.    These transactions appear more egregious when viewed in the light of defendant Singhal's past corporate shenanigans. Since at least 2003, Xinhua and XFL (the parent company of Xinhua) have engaged in a number of related party transactions with Singhal's SBI. For example, in November 2003, Xinhua Financial Network announced in a press release that it had finalized a round of financing for $20 million with the assistance of SBI serving as one of two investment bankers on the deal. Further, in November 2003, Singhal, as Managing Director of SBI, then a division of