UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

IN RE XINHUA FINANCE MEDIA, LTD.
SECURITIES LITIGATION

Master File 07 Civ. 3994 (LTS)

**MEMORANDUM IN SUPPORT OF THE UNDERWRITER DEFENDANTS' MOTION
TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION
COMPLAINT**

CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY 10019
(212) 878-8000

*Attorneys for Defendants JP Morgan
Securities, Inc., UBS AG, CIBC World Markets
Corp. and W.R. Hambrecht + Co. LLC*

NYA874341.1

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF PLAINTIFFS' ALLEGATIONS ..................................................3

ARGUMENT...........................................................................................................7

I.  PLAINTIFFS' SECTION 11 AND 12 CLAIMS SHOULD BE DISMISSED
    BECAUSE DEFENDANTS EITHER DISCLOSED, OR HAD NO DUTY TO
    DISCLOSE, THE ALLEGEDLY OMITTED INFORMATION .......................................7

    A.    The Alleged Omissions Concerning Xinhua Fail to State A Claim ......................7

    B.    Defendants Had No Duty to Disclose The Alleged Omissions Concerning
          Singhal's Involvement with Other Companies......................................................11

II.  THE ALLEGED FAILURE OF THE UNDERWRITER DEFENDANTS TO
     CONDUCT AN ADEQUATE DUE DILIGENCE INVESTIGATION DOES
     NOT STATE A CLAIM UNDER SECTIONS 11 OR 12.................................................18

III. PLAINTIFFS' SECTION 12 CLAIM SHOULD BE DISMISSED BECAUSE THEY
     DID NOT PURCHASE SHARES IN THE IPO AND DO NOT ALLEGE A
     DIRECT PURCHASE FROM THE UNDERWRITER DEFENDANTS.........................19

    A.    There Is No Section 12(a)(2) Liability to Aftermarket Purchasers, Such As
          Plaintiffs................................................................................................................19

    B.    There Are No Allegations of Direct Purchase from Underwriter
          Defendants .............................................................................................................21

CONCLUSION.........................................................................................................22

NYA874341.1

## TABLE OF AUTHORITIES

**Page**

## CASES

*Akerman v. Oryx Commc'ns, Inc.*,
    810 F.2d 336 (2d Cir. 1987)............................................................4

*In re Allied Capital Corp. Sec. Litig.*,
    2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003)...................................3

*Am. High-Income Trust v. AlliedSignal*,
    329 F. Supp. 2d 534 (S.D.N.Y. 2004)......................................19, 20

*In re Azurix Corp. Sec. Litig.*,
    198 F. Supp. 2d 862 (S.D. Tex. 2002),
    *aff'd*, 332 F.3d 854 (5th Cir. 2003)..............................................20

*Bell Atlantic Corp. v. Twombly*,
    127 S. Ct. 1955 (2007)..................................................................10

*Capri v. Murphy*,
    856 F.2d 473 (2d Cir. 1988)..........................................................21

*Ciresi v. Citicorp*,
    782 F. Supp. 819 (S.D.N.Y. 1991),
    *aff'd*, 956 F.2d 1161 (2d Cir. 1992) .......................................14, 15

*In re Citigroup, Inc. Sec. Litig.*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004),
    *aff'd*, 165 F. App'x 928 (2d Cir. 2006) ........................................16

*Dartley v. Ergobilt, Inc.*,
    2001 WL 313964 (N.D. Tex. Mar. 29, 2001) ...........................21-22

*DeMaria v. Andersen*,
    153 F. Supp. 2d 300 (S.D.N.Y. 2001),
    *aff'd*, 318 F.3d 170 (2d Cir. 2003) .........................................20, 21

*In re Digital Island Sec. Litig.*,
    223 F. Supp. 2d 546 (D. Del. 2002),
    *aff'd*, 357 F.3d 322 (3d Cir. 2004) ..............................................13

*In re Donna Karan Int'l Sec. Litig.*,
    1998 WL 637547 (E.D.N.Y. Aug. 14, 1998)..................................16

NYA874341.1

# TABLE OF AUTHORITIES

**Page**

*Fant v. Perelman,*
 1999 WL 199078 (S.D.N.Y. Apr. 9, 1999)....................................................3

*In re Ford Motor Co. Sec. Litig.,*
 381 F.3d 563 (6th Cir. 2004) ....................................................10

*GAF Corp. v. Heyman,*
 724 F.2d 727 (2d Cir. 1983)............................................. 13-14, 15

*Galvin v. First Nat'l Monetary Corp.,*
 624 F. Supp. 154 (E.D.N.Y. 1985) ....................................................19

*Geiger v. Solomon-Page Group, Ltd.,*
 933 F. Supp. 1180 (S.D.N.Y. 1996)............................................. 12-13

*Goodridge v. Harvey Group, Inc.,*
 778 F. Supp. 115 (S.D.N.Y. 1991) ....................................................15

*Gustafson v. Alloyd Co.,*
 513 U.S. 561 (1995)....................................................19

*In re Int'l Rectifier Sec. Litig.,*
 1997 WL 529600 (C.D. Cal. Mar. 31, 1997)....................................................19

*Klein v. Gen. Nutrition Cos.,*
 186 F.3d 338 (3d Cir. 1999)....................................................9

*Komanoff v. Mabon, Nugent & Co.,*
 884 F. Supp. 848 (S.D.N.Y. 1995) ....................................................20

*Lasker v. N.Y. State Elec. & Gas Corp.,*
 5 F.3d 55 (2d Cir. 1996)............................................. 9-10

*In re Merrill Lynch & Co. Research Reports Sec. Litig.,*
 272 F. Supp. 2d 243 (S.D.N.Y. 2003)............................................. 3-4, 5, 9, 12, 21

*In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.,*
 434 F. Supp. 2d 233 (S.D.N.Y. 2006)............................................. 11, 13, 15

*In re N.Y. Cmty. Bancorp, Inc. Sec. Litig.,*
 448 F. Supp. 2d 466 (E.D.N.Y. 2006) ............................................. 18-19

NYA874341.1

## TABLE OF AUTHORITIES

**Page**

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
297 F.3d 1182 (11th Cir. 2002) ...............................................................11

*Phillips v. Kidder, Peabody & Co.*,
933 F. Supp. 303 (S.D.N.Y. 1996),
*aff'd*, 108 F.3d 1370 (2d Cir. 1997) ......................................................19

*Pinter v. Dahl*,
486 U.S. 622 (1988)...........................................................................21

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)................................................................10

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
441 F. Supp. 2d 579 (S.D.N.Y. 2006).....................................................15

*Schoenhaut v. Am. Sensors, Inc.*,
986 F. Supp. 785 (S.D.N.Y. 1997) .........................................................10

*Seibert v. Sperry Rand Corp.*,
586 F.2d 949 (2d Cir. 1978)..................................................................9

*In re Ultrafem Inc. Sec. Litig.*,
91 F. Supp. 2d 678 (S.D.N.Y. 2000).................................................11, 20

*United Res. Equity Partners I, L.P. v. Nat. Energetics Co.*,
989 F. Supp. 479 (S.D.N.Y. 1997) ........................................................10

*United States v. Matthews*,
787 F.2d 38 (2d Cir. 1986)..................................................................13

*Wielgos v. Commonwealth Edison Co.*,
892 F.2d 509 (7th Cir. 1989) .................................................................9

*Wilson v. Saintine Exploration & Drilling Corp.*,
872 F.2d 1124 (2d Cir. 1989)...............................................................21

NYA874341.1

**TABLE OF AUTHORITIES**

**Page**

### STATUTES AND OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(6)................................................................................1

15 U.S.C. § 77k............................................................................... *passim*

15 U.S.C. § 77k(b)(3) ...............................................................................19

15 U.S.C. § 77l(a)(1)................................................................................21

15 U.S.C. § 77l(a)(2)....................................................................... *passim*

15 U.S.C. § 77o.........................................................................................7

17 C.F.R. § 239.31 ...................................................................................12

Form 20-F, Fed. Sec. L. Rep. (CCH) ¶ 29,721 (Jan. 11, 2006).......................12

Bill Alpert, *Ignoring an Inconvenient Truth*, BARRON'S, May 21, 2007.................. *passim*

Roddy Boyd, *Xinhua Exec's Pre-IPO Deals*, N.Y. POST, June 1, 2007 .......................6, 7

NYA874341.1

Defendants JP Morgan Securities, Inc., UBS AG, CIBC World Markets Corp. and W.R. Hambrecht + Co. LLC (collectively, the "Underwriter Defendants") submit this memorandum in support of their motion, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiffs' Consolidated Amended Class Action Complaint ("Complaint"). The Underwriter Defendants also join in the motion to dismiss filed by Defendants Xinhua Finance Media, Ltd. ("Xinhua"), Loretta Fredy Bush and Shelly Singhal (together, the "Xinhua Defendants").

## PRELIMINARY STATEMENT

In April and May 2007, Plaintiffs purchased American Depositary Shares ("shares") of Xinhua, a diversified media company in China. Shortly after those purchases, Plaintiffs filed this lawsuit. Plaintiffs' initial complaints were prompted by a May 2007 drop in Xinhua's share price following publication of a *Barron's* article alleging negative information about Xinhua's CFO, Defendant Shelly Singhal. The article's main "revelation" was that Singhal ran a company unrelated to Xinhua called Bedrock Securities, LLC ("Bedrock"), which purportedly was subject to a NASD cease-and-desist order at the time of Xinhua's initial public offering ("IPO"). According to Plaintiffs, the failure to disclose the existence of this pending cease and desist order in the Registration Statement and Prospectus (together, the "March 2007 Prospectus") for Xinhua's IPO violated Sections 11 and 12(a)(2) of the Securities Act of 1933 ("1933 Act").

However, the *Barron's* article was wrong. Bedrock was not subject to an NASD cease and desist order at the time of the Xinhua IPO. That cease and desist order had been lifted the previous December.

Even though the foundation for their lawsuit has crumbled, Plaintiffs have chosen to press forward with their claims. Plaintiffs' amended Complaint no longer alleges that Xinhua's March 2007 Prospectus failed to disclose that Bedrock was subject to an NASD cease and desist order at the time of Xinhua's IPO. All that is left is a grab bag of attenuated, irrelevant, or

previously disclosed "facts" that Plaintiffs allege were misrepresented in or omitted from the Prospectus.

Only two of those "facts" actually concern Xinhua. The first involves related party transactions which allegedly overcompensated Singhal and Xinhua's CEO, Defendant Fredy Bush. As discussed below, those transactions were all publicly disclosed and therefore cannot form the basis for Section 11 or 12(a)(2) liability. The second such "fact" concerns the Prospectus' purportedly misleading statement that Xinhua's management team was one of its "strongest assets." This is nothing more than inactionable puffery and fails to support a claim under Sections 11 or 12(a)(2).

Plaintiffs' remaining allegations do not even concern Xinhua. Instead, Plaintiffs allege that the Prospectus omitted unproven allegations concerning Singhal's involvement with companies completely separate from Xinhua. Most of those allegations are nothing more than Plaintiffs' innuendo stemming from investment banking services Singhal provided to companies several years ago, where those companies -- but not Singhal -- were later accused of fraud. As shown below, there was no duty to disclose such information and thus no liability under Sections 11 or 12(a)(2).

Plaintiffs' allegation that the Underwriter Defendants failed to conduct an adequate due diligence investigation into the background of Xinhua's management also is not actionable under Sections 11 and 12(a)(2). Those sections do not impose any duty on underwriters to conduct due diligence. Rather, they allow underwriters to raise their "due diligence" as an affirmative defense to prospectus omission claims under Sections 11 and 12(a)(2).

Finally, Plaintiffs' Section 12(a)(2) claim also should be dismissed because they purchased their shares of Xinhua in the aftermarket, not in the March 2007 IPO, and because they fail to allege that they purchased their shares directly from any of the Underwriter Defendants.

- 2 -

## STATEMENT OF PLAINTIFFS' ALLEGATIONS

The Underwriter Defendants led the syndicate that underwrote Xinhua's March 9, 2007 IPO of its shares.[1]  In connection with that IPO, Xinhua filed the March 2007 Prospectus with the SEC.[2]  That Prospectus described Xinhua in detail, including its business as a diversified media company in China, its management, and its financial condition.  The Prospectus also warned potential investors that "[a]n investment in our ADSs involves significant risks."[3]  For over 30 pages, the Prospectus described the types of risks that could adversely impact an investment in Xinhua.  Those risk disclosures repeatedly emphasized the potential volatility of Xinhua's shares, including:

- "The market price for our ADSs may be volatile." (Prospectus at 40.)

- "We derive a substantial proportion of our revenues from advertising, and the advertising market is particularly volatile." (*Id.* at 20.)

- "An active trading market for our ADSs may not develop and the market price of our ADSs may decline below the initial public offering price." (*Id.* at 40.)

- "The market price for our ADSs is likely to be highly volatile and subject to wide fluctuations in response to factors including….addition or departure of our executive officers and key personnel." (*Id.*)

Xinhua's IPO was priced at $13.00.[4]  Five days later (March 14, 2007), as foreshadowed by the warnings about price volatility, Xinhua's share price had dropped to $10.09.[5]  On April 5,

---

[1]  Compl. ¶ 9.

[2]  Compl. ¶ 20.  The Xinhua Defendants are submitting a copy of the March 2007 Prospectus in support of their motion to dismiss.

[3]  Prospectus at 15.

[4]  Compl. ¶ 13.

[5]  *See* Declaration of Mark Holland dated December 21, 2007 ("Holland Decl."), Ex. A, *Bloomberg Finance* quotation of stock prices for Xinhua, at 15.  This Court "may take judicial notice of public quotations of stock prices."  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* 272 F. Supp. 2d 243, 254 (S.D.N.Y. 2003) ("*Merrill Lynch Research Reports*"); *accord In re Allied Capital Corp. Sec. Litig.,* 2003 WL 1964184, at *3 (S.D.N.Y. Apr. 25, 2003) (on a motion to dismiss, the court may take judicial notice of "well-publicized stock prices") (quoting *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 167 n.8 (2d Cir. 2000)); *Fant v. Perelman,* 1999 WL 199078 (S.D.N.Y. Apr. 9, 1999) (court considered the closing prices of the relevant securities on a motion to dismiss).

2007, the first day that the named Plaintiffs in this action bought Xinhua shares, the price opened at $10.14 -- a decline of approximately 22% from the IPO price. Notwithstanding this volatility, Plaintiffs continued to purchase Xinhua shares through May 21, 2007.[6]

On Friday, May 18, 2007, Xinhua's shares closed at $9.94.[7] After trading closed that day, Xinhua announced Singhal's resignation. The following Monday, May 21, 2007, *Barron's* published the article claiming that at the time of Xinhua's IPO, Singhal ran a company, Bedrock, unrelated to Xinhua. *Barron's* reported that Bedrock had been under an NASD cease and desist order from April 2006 through the time of Xinhua's IPO.[8] The *Barron's* article also repeated information contained in an earlier *Barron's* article about a private civil racketeering lawsuit that had been filed in California accusing Singhal and others of manipulating the market for the stock of Perfisans Holdings Inc. ("Perfisans"), another company completely unrelated to Xinhua.[9] The May 21 *Barron's* article also reported that two executives from Glass Lewis, Inc., a company owned by Xinhua's parent, Xinhua Finance Ltd. ("XFL"), had resigned the previous week.[10]

Following these developments, on Monday, May 21, 2007, the price of Xinhua's shares dropped as low as $8.31 -- a decline of $1.63, or 16%, from the preceding Friday's close -- and closed at $8.76.[11] This lawsuit followed.

---

[6]  *See* Holland Decl. Ex. A at 14; *see also id.* at Ex. B, Lead Plaintiff Certifications of Leo Yen, Shaokai Li, Wu Lin and James O'Callaghan.

[7]  Holland Decl. Ex. A at 12.

[8]  Specifically, the article claimed that "since April 2006, Singhal's firm [Bedrock] has been under a cease-and-desist order from the [NASD], as the regulators seek to suspend Bedrock for violating several SEC rules." (Holland Decl. Ex. C, May 21 *Barron's* Article at 1.)

[9]  *Id.* at 1.

[10]  *Id.* at 1-2.

[11]  *See* Holland Decl. Ex. A at 11. Defendants clearly are not liable for the stock drop between the March 9 IPO through May 18, the last trading day before the May 21 *Barron's* article's "corrective disclosure." *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 342 (2d Cir. 1987) ("[t]he price decline before disclosure may not be charged to defendants"); *Merrill Lynch Research Reports*, 272 F. Supp. 2d at 255 (dismissing the plaintiff's Section 11 and 12(a)(2) claims because, among other things, the

NYA874341.1

The May 21 *Barron's* article contained a glaring error. In truth, Bedrock was not subject to an NASD cease and desist order at the time of the Xinhua IPO. That cease and desist order had been lifted the previous December.[12] As these and other inaccuracies in the *Barron's* article became known over the next month, the price of Xinhua shares climbed, and by June 19, 2007 had reached $10.13 per share -- well above the price the shares were trading at immediately before the *Barron's* article was published.[13]

Plaintiffs filed this lawsuit in the aftermath of the *Barron's* article and concomitant stock drop, and their initial complaints repeated the erroneous information in the *Barron's* article about the Bedrock cease and desist order.[14] Even though the fundamental premise of that *Barron's* article -- and hence Plaintiffs' initial complaints -- was wrong, Plaintiffs apparently have decided to continue with their lawsuit. They filed the Consolidated Amended Complaint on October 22, 2007.

While Plaintiffs no longer allege that the Prospectus failed to disclose that Bedrock was subject to an NASD cease and desist order at the time of Xinhua's IPO, they now allege a potpourri of other "facts" that purportedly were misrepresented in or omitted from the Xinhua Prospectus. Only two such "facts" actually concern Xinhua. First, Plaintiffs contend that the Prospectus failed to disclose that Xinhua engaged in four "related party transactions" -- two in 2003 and two in 2006 -- which overcompensated Singhal and Bush.[15] Plaintiffs' principal

---

plaintiff's alleged decline in the price of her shares "occurred before public disclosure of the allegedly concealed information").

[12]  *See* Holland Decl. Ex. D, November 30, 2007 FINRA Report on Bedrock ("Bedrock Report") at 15; *see also* Compl. ¶¶ 2, 25(a). After Bedrock presented updated books and records to the NASD in 2006, the NASD "allowed [it] to resume conducting a securities business." (Bedrock Report at 15.)

[13]  *See* Holland Decl. Ex. A at 10.

[14]  *See, e.g.*, May 23, 2007 Complaint by Plaintiff Leo Yen at ¶ 2 (claiming that Defendants allegedly failed to reveal that "since April 2006, prior to the IPO, Bedrock had been under a 'cease-and-desist' order" by the NASD).

[15]  Compl. ¶¶ 26-31.

NYA874341.1

sources for these allegations are two 2003 press releases and a June 1, 2007 article from the *New York Post*.[16]    Second, Plaintiffs allege that the Prospectus misrepresented that one of Xinhua's key "Strengths" was its purported "Strong and Experienced Management Team."[17]

The remainder of the alleged misrepresentations and omissions concern conduct by Mr. Singhal and, in one instance, Ms. Bush, that have nothing to do with Xinhua.    Plaintiffs allege that the Prospectus should have disclosed that Bedrock was subject to an ongoing NASD inquiry,[18] and that Singhal was one of several defendants named in the civil racketeering lawsuit in California concerning Perfisans.[19]    Plaintiffs also allege that Singhal, an investment banker, had "connections to," or was "involved with," several other companies, all unrelated to Xinhua, that had experienced financial difficulties or been the subject of unproven regulatory or civil allegations.[20]    Plaintiffs also complain that the Prospectus failed to disclose that Ms. Bush was involved in a $3 million tax dispute with the IRS regarding her personal income.[21]

Plaintiffs allege that these "material, adverse facts omitted from the Prospectus" violated Sections 11 and 12(a)(2) of the 1933 Act, 15 U.S.C. §§ 77(k), 77l(a)(2).[22]    Plaintiffs further allege that the Underwriter Defendants failed "to conduct an adequate due diligence investigation" into the background of Xinhua's senior officers, which supposed failure "was a substantial contributing factor leading to the harm" of which Plaintiffs complain.[23]

---

[16]    Compl. ¶¶ 29, 31.

[17]    Compl. ¶ 38.

[18]    Compl. ¶ 25(a)-(d).

[19]    Compl. ¶ 25(e)-(l).

[20]    Compl. ¶ 25(m)-(ii).

[21]    Compl. ¶ 25(jj)-(kk).

[22]    Compl. ¶ 25.

[23]    Compl. ¶ 15.    Plaintiffs also assert a claim under Section 15 of the 1933 Act against the Individual Issuer Defendants, but not the Underwriter Defendants.    (Compl. Count III.)

NYA874341.1

## ARGUMENT

## I.

## PLAINTIFFS' SECTION 11 AND 12 CLAIMS SHOULD BE DISMISSED BECAUSE DEFENDANTS EITHER DISCLOSED, OR HAD NO DUTY TO DISCLOSE, THE ALLEGEDLY OMITTED INFORMATION

### A.    The Alleged Omissions Concerning Xinhua Fail to State A Claim

### 1.    The Related Party Transactions Were Disclosed

The Complaint alleges that the Prospectus omitted the fact that since 2003, Xinhua and XFL have "engaged in a number of related party transactions with Singhal's related companies," which "resulted in material personal profits for defendant Singhal."[24] The Complaint identifies four such transactions -- two that occurred in 2006, and two that occurred in 2003.

### a.    The 2006 Transactions

The allegations concerning the two 2006 transactions appear in Paragraph 29 of the Complaint, and are based upon a June 1, 2007 article in the *New York Post*.[25] According to that *Post* article, in 2006 Sino Investment LLC, a company controlled by Singhal, sold Xinhua a 37% stake in a company called "Upper Step" and a 61% stake in a company called "Accord Group" for $9.1 million in cash, 6.92 million class A shares, and 4.1 million warrants.  (Compl. ¶ 29.) The *Post* article contends that Xinhua paid significantly more for these two companies than they were worth just six months earlier.  The Complaint acknowledges the *Post* article as the source for these allegations.  Indeed, Paragraph 29 of the Complaint virtually parrots the *Post* article, except in one important respect.  The *Post* article repeatedly states that the source for its information is the <u>March 2007 Prospectus</u> for Xinhua.  For example, the *Post* article states, "<u>according to the IPO prospectus</u>, Singhal's Sino Investments sold a 37 percent stake in Upper

---

[24]    Compl. ¶ 25(p); *see id.* ¶ 31.

[25]    Holland Decl. Ex. E.

Step and 61 percent of Accord Group for a total of $9.1 million in cash, 6.92 million class A shares and 4.1 million warrants" (emphasis added).[26]  The article further states, "[a]ccording to the prospectus, in February of 2006 [Xinhua] acquired a 19 percent stake in Upper Step for $5.1 million" (emphasis added).[27]

And, in fact, the Prospectus does disclose all the relevant information concerning these two transactions that Plaintiffs allege in Paragraph 29 of the Complaint.  Those disclosures appear in several places in the Prospectus, including under the section labeled "Related Party Transactions."[28]  *See, e.g.*, Prospectus at 63 ("we acquired 19.0% of the equity of Upper Step on February 28, 2006, at an initial price of $5.1 million;" "on September 22, 2006, we acquired an additional 37.0% of the equity of Upper Step from Sino Investment for a consideration of 6,478,437 class A common shares, $9.1 million paid by our parent and 4,099,968 warrants to purchase our class A common shares at $3.659 per share"); *id.* at 63 ("on September 22, 2006, we acquired 61.0% of the equity of Accord Group from Sino Investment by issuing 451,107 class A common shares to Sino Investment"); *see also id.* at 62-63, 142-43, 146.  Yet, incongruously, the Complaint alleges that the Prospectus omitted the very information that the *Post* found in the Prospectus and reported.

### b.     The 2003 Transactions

The alleged omissions concerning the two 2003 related party transactions appear in Paragraph 31 of the Complaint.  Plaintiffs allege that in November 2003, "Xinhua Financial Network" -- not Xinhua -- "announced in a press release that it had finalized a round of financing

---

[26]   Holland Decl. Ex. E at 1.

[27]   *Id.*

[28]   Prospectus at 169; *see id.* at 172, 175-76.

NYA874341.1

for $20 million" with SBI's assistance.[29]  The transaction involved a different subsidiary of XFL, not the entity at issue in this lawsuit.  Plaintiffs fail to explain why Xinhua's Prospectus was required to disclose consulting fees that XFL -- not Xinhua -- paid to Singhal.  More important, Plaintiffs themselves acknowledge in Paragraph 31 that the transaction <u>was publicly disclosed</u> in the November 2003 press release they reference.  Plaintiffs also acknowledge in Paragraph 31 that the other related party transaction they identify -- a joint venture between Freestar Technology Corporation and Xinhua, arranged by SBI -- similarly was publicly disclosed in a November 2003 press release.  It is well-settled that the 1933 Act does not impose any duty to disclose information which is publicly available. [30]

### 2. The Alleged Misstatements in the Prospectus Regarding Xinhua's Management Team are At Most Inactionable Puffery

Plaintiffs allege that the statement in the Prospectus that "[o]ur management team is one of our strongest assets" was "materially misleading" because it failed to disclose Singhal's "close associations with companies accused of fraud."  (Compl. ¶¶ 38-39.)  This "strongest assets" statement is "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable" under the federal securities laws.  *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996).  In *Lasker*, the Second Circuit affirmed dismissal of claims under Sections 11 and 12(a)(2), holding that statements about the company's "commitment to create earnings opportunities" and that "business strategies [would] lead to continued prosperity" were

---

[29]  Compl. ¶ 31 (emphasis added).

[30]  *See, e.g., Merrill Lynch Research Reports*, 272 F. Supp. 2d at 249-50 (defendants had no duty to disclose information concerning companies in which a fund might invest and to whom the fund's corporate parent provides investment banking services because the information was publicly available).  *Accord, Klein v. Gen. Nutrition Cos.*, 186 F.3d 338, 343 (3d Cir. 1999) (where the information was public knowledge, "[f]ederal securities laws do not require a company to state the obvious"); *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 517 (7th Cir. 1989) ("[i]t is pointless and costly to compel firms to reprint information already in the public domain"); *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978) ("[a]lthough the underlying philosophy of federal securities regulations is that of full disclosure, there is no duty to disclose information to one who reasonably should already be aware of it") (internal citations omitted).

not materially misleading because they did not certify that "the company would not suffer losses," nor did they "insur[e] that dividend rates would remain constant." *Id.* In *In re New York Community Bancorp, Inc. Secs. Litig.*, 448 F. Supp. 2d 466 (E.D.N.Y. 2006), the court likewise dismissed claims under Sections 11 and 12(a)(2) alleging misleading statements concerning the company's exposure to interest rate risk. The court noted that the statement that the company's "greatest asset was that it is risk-averse" was a "generalization[] regarding integrity, fiscal discipline, and risk management, that amount[s] to no more than inactionable puffery."[31]

Similarly, here, the general optimistic statement about Xinhua's management team being one of its "strongest assets" did not ensure that Xinhua's management team would never change or that the company would never suffer losses. Instead, it is the same kind of generalized "puffery" that the Second Circuit and this Court have found inactionable under Sections 11 and 12(a)(2). *See Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("expressions of puffery and corporate optimism do not give rise to securities violations"); *accord In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570071 (6th Cir. 2004) (affirming dismissal of securities claims for alleged misstatements as inactionable puffery).[32]

---

[31] *Id.* at 478-79. *See also Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 793 (S.D.N.Y. 1997) (dismissing complaint because, among other things, "mere general expressions of optimism and anticipation of . . . success" are not actionable misstatements under Sections 11 and 12(a)(2)); *United Res. Equity Partners I, L.P. v. Nat'l Energetics Co.*, 989 F. Supp. 479, 482 (S.D.N.Y. 1997) ("[v]ague statements about future projections are not actionable" under Sections 11 and 12 "as they are mere 'puffery'").

[32] Plaintiffs attempt to bolster their allegations by citing to the resignations of two executives of Glass Lewis, a company owned by Xinhua's parent, XFL. (Compl. ¶ 46.) Plaintiffs do not claim that those resignations should have been disclosed in the March 2007 Prospectus, nor could they, since those resignations occurred in mid-May 2007 -- after the IPO. (*Id.*) Plaintiffs claim that Glass Lewis' head of research, Lynn Turner, and its managing director and research editor, Jonathan Weill, "both resigned from [Glass Lewis] . . . in protest over Defendants' material omissions from the Prospectus." (Compl. ¶ 3.) However, the Complaint does not cite to any statement whatsoever by Turner regarding the reasons for his resignation. And Weill's resignation letter refers only to unspecified "conduct, background and activities" by senior management and directors of XFL, not Xinhua. (Compl. ¶ 4; Holland Decl. Ex. C, May 21 *Barron's* Article at 2.) Plaintiffs' statement that the two Glass Lewis resignations "protested omissions" in Xinhua's Prospectus is pure speculation, not grounded in any fact, and fails to support their omissions claims. *See, e.g., Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) (to survive an attack under Rule 12(b)(6), a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level").

NYA874341.1

**B.**    **Defendants Had No Duty to Disclose The Alleged Omissions Concerning Singhal's Involvement with Other Companies**

To state a claim under Sections 11 and 12(a)(2) of the 1933 Act, a complaint must allege the misrepresentation or omission of a material fact which was "required to be stated [in the prospectus] or necessary to make the statements therein not misleading." 15 U.S.C. §§ 77k, 77l(a)(2). Thus, it is not enough to allege that a prospectus omitted a material fact. Rather, "[f]or an omission to be actionable" under Sections 11 and 12(a)(2), "it must involve information that the defendant had a duty to disclose."[33]

Plaintiffs' allegations concerning Singhal's involvement with companies unrelated to Xinhua and Ms. Bush's tax dispute with the IRS likewise should be dismissed because Defendants had no duty to disclose that information in Xinhua's March 2007 Prospectus.

**1.**    **Defendants Had No Duty to Disclose the NASD Investigation of Bedrock and Past Cease and Desist Order**

Defendants had no duty to disclose in Xinhua's Prospectus information about the lifted cease and desist order and pending NASD inquiry of Bedrock, a completely separate company from Xinhua.[34] The information required to be disclosed in the Registration Statement and Prospectus filed for Xinhua's IPO is set forth in SEC Form F-1, which governs securities offerings for foreign private issuers. *See* 17 C.F.R. § 239.31. As explained more fully in the

---

[33]    *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233, 237 (S.D.N.Y. 2006) ("*Merrill Lynch Funds*"). *Accord, Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1190 (11th Cir. 2002) ("[t]o hold that section 11(a) imposes liability unless the prospectus includes all material facts is simply to wholly ignore and render superfluous that section's qualifying language 'required to be stated therein or necessary to make the statements therein not misleading'"). *See also In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 699 (S.D.N.Y. 2000) (dismissing Section 11 and 12(a)(2) claims where the defendants were not obligated to disclose the risks of whether the market would accept the company's feminine protection product).

[34]    The regulatory inquiry which is still ongoing involves SEC rules on records, net capitalization and customer protection, and nothing about that inquiry "impact[s] directly on [Singhal's] ability to serve as an officer or director of a public corporation." (Compl. ¶ 22; *see* Holland Decl. Ex. D, Bedrock Report at 15.)

NYA874341.1

Xinhua Defendants' memorandum, Item 4 of Form F-1 requires a foreign private issuer's prospectus to furnish the information specified in Part I of Form 20-F.

Item 8.A.7 of Form 20-F only required Xinhua to provide information on "any legal or arbitration proceedings" involving Xinhua "which may have, or have had in the recent past, significant effects on the company's financial position or profitability."[35]  Disclosure is also required of any material proceeding in which one of Xinhua's directors or senior management is either "a party adverse" to Xinhua or "has a material interest adverse to" Xinhua.[36]  Plaintiffs do not -- and cannot -- allege that the omitted legal proceedings involved Xinhua, adversely affected its profitability, or placed Singhal in a position adverse to Xinhua.  And, no portion of Form F-1 requires the disclosure of lawsuits or investigations against directors or senior management arising out of their involvement with completely unrelated companies.

Courts repeatedly have dismissed Section 11 and 12(a)(2) claims where the relevant SEC rules did not require disclosure of the allegedly omitted information.  For example, in *Merrill Lynch Research Reports*, 272 F. Supp. 2d at 249, the court dismissed Section 11 and 12(a)(2) claims, where no portion of Form N-1A for mutual fund registration statements and prospectuses or any other statute or rule required disclosure of investment banking relationships between the companies whose stocks were purchased by a fund and the broker-dealer affiliate of the fund's investment adviser.  In *Geiger v. Solomon-Page Group, Ltd.*, 933 F. Supp. 1180, 1187-88 (S.D.N.Y. 1996), the court explained: "[t]he fact that the SEC does not require disclosure" of the allegedly omitted fact about the relationship between selling shareholders, particularly given the detailed information that is required about the selling shareholders, "is further support for this

---

[35]   Form 20-F, Item 8.A.7, Fed. Sec. L. Rep. (CCH) ¶ 29,721, at 21,762 (Jan.11, 2006).

[36]   *Id.* at 21,763 (instructions to Item 8.A.7).

NYA874341.1

conclusion" that the alleged omission did not give rise to liability under Sections 11 and 12(a)(2) because "it reflects the SEC's expert view that such disclosure is not required."[37]

Courts in this Circuit also have dismissed securities claims alleging a failure to disclose the existence of unproven allegations in a lawsuit, particularly where the relevant SEC rules did not require such disclosure. For example, in *United States v. Matthews*, 787 F.2d 38 (2d Cir. 1986), the government alleged that the defendant violated proxy disclosure rules by failing to state that he was guilty of uncharged bribery and tax evasion conspiracy. The Second Circuit reversed, holding that "at least so long as uncharged criminal conduct is not required to be disclosed by any rule lawfully promulgated by the SEC, nondisclosure of such conduct cannot be the basis of a criminal prosecution." *Id.* at 49.

Similarly, in *GAF Corp. v. Heyman*, 724 F.2d 727 (2d Cir. 1983), a proxy contest resulted in replacement of the incumbent board of directors with a new board. The corporation sued the new board for proxy violations, alleging that the failure to disclose a breach of trust action brought against one of the new board members by his sister, which did not in any way involve the corporation, was a material omission. The Second Circuit reversed the district court's finding of a proxy violation. It found persuasive the fact that Regulation S-K did not require disclosures about the "unproven allegations" in the lawsuit, let alone the disputed loan transaction which prompted the lawsuit:

> In our view, the regulation's emphasis on orders, judgments, decrees, and findings in civil proceedings, in stark contrast to its

---

[37] Similarly, in *Merrill Lynch Funds*, 434 F. Supp. 2d at 233, the plaintiffs asserted a Section 12(a)(2) claim and other securities law violations because mutual fund prospectuses allegedly failed to disclose payments made to retail brokers, in exchange for the retail broker's preferential marketing of those funds to its customers. The court dismissed the Section 12(a)(2) claim, noting that "current law and SEC regulations impose no duty on the defendants that the funds' offering prospectuses disclose more than they did." *Id.* at 238. *See also In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 551-52 (D. Del. 2002), *aff'd*, 357 F.3d 322 (3d Cir. 2004) (dismissing claims under Section 14(e) of the 1934 Act for failure to disclose in tender offer documents several agreements that Digital Island had with third parties, finding it significant that the information required to be included in tender offer documents was specifically set forth in two SEC regulations, and no portion of those regulations required the disclosure of the agreements at issue).

> express coverage of all pending criminal proceedings, strongly suggests that regardless of how serious they may appear on their face, unadjudicated allegations in a pending civil action against a director-nominee should not automatically be deemed material.

*Id.* at 739. The Second Circuit concluded that the information did not need to be disclosed, noting, among other things, that the lawsuit "did not in any way" involve the corporation at issue, and that it had been stayed shortly after its filing and no formal discovery had yet occurred. *Id.* at 740.

And, in *Ciresi v. Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1161 (2d Cir. 1992), the plaintiffs also brought proxy violations claims for failure to disclose that the board of director candidates had engaged in the wrongdoings alleged by the plaintiffs, and that the company's accounting firm also was guilty of "numerous improprieties." The court, citing the Second Circuit's decision in *GAF Corp.*, held that "the law does not impose a duty to disclose uncharged, unadjudicated wrongdoing or mismanagement." *Id.*

Here, too, where the SEC rules do not require disclosure of a past cease and desist order or a present NASD inquiry of an unrelated company, and where the allegations are unproven, those alleged omissions from Xinhua's March 2007 Prospectus are not actionable under Sections 11 or 12(a)(2).

### 2. Defendants Had No Duty to Disclose a Private Civil Lawsuit Against Singhal or Bush's Personal Income Tax Disputes Unrelated to Xinhua

For the same reasons, there was no duty to disclose the February 2007 Perfisans lawsuit against Singhal. That lawsuit makes no allegations about Singhal's activities as CFO of Xinhua. Nor does the Complaint allege that Perfisans was related to Xinhua. Rather, the allegations concern conduct unrelated to Xinhua by a completely separate company. As discussed above, such a lawsuit is not required to be disclosed in Form F-1. In addition, the Perfisans lawsuit consists of nothing more than unproven, unadjudicated allegations which are not required to be disclosed. *See GAF Corp.*, 724 F.2d at 739-40; *Ciresi*, 782 F. Supp. at 823.

- 14 -

Further, Plaintiffs themselves "ignore an inconvenient truth" about the May 21 *Barron's* article. That article admits that the Perfisans lawsuit against Singhal "actually came up in *Barron's* May 7, 2007 issue" where *Barron's* reported that Singhal "was fighting a private civil racketeering suit in California courts for his investment activities."[38] The Perfisans lawsuit thus was disclosed two weeks earlier in the <u>very same</u> publication that supposedly triggered the May 21 stock drop. Yet, Plaintiffs cannot point to any stock drop following the May 7 article, undercutting their claim that the Perfisans lawsuit was a "material adverse omission." This Court has dismissed Section 11 and 12(a)(2) claims where the plaintiff failed to plead any losses resulting from the alleged omissions.[39]

For the same reasons, Defendant Bush's settlement with the U.S. government of a personal income tax dispute[40] is not a "material adverse omission" from the March 2007 Prospectus. Those personal tax issues involved unproven allegations against Ms. Bush herself, not Xinhua, and the dispute eventually was settled, not adjudicated. Further, Plaintiffs claim no losses resulting from the July 2, 2007 *Forbes* article's disclosure -- or any other such disclosure -- of that tax issue.

### 3. Defendants Had No Duty to Disclose Information about Singhal's Prior Relationships with Other Companies

Plaintiffs' laundry list of omissions about Singhal's relationships with other companies unrelated to Xinhua is even more attenuated.[41] Most of Singhal's alleged contacts with those

---

[38]    Holland Decl. Ex. C, May 21 *Barron's* Article at 1; *see also* Compl. ¶ 46.

[39]    *See, e.g., Merrill Lynch Funds*, 434 F. Supp. 2d at 238 (granting motion to dismiss Section 12 prospectus omissions claims where "[i]t is apparent on the face of the complaint that plaintiffs have not pleaded losses" from those omissions); *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 591 (S.D.N.Y. 2006) (dismissing Section 11 and 12(a)(2) claims for alleged prospectus omissions where the plaintiffs "have not alleged even that they in fact lost money"). *See also Goodridge v. Harvey Group, Inc.*, 778 F. Supp. 115, 129 (S.D.N.Y. 1991) (section 12(2) claim "cannot prevail" where the plaintiff "failed to show that it suffered cognizable damages as a result of the material misrepresentations and omissions made").

[40]    Compl. ¶ 25(jj)-(kk).

[41]    Compl. ¶¶ 25(m)-(o), (q)-(ii).

NYA874341.1

companies took place years before the March 2007 Xinhua Prospectus filing.  And, Plaintiffs do not cite a single lawsuit against, or investigation of, Singhal himself arising from Singhal's relationships with those companies.

For example, the May 21 *Barron's* article states that Singhal previously was a "major investor in a couple of companies called AremiSoft and ACLN -- which purportedly turned out to be outrageous frauds."[42]  But neither the article nor the Complaint identifies any purported wrongdoing by Singhal in connection with those companies, let alone any claims or proceedings against him.[43]  Plaintiffs themselves admit that Singhal invested in and was lead investment banker for AremisSoft and ACLN back in 2003, four years prior to Xinhua's IPO.[44]  Defendants can hardly be liable under Sections 11 and 12(a)(2) for failure to disclose in Xinhua's March 2007 Prospectus that one of Xinhua's executives invested and acted as investment banker for a completely unrelated company in 2003, particularly where Singhal himself was never even accused of fraud or any other wrongdoing in connection with that company -- let alone found to have committed it.  As this Court has stated, "the federal securities laws do not require a company to accuse itself of wrongdoing."  *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (Swain, J.), *aff'd*, 165 F. App'x 928 (2d Cir. 2006).[45]

Plaintiffs' other alleged omissions about Singhal are even more attenuated.

a.    Roth Capital -- From July 1995 to December 2000, Singhal was Managing Director of Corporate Finance at Roth Capital Partners LLC ("Roth Capital"), f/k/a Cruttenden Roth Inc.  During that time, Roth Capital acted as underwriter for several companies accused of

---

[42]    Holland Decl. Ex. C, May 21 *Barron's* Article at 1.

[43]    Compl. ¶ 25(m)-(o).

[44]    Compl. ¶ 25(m).

[45]    *See also In re Donna Karan Int'l Sec. Litig.*, 1998 WL 637547, at *10 n.9 (E.D.N.Y. Aug. 14, 1998) (in dismissing Section 11 and 12(a)(2) claims, the court noted the "accepted view that the securities laws do not require corporate management to direct conclusory accusations at itself or to characterize its behavior in a pejorative manner") (internal quotations and citation omitted).

NYA874341.1

fraud, but no allegations were made against Singhal. Also during that time, Roth Capital was assessed "hundreds of thousands of dollars in fines" in arbitration proceedings as well as regulatory sanctions for inadequate supervision and reporting, but the Complaint does not identify any allegations, fines or sanctions against Singhal.[46]

b.    iMergent -- From November 2000 to May 2002, Singhal served on the board of directors of iMergent, and also provided financial advisory services to iMergent in 2001-2002. In 2005 -- years after Singhal's involvement -- iMergent was forced to restate its financial data from 2002-2005, a period after Singhal no longer served on the company's board. For the past two years, it is alleged that iMergent has been under an SEC investigation and faces public and private lawsuits. The Complaint does not identify any allegations of wrongdoing against Singhal regarding his involvement with iMergent or even allege that he has had any involvement with iMergent since 2002.[47]

c.    Chell Group -- In 2001, Chell Group Corporation ("Chell") elected Singhal to its board of directors in connection with his role to provide corporate finance and M&A services to the company. In 2002, Chell was delisted, and US and Canadian authorities filed civil and criminal complaints against one long-time Chell director, but not Singhal.[48]

d.    Small World -- The Complaint alleges that while the March 2007 Xinhua Prospectus did disclose that Singhal was a director of Small World Kids, Inc. ("Small World"), it failed to disclose that in October 2006, SBI Advisors, controlled by Singhal, was awarded warrants to purchase 100,000 shares of Small World stock as a placement fee for a loan Singhal had arranged. According to the Complaint, the Prospectus thus failed to disclose that Singhal "benefited from his transactions with Small World amid a severe financial crisis at the

---

[46]    Compl. ¶ 25(q)-(x).

[47]    Compl. ¶ 25(y)-(aa).

[48]    Compl. ¶ 25(bb)-(ff).

company," ending in its August 2007 bankruptcy filing.[49]  (The Complaint fails to point out that the purpose of the loan was to alleviate Small World's financial difficulties, or that the bankruptcy presumably rendered those warrants worthless.)   The Complaint identifies no allegations of wrongdoing against Singhal regarding Small World -- a company that has nothing to do with Xinhua -- and, in any event, Small World's bankruptcy occurred five months after Xinhua's March 2007 Prospectus was filed.

As with the other purported omissions, Defendants had no duty to disclose this information and Plaintiffs' Section 11 and 12(a)(2) claims should be dismissed.

## II.

## THE ALLEGED FAILURE OF THE UNDERWRITER DEFENDANTS TO CONDUCT AN ADEQUATE DUE DILIGENCE INVESTIGATION DOES NOT STATE A CLAIM UNDER SECTIONS 11 OR 12

Plaintiffs repeatedly claim that the Underwriter Defendants "failed to conduct an adequate due diligence investigation into [Xinhua] prior to the IPO," and that this was "a substantial contributing factor leading to the harm complained of herein."[50]  Sections 11 and 12(a)(2), however, only provide a cause of action for misrepresentation or omission of a material fact which was "required to be stated [in the prospectus] or necessary to make the statements therein not misleading."  15 U.S.C. §§ 77k, 77l(a)(2).  Nowhere do those statutes impose a duty to conduct due diligence, or provide a cause of action against an entity that did not conduct due diligence in a particular manner.

Due diligence is an affirmative defense available under Section 11(b)(3) to certain parties, such as underwriters, accused of violating Sections 11 or 12(a)(2).  15 U.S.C. §§ 77k(b)(3), 77l(a)(2); *see, e.g., In re Int'l Rectifier Sec. Litig.,* 1997 WL 529600, at *6 (C.D. Cal. Mar. 31, 1997) (noting that "(t)he underwriters have an additional basis upon which to avoid

---

[49]   Compl. ¶ 25(gg)-(ii).

[50]   Compl. ¶¶ 2, 15; *see also id.* at ¶ 77.

- 18 -

liability under Sections 11 and 12(2) of the 1933 Act: by establishing a 'due diligence' defense"); *Phillips v. Kidder, Peabody & Co.*, 933 F. Supp. 303, 323 (S.D.N.Y. 1996), *aff'd*, 108 F.3d 1370 (2d Cir. 1997) (under Sections 11 and 12(a)(2) "underwriters are entitled to an affirmative 'due diligence' defense if they establish that they conducted a reasonable investigation and 'had reasonable ground to believe and did believe' that the prospectus contained no omissions or misrepresentations"). Plaintiffs' allegations that the Underwriter Defendants failed to conduct adequate due diligence -- and therefore may not have an affirmative defense -- thus cannot serve as the basis for a violation of Sections 11 or 12(a)(2). *See, e.g., Galvin v. First Nat'l Monetary Corp.*, 624 F. Supp. 154, 158 (E.D.N.Y. 1985) ("an affirmative defense . . . does not give rise to a cause of action").

### III.

**PLAINTIFFS' SECTION 12 CLAIM SHOULD BE DISMISSED BECAUSE THEY DID NOT PURCHASE SHARES IN THE IPO AND DO NOT ALLEGE A DIRECT PURCHASE FROM THE UNDERWRITER DEFENDANTS**

**A.  There Is No Section 12(a)(2) Liability to Aftermarket Purchasers, Such As Plaintiffs**

In *Gustafson v. Alloyd Co.*, 513 U.S. 561, 580-81 (1995), the Supreme Court stated that liability under Section 12 "affects only new offerings of securities" and not "the ordinary redistribution of securities." This Court and others have consistently applied that principle to dismiss Section 12 claims where, as here, the plaintiff does not allege that it purchased securities in an IPO, as opposed to the aftermarket.

For example, in *American High-Income Trust v. AlliedSignal*, 329 F. Supp. 2d 534, 547 & n.8 (S.D.N.Y. 2004) (Swain, J.), this Court held that the plaintiffs stated a Section 12(a)(2) claim "to the extent their claim is premised on notes acquired through the Exchange Offering, but not as to notes purchased in the aftermarket," because "Section 12(a)(2) liability does not apply to aftermarket purchases." Similarly, in *DeMaria v. Andersen*, 153 F. Supp. 2d 300, 307 (S.D.N.Y. 2001), *aff'd*, 318 F.3d 170 (2d Cir. 2003), the court dismissed the plaintiff's

- 19 -

Section 12(a) claim where the complaint "does [not] even state any named plaintiff purchased in the ILife IPO," but instead merely alleged that the named plaintiffs purchased "during the Class Period." In *Ultrafem*, 91 F. Supp. 2d at 693, the court likewise dismissed the Section 12(a)(2) claims of those plaintiffs who purchased in the aftermarket because "[p]urchasers in private or secondary market offerings do not have standing to bring actions under Section 12(2)."[51]

Here, Plaintiffs' lead plaintiff certifications confirm that they all purchased their Xinhua shares in the aftermarket, not in the IPO. All of their purchases took place long after Xinhua's March 9, 2007 IPO, at aftermarket prices rather than the $13.00 IPO price:

- Plaintiff Leo Yen purchased shares on April 5 and 26, 2007, at prices ranging from $10.09 to $10.14;

- Plaintiff Shaokai Li purchased shares between May 3 and May 17, 2007, at prices ranging from $11.74 to $12.70;

- Plaintiff Wu Lin purchased shares between May 15 and 21, 2007, at prices ranging from $8.70 to $12.05; and

- Plaintiff James O'Callaghan purchased his shares on May 21, 2007, at prices ranging from $9.00 to $9.15.[52]

Because Plaintiffs here did not purchase their shares in the IPO, their Section 12(a)(2) claim should be dismissed. *American High-Income Trust*, 329 F. Supp. 2d at 547 n.8.[53]

---

[51]  For the same reasons, the court in *Komanoff v. Mabon, Nugent & Co.*, 884 F. Supp. 848, 857 (S.D.N.Y. 1995), dismissed the plaintiffs' Section 12(a)(2) claims because the allegations referred only to secondary market transactions, but "Section 12(2) extends only to initial public offerings of stock, and not to secondary market transactions." *See also In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d 862, 893 (S.D. Tex. 2002), *aff'd*, 332 F.3d 854 (5th Cir. 2003) (granting motion to dismiss a Section 12(a)(2) claim "because it is undisputed that plaintiffs did not purchase their shares of Azurix stock pursuant to the company's initial public offering").

[52]  *See* Holland Decl. Ex. B, Lead Plaintiff Certifications of Yen, Li, Lin and O'Callaghan.

[53]  The Underwriter Defendants acknowledge that in *Demaria v. Anderson*, 318 F.3d 170, 178 (2d Cir. 2003), the Second Circuit held that aftermarket purchasers who can trace their shares to an allegedly misleading registration statement have standing to sue under Section 11 (but not Section 12). However, in the event that the United States Supreme Court holds that aftermarket purchasers lack standing to sue under Section 11, the Underwriter Defendants hereby reserve their right to argue that Plaintiffs' Section 11 claims also should be dismissed because they purchased only in the aftermarket.

**B.    There Are No Allegations of Direct Purchase from Underwriter Defendants**

Plaintiffs also do not state a viable Section 12(a)(2) claim against the Underwriter Defendants because they fail to allege that they purchased Xinhua shares directly from any of the Underwriter Defendants.

To successfully plead a claim under Section 12(a)(2) of the 1933 Act, a plaintiff must allege that (1) the defendant directly sold the stock to plaintiff, or (2) that the defendant directly solicited the plaintiff's purchase of the stock. *Pinter v. Dahl*, 486 U.S. 622, 647 (1988) (holding that liability under Section 12(1) applies only to those who pass title, or those who solicit securities purchases).[54]

Accordingly, in *DeMaria*, 153 F. Supp. 2d at 307, the district court dismissed the plaintiffs' Section 12(a)(1) claim against the underwriter defendants because "the amended complaint does not aver that any defendant was the immediate seller to any named plaintiff." Similarly, in *Dartley v. Ergobilt, Inc.*, 2001 WL 313964, at *2 (N.D. Tex. Mar. 29, 2001), the plaintiffs "merely allege[d] that they purchased shares 'pursuant to and traceable to' the Prospectus." The court pointed out that "[f]or potential Section 12(a)(2) liability to exist, the Underwriters must have passed title to the Plaintiffs, as a direct seller, or solicited the transaction in which title passed to them." *Id.* The court dismissed the Section 12(a)(2) claim, noting that the plaintiffs "do not allege any facts to support the conclusion that [the underwriter defendants] were statutory sellers as to any of the Plaintiffs" and therefore if the plaintiffs "did not buy from [the underwriter defendants] and were not solicited by them, they cannot sue [the underwriter defendants] for Section 12(a)(2) violations." *Id.*[55]

---

[54]    *See also Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir. 1989) (applying the § 12(1) analysis in *Pinter* to what is now § 12(a)(2)); *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988) (same).

[55]    *See also Merrill Lynch Research Reports*, 272 F. Supp. 2d at 255 (dismissing the plaintiff's Section 12(a)(2) claim against the broker-dealer defendant because she did not allege that she purchased her mutual fund shares from that defendant).

NYA874341.1

Here, as in *Dartley*, Plaintiffs merely allege that they purchased Xinhua shares "pursuant to and/or traceable to the Company's materially false and misleading Prospectus in connection with the IPO." (Compl. ¶ 9.) Nowhere do they allege that they purchased their shares from the Underwriter Defendants. For this reason as well, Plaintiffs' Section 12(a)(2) claim should be dismissed.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in the Xinhua Defendants' Memorandum, Plaintiffs' Complaint should be dismissed in its entirety with prejudice.

Dated: December 21, 2007

Respectfully submitted,

CLIFFORD CHANCE US LLP

By: *Mark Holland*
_____
James B. Weidner (JW 0909)
Mark A. Kirsch (MK 7806)
Mark Holland (MH 6494)
Mary K. Dulka (MD 0013)
Angelique Shingler (AS 6052)
31 West 52nd Street
New York, New York 10019
(212) 878-8000

*Attorneys for Defendants JP Morgan Securities, Inc., UBS AG, CIBC World Markets Corp. and W.R. Hambrecht + Co. LLC*

NYA874341.1