**KAHN GAUTHIER SWICK, LLC**
Kim E. Miller
12 East 41st Street,12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

- and -

Lewis S. Kahn
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**
U. Seth Ottensoser
Gregory M. Egleston
10 East 40th Street, 22nd Floor
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218

*Co-Lead Counsel for Lead Plaintiffs & the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE XINHUA FINANCE MEDIA, LTD. SECURITIES LITIGATION** | **NO. 07 Civ. 3994 (TLS)**<br><br>**OPPOSITION TO XINHUA DEFENDANTS' AND UNDERWRITER DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 7

ARGUMENT ................................................................................................................... 12

   I.  Applicable Legal Standard on a Motion to Dismiss ............................................. 12

   II.  Plaintiffs' Claims Are Subject To Rule 8 Pleading Requirements ......................... 12

      A.  Plaintiffs' Securities Act Claims Are Governed By Fed. R. Civ. P. Rule 8 ............ 12

      B.  Alternatively, Plaintiffs' Section 11 and 12 Claims Meet the Requirements of 9(b) .................................................................................................................... 16

   III. The Complaint Adequately Alleges a Section 11 Claim ......................................... 18

      A.  Legal Standard ........................................................................................................ 18

      B.  Xinhua, as a Foreign Private Issuer, Cannot Hide Behind SEC Regulations To Excuse Violations of the Securities Laws ............................................................. 19

      C.  Purported Compliance with Form F-1 Does Not Excuse Defendants From Disclosing the Omitted Information ......................................................................... 21

         1.  Purported Compliance with Form S-1 Is a Red Herring that Does Not Excuse Defendants From Disclosure ..................................................................... 22

         2.  The SEC's Inapplicable Policy Behind Rule 3a12-3(b) Regarding Section 14(a) Does Not Shield Defendants From Liability Here ..................................... 23

      D.  While F-1 Does Not Define Materiality For Foreign Private Issuers for Purposes of Section 11, Regulation C Nevertheless Incorporates Section 11 Requirements into the Form ....................................................................................................... 27

      E.  Plaintiffs Have Alleged Material Omissions .......................................................... 31

      F.  The Statements Regarding Xinhua Management Team Do Not Constitute Inactionable Puffery .............................................................................................. 35

      G.  Defendants Were Under a Duty To Disclose the Material Information that Plaintiffs Allege Was Omitted From the Registration Statement ........................... 37

         1.  The NASD Investigation of Bedrock, the Cease and Desist Order, the RICO Action Against Defendant Singhal, and Defendant Bush's Income Tax Dispute ................................................................................................................. 39

         2.  Statements Regarding Managements' Background and Competence ............... 43

3.   The Xinhua Financial Network Financing and the Freestar Transaction ........47

4.   The Upper Step and Accord Transactions .................................................47

IV. Underwriter Defendants' Due Diligence Argument Is a Red Herring .........................49

V.   The Underwriter Defendants' Premature Loss Causation Footnote Provides No Basis for Dismissal ..................................................................................................50

VI. The Complaint States a Claim Under Sections 12 and 15 of the Securities Act ..........54

A.   Plaintiffs Purchased Xinhua Common Stock in the IPO and Have Standing to Assert a Claim Under Section 12(a)(2) ........................................................54

B.   The Complaint States Section 12(a)(2) Claims Against Defendants ........................56

C.   Plaintiffs Have Adequately Alleged Control Person Claims Against the Individual Defendants Under Section 15 of the Securities Act ................................58

CONCLUSION ..............................................................................................................60

# TABLE OF AUTHORITIES

## Cases

*Adair v. Bristol Tech. Sys., Inc.*, 179 F.R.D. 131 (S.D.N.Y. 1998) ................................. 55

*American High-Income Trust v. Allied Signal*, 329 F. Supp. 2d 534 (S.D.N.Y. 2004).... 55

*Backman v. Polaroid Corp.,* 910 F.2d 10, 12 (1st Cir. 1990)........................................... 41

*Basic Inc. v. Levinson*, 485 U.S. 224, 231, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988). 32, 41

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1975 (2007) ........................................... 12, 34

*Chevron, U.S.A. v. Natural Res. Def. Counsel, Inc.*, 467 U.S. 837 (1984)........... 27, 28, 29

*Chiarella v. United States*, 445 U.S. 222, 235 (1980) ..................................................... 41

*Chris-Craft Indus. v. Piper Aircraft Corp.*, 480 F.2d 341, 370 (2d Cir. 1973) ............... 50

*Cooperman v. Individual Inc.,* 171 F.3d 43 (1st Cir. 1999)....................................... 42, 43

*Credit Suisse First Boston Corp. v. Arm Fin. Group*, 2001 U.S. Dist. LEXIS 3332
    (S.D.N.Y. Mar. 28, 2001) ........................................................................................ 48

*Dabit v. Merrill Lynch*, 395 F.3d 25, n.6 (2d Cir. 2005) ................................................. 28

*Dartley v. Ergobilt Inc.*, 2001 U.S. Dist. LEXIS 4154 (N.D. Tex. Mar. 29, 2001).......... 56

*De Vries v. Tower Semiconductor Ltd.*, 2004 U.S. Dist. LEXIS 29921 (S.D.N.Y. August
    19, 2004) ................................................................................... 23, 24, 25, 30

*Degulis v. LXR Biotech., Inc.*, 1997 U.S. Dist. LEXIS 381 (S.D.N.Y. Jan. 21, 1997)..... 18

*Delamota v. United States Dep't of Educ.*, 412 F.3d 71, 79 (2d Cir. 2005) ..................... 30

*DeMaria v. Andersen*, 153 F. Supp. 2d 307 (S.D.N.Y. 2001) .............................. 20, 48, 56

*Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) .................................... 54

*Elfenbein v. American Financial Corp.*, 487 F. Supp. 619 (S.D.N.Y. 1980) .................. 45

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976)................................................. 18

*Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 540-41 (2d Cir. 1996)................. 32

*Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 294 (S.D.N.Y. 2004).... 38, 40, 58

*Funke v. Life Fin. Corp.*, 237 F. Supp. 2d 458, 475 (S.D.N.Y. 2002).............................. 49

*GAF Corp. v. Heyman*, 724 F.2d 727 (2d Cir. 1983) .................................................. 44, 45

*Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830 (8th Cir. 2003)............................ 44

*Gieger v. Solomon-Page Group, Ltd.*, 933 F. Supp. 1180 (S.D.N.Y. 1996) ................... 26

*Gladwin v. Medfield Corp.*, 540 F.2d 1266, 1268-69 (5th Cir. 1976) ............................. 47

*Glazer v. Formica Corp.* 964 F.2d 149 (2d Cir. 1992)..................................................... 41

*GMS Group, LLC v. Benderson*, 326 F.3d 75, 82 (2d Cir. 2003)..................................... 40

*Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)................................................ 12

*Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)...................................... 35

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995)............................................................. 55, 56

*Haft v. Eastland Fin. Corp.*, 755 F.Supp. 1123, 1131 (D.R.I. 1991)................................. 45

*Halperin v. eBanker USA.COM, Inc.*, 295 F.3d 352, 357 (2d Cir.2002).......................... 32

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) ............................. 2, 13, 18

*Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1081-82 (9th Cir. 1999) ................ 55

*In re Adams Golf Inc., Sec. Litig.*, 381 F.3d 267, 274 n.7 (3d Cir. 2004).................. 36, 38

*In re Adams Golf, Inc. Sec. Lit.*, 381 F.3d 267, 273 (3d Cir. 2004)..................................... 3

*In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 182 (S.D.N.Y. 2003) ...... 42

*In re Cendant Litig.*, 60 F. Supp. 2d 354, 365 (D.N.J. 1999) ....................................... 2, 50

*In re Check Point Software Techs. Ltd. Sec. Litig.*, 2006 U.S. Dist. LEXIS 24317 at *5 (S.D.N.Y. Apr. 26, 2006)............................................................................................. 59

*In re Computer Assocs. Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999) ......................................................................................................................... 37

*In re Computervision Corp. Sec. Litig.*, 869 F. Supp. 56 (D. Mass. 1994)...................... 45

*In re Dynegy, Inc. Sec. Litig.*, 339 F.Supp. 2d 804, 869 (S.D. Tex. 2004) ....... 6, 51, 53, 59

*In re Elan Corp. Secs. Litig.*, 2004 U.S. Dist. LEXIS 9913 (S.D.N.Y. May 18, 2004) 2, 26

*In re Emex Corp. Sec. Litig.*, 2002 U.S. Dist. LEXIS 17528 at *9 (S.D.N.Y. Sept. 18, 2002) ........................................................................................................................ 59

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 411 F. Supp. 2d 377, 383 (S.D.N.Y. 2006) ................................................................................................................ 6, 51, 53

*In re Franchard Corp.*, Release No. 33-4710, 42 S.E.C. 163, 172 (SEC July 31, 1964). 43

*In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 208 (S.D.N.Y. 2003)........ 55

*In re Globalstar Sec. Litig.*, No. 01 Civ. 1748 (SHS), 2003 U.S. Dist. LEXIS 22496 (S.D.N.Y. Dec. 15, 2003) ......................................................................................... 48

*In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741 (S.D.N.Y. 2001) 2, 18, 38, 40

*In re International Rectifier Sec. Litig.*, 1997 U.S. Dist. LEXIS 23966, at *19 (C.D. Cal. Mar. 31, 1997)........................................................................................................... 50

*In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 327 (S.D.N.Y. 2003) .................. 16, 18, 39, 59

*In re Marsh & McLennan Co. Sec. Litig.*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006) ........... 35

*In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 468 (S.D.N.Y. 2006)... 4, 35

*In re N2K Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 207 (S.D.N.Y. 1999) ............................. 21

*In re New York Community Bancorp. Sec. Litig.*, 448 F. Supp. 2d 466, 478 (E.D.N.Y. 2006) ............................................................................................................... 35, 36

*In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) ................................... 12

*In re PMA Capital Sec. Litig.*, No. 03-6121, 2005 U.S. Dist. LEXIS 15696 at *16-*17 (E.D. Pa. July 27, 2005) ............................................................................................. 36

*In re Prestige Brands Holding, Inc.*, No. 05-06924 (CLB), 2006 U.S. Dist. LEXIS 46667 at *10 (S.D.N.Y. July 10, 2006) ................................................................................. 57

*In re Regeneron Pharm., Inc., Sec. Litig.*, No. 03 Civ. 311(RWS), 2005 U.S. Dist. LEXIS 1350 at *23-*24 (S.D.N.Y. Feb. 1, 2005) ................................................................. 59

*In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 587 (S.D.N.Y. 2006) ......................................................................................................................... 18

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ................................... 16

*In re Seebeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1171-72 (C.D. Cal. 2003) ................................................................................................................................. 55

*In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) ................................. 39

*In re Turkcell Iletisim Hizmetler*, 202 F. Supp. 2d 8, 12 (S.D.N.Y. 2001) ..................... 13

*In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 201 (E.D.N.Y. 2000) ............... 2, 19

*In re U.S.A. Classic Sec. Litig.*, No. 93 Civ. 6667 (JSM), 1995 WL 363841, at *3 (S.D.N.Y. June 19, 1995) .......................................................................................... 54

*In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158 (S.D.N.Y. 2003) ....... 26, 27

*In re Warnaco Group Sec. Litig.,* 388 F. Supp. 2d 307, 313 (S.D.N.Y. 2005)............. 4, 34

*In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 431 (S.D.N.Y. 2003) ................. passim

*In re WRT Energy Sec. Litig.*, 2005 U.S. Dist. LEXIS 18701, *5 (S.D.N.Y. August 30, 2005) ......................................................................................................... 6, 50, 51, 52

*Joseph v. Wiles*, 223 F.3d 1155, 1161 (10th Cir. 2000)..................................................... 55

*Komanoff v. Mabon, Nugent & Co.*, 884 F. Supp. 848 (S.D.N.Y. 1995) ......................... 55

*Kronfeld v. TWA, Inc.*, 832 F.2d 726, 734-35 (2d Cir. 1988) ................................. 2, 19, 41

*Laser Mortg. Mgmt. v. Asset Securitization Corp.*, No. 00 Civ. 8100 (NRB), 2001 U.S. Dist. LEXIS 13746, at *16 (S.D.N.Y. Sept. 6, 2001) ................................................. 13

*Lasker v. New York State Elec. & Gas Corp*., 85 F.3d 55 (2d Cir. 1996) ........................ 37

*Lee v. Ernst & Young, LLP*, 294 F.3d 969, 978 (8th Cir. 2002) ....................................... 55

*McMahan & Co. v. Wherehouse Entm't., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)38, 40, 58

*Milman v. Box Hill Sys. Corp*, 192 F.R.D 105, 108 (S.D.N.Y. 2000) ........................ 18, 55

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt.*, No. 02 Civ 0767(LBS), 2008 U.S. Dist. LEXIS 6225 at *8 (S.D.N.Y. Jan. 29, 2008)......................................................... 3

*Newman v. Rothschild*, 651 F. Supp. 160, 162-63 (S.D.N.Y. 1986) ................................ 40

*Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ........................................................ 37

*Novak*, 216 F.3d at 314 .................................................................................................... 16

*Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000) ................................................... 41

*Oxford Asset Mgmt., Ltd. V. Jaharis*, 297 F.3d 1182, 1190 (11th Cir. 2002).................. 42

*Phillips Petroleum Co. v. Federal Energy Regulatory Comm.,* 792 F.2d 1165, 1169 (D.C. Cir. 1986) ...................................................................................................................... 29

*Pinter v. Dahl*, 486 U.S. 622, 642 (1988) .................................................................... 6, 56

*Platsis v. E.F. Hutton & Co.*, 642 F. Supp. 1277 (W.D. Mich. 1986) ............................. 26

*Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987) ........................................ 40

*Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ....................................... 13, 16, 59

*Rosen v. Textron*, 321 F.Supp. 2d 308, 320 (D.R.I. 2004)............................................... 35

*Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984), *aff'd*, 865 F.2d 492 (2d Cir. 1989).......................................................... 12

*Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 789 (S.D.N.Y. 1997) ................. 5, 54

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1208 (1st Cir. 1996) ....................... 2, 18, 19

*Shikles v. Sprint/United Management Company*, 426 F.3d 1304, fn. 7 (10th Cir. 2005) . 31

*Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ........................................................ 27

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976)........................................................................................................................ 32, 46

*U.S. S.E.C. v. Fehn*, 97 F.3d 1276, 1291 (9th Cir. 1996) ................................................ 40

*United States v. Matthews*, 787 F.2d 38 (2d Cir. 1986)............................................. 45, 46

*United States v. Mead*, 533 U.S. 218, 229-230 (2001) .................................. 27, 28, 29, 30

*United States v. Yuzary*, 545 F.3d 47, 51 (2d Cir. 1995) ................................................ 28

*Zell v. InterCapital Income Sec., Inc.*, 675 F.2d 1041, 1047-48 (9th Cir. 1982).............. 44

## Statutes

15 U.S.C. §77(c)(b)............................................................................................................ 30

15 U.S.C. §77k ....................................................................................................... 2, 19, 21

15 U.S.C. §77k(a) ........................................................................................... 2, 5, 18, 27

15 U.S.C. §77k(b)(3)(C) ................................................................................................... 50

17 C.F.R. §240.12b-2 (1995) ........................................................................................... 59

## Other Authorities

Form F-1, II.B ..................................................................................................... 4, 25, 28

http://www.finra.org/AboutFINRA/CorporateInformation/index.htm............................... 7

International Disclosure Standards, Exchange Act Release No. 41014 ........................... 23

**Rules**

Fed. R. Civ. P. 8 ........................................................................................................... 16

Fed. R. Civ. P. 9(b) ................................................................................................. 16, 18

**Regulations**

SEC Regulation C, 230.408(a) .................................................................................. 21, 26

Lead Plaintiffs ("Plaintiffs") respectfully submit this omnibus brief in opposition to the Xinhua Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint (the "Complaint") ("Co. Br.") and the Underwriter Defendants' Motion to Dismiss Plaintiffs' Complaint[1] ("Und. Br."). Accepting as true the factual allegations contained in the Complaint and drawing all inferences in the light most favorable to the non-moving party, Defendants' motions to dismiss should be denied in their entirety.[2]

## PRELIMINARY STATEMENT

Plaintiffs have adequately pleaded claims for violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act").  While it certainly comes as no surprise that Defendants have taken their best shot to dismiss the Complaint at the pleading stage, as discussed in detail below, Defendants are quite limited with respect to the issues they may properly raise on these motions and face a "virtually absolute" liability standard on the Section 11 claims, as well as a "relatively minimal burden" for Plaintiffs to adequately plead their claims.

Section 11 renders any signer, director of the issuer, or underwriter liable if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make

---

[1] The "Xinhua Defendants" are Xinhua, Fredy Bush ("Bush") and Shelly Singhal ("Singhal"). The "Underwriter Defendants" are JP Morgan Securities, Inc., UBS AG, CIBC World Markets Corp., and W.R. Hambrecht & Co., LLC.

[2] Defendants continually attempt to interpose in their papers inapplicable burdens of proving a case. At this stage, it is only the burden of pleading that is implicated, taking all factual allegations as true. Defendants' constant assertions of insufficient proof to suggest that more must be alleged in the Complaint are belied by the fact that the Complaint provides more than sufficient notice of the basis of the claims advanced. *See, e.g.,* Co. Br. at 9-22 (asking Court to consider forms from the SEC and whether purported "compliance" with requirements of form might suffice to defeat a Section 11 claim despite fact that materiality is a question of fact); Co. Br. at 24 (suggesting that the recitation of facts in the Complaint is inaccurate;); Co. Br. at 32-34 (implying that there was full disclosure here, a question of fact).

the statements therein not misleading . . . ." 15 U.S.C. §77k(a); *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741 (S.D.N.Y. 2001) . Liability is "virtually absolute," *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983), because the securities laws recognize that the issuers' disclosure of material information is "crucial in the context of a public offering, where investors typically must rely . . . on an offering price determined by the issuer and/or the underwriters of the offering[.]" *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1208 (1st Cir. 1996).

Section 11 is the enforcement mechanism for the mandatory disclosure requirements of the Securities Act. 15 U.S.C. §77k. It ensures compliance with the disclosure provisions of the Securities Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering. *Kronfeld v. TWA, Inc.*, 832 F.2d 726, 734-35 (2d Cir. 1988). This policy is further reinforced by imposing only a "'relatively minimal burden on a plaintiff,' requiring simply that the plaintiff allege that he purchased the security and that the registration statement contains false or misleading statements concerning a material fact." *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 201 (E.D.N.Y. 2000) (quoting *Herman & MacLean*, 459 U.S. at 381-82) ).

Under Section 11, an issuer has *absolute* liability for misstatements or omissions appearing in its registration materials. There is no exemption from liability under Section 11 of the Securities Act for foreign issuers and indeed several courts have found that a foreign issuer is subject to Section 11 liability where such violations are properly pleaded. *E.g.*, *In re Elan Corp. Secs. Litig.*, 2004 U.S. Dist. LEXIS 9913 (S.D.N.Y. May 18, 2004). While the Non-Issuer Defendants may potentially attempt to assert a due diligence affirmative defense at a later stage of the litigation, such a defense would be improper and premature at this stage and would not constitute any basis for dismissal. *In re Cendant Litig.*, 60 F. Supp. 2d 354, 365 (D.N.J. 1999)

2

(concluding that it is inappropriate to dismiss claims based on affirmative defense before summary judgment stage because contents of documentary evidence cannot be considered for truth of content beforehand). Essentially conceding the point, these Defendants have wasted no time on such arguments.

Predictably, Defendants argue that despite the fact that this case sounds in negligence, the Rule 9(b) standard for pleading fraud with particularity should apply. Co. Br. at 34. Unfortunately for Defendants, Plaintiffs' allegations plainly sound in negligence—in fact, no Section 10(b) claims under the Securities Exchange Act are alleged—and therefore Rule 8 is the governing pleading standard. Indeed, in light of the short shrift Defendants have given to this argument—a bare two sentences in the Company and Individual Defendants' 35-page brief, with no case law and no cognizable argument—it is clear that Defendants themselves have put no stock whatsoever in the argument.

Defendants also suggest that Plaintiffs must allege "a legal obligation [*i.e.*, duty] to disclose the allegedly omitted information." Co. Br. at 7. However, "[t]he 1933 Act creates federal duties, particularly involving registration and disclosure, in connection with the public offering of securities." *In re Adams Golf, Inc. Sec. Lit.*, 381 F.3d 267, 273 (3d Cir. 2004). The Securities Act itself creates the legal obligations to those subject to it. Defendants recognize as much. Co. Br. at 11. "Where a company chooses to make a disclosure, it has a 'duty to make it complete and accurate.'" *Nanopierce Techs., Inc. v. Southridge Capital Mgmt.*, No. 02 Civ 0767(LBS), 2008 U.S. Dist. LEXIS 6225 at *8 (S.D.N.Y. Jan. 29, 2008). .

The Complaint adequately alleges that Defendants' statements and omissions in the Registration Statement and Prospectus (collectively, the "Registration Statement") were materially untrue and/or misleading when made. *See* ¶¶32-41. Although Defendants argue that

they did not have a duty to disclose the National Association of Securities Dealers ("NASD") investigation into Bedrock Securities ("Bedrock"), the cease-and-desist order against Bedrock, the RICO litigation pending against Defendant Singhal, and the tax disputes against Defendant Bush (*see* Und. Br. at 14-15), Section 11 requires that the information received by investors not be materially misleading. *See also In re WorldCom, Inc. Sec. Litig*., 294 F. Supp. 2d 431 (S.D.N.Y. 2003). Plaintiffs have adequately pleaded the materially untrue and misleading nature of the statements and omissions; nothing further is required. *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 468 (S.D.N.Y. 2006). Of course, issues of materiality are for the trier of fact and not properly resolved at the pleading stage. *In re Warnaco Group Sec. Litig.,* 388 F. Supp. 2d 307, 313 (S.D.N.Y. 2005)("The question of materiality may be characterized as a mixed question of law and fact, and is generally inappropriate for determination at the pleading stage of litigation.")

In addition to the above standard arguments typically raised in Section 11 cases, Defendants also espouse an inventive and highly-technical but purely specious argument that any failure to disclose material information in the Registration Statement in violation of Section 11 is somehow excused by the fact that the Company is a foreign private issuer whom they argue complied with the requirements of Form F-1. Co. Br. at 10.

This argument is baffling in light of not only the plain language of the statute, imposing liability for material misstatements and omissions here, but also the fact that Form F-1 directs the issuer's attention to "the General Rules and Regulations under the Securities Act, *particularly Regulation C*… [which] contains general requirements regarding the preparation and filing of registration statements." Form F-1, II.B (emphasis added). Section 230.408(a) of Regulation C requires "Additional Information" beyond that expressly required by Form F-1:

In addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading.

In short, this explicit language parallels that of Section 11 and makes clear that compliance only with the requirements on Form F-1's face are insufficient if statements within the Registration Statement are otherwise materially false or misleading.

Further, Defendants ask the Court to afford deference to SEC Form F-1 for what it does not say, *e.g.*, that because SEC Form S-1 contains additional reporting requirements, the SEC must have intended no such reporting requirement for Form F-1 and foreign private issuers. This argument sidesteps the core issue: Congress did not delegate to the SEC authority with respect to whether Form F-1 delimits materiality for purposes of Section 11. *See* Section 11(a), 15 U.S.C. §77k(a) (allowing suit to be brought in a court of competent jurisdiction). Further Form F-1 is not ambiguous and requires specific adherence to the General Regulations and to Regulation C which mirrors Section 11's requirements. Thus, any deference due the form should be for what the SEC has expressly stated, which is consistent with the application of Section 11 to all materially false and misleading statements and/or omissions in an issuer's registration statement, regardless of its status as a foreign private issuer or otherwise.

Defendants' remaining arguments, focused on Section 12(a)(2), fare no better. Despite Defendants' protestations to the contrary, a plaintiff has standing to sue under Section 12(a)(2) where it is alleged that he or she purchased pursuant to or traceable to a public offering. *See Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 789 (S.D.N.Y. 1997). Here, the Complaint alleges that the claims under Section 12(a)(2) are brought on behalf of purchasers in Xinhua ADS's who bought pursuant and/or traceable to the Registration Statement and Prospectus (collectively, the "Registration Statement".) ¶¶1, 9, 68.

5

The Underwriter Defendants also argue that the Section 12(a)(2) claims asserted against them should be dismissed because the Complaint purportedly fails to allege that they "offered or sold" securities pursuant to a prospectus. *See* Und. Br. at 21-22. However, the Complaint repeatedly alleges that Defendants—including the Underwriter Defendants—"sold" the securities at issue to class members pursuant and/or traceable to a prospectus containing untrue statements and omissions. *See, e.g.*, ¶¶1, 9, 59, 68, 85. These allegations are more than adequate. *See Pinter v. Dahl*, 486 U.S. 622, 642 (1988) (defendant liable as "seller" under Section 12(a)(2) if it "passes title, or other interest in the security, to the buyer for value," or "successfully solicits the purchases, motivated at least in part by a desire to serve his own financial interests or those of the securities owner").

Ignoring the legal standards applicable to this motion, Underwriter Defendants also attempt to prematurely raise a fact-intensive inquiry in a seven-line footnote. There, the Underwriter Defendants argue that they are not liable for the stock drop from the date of the IPO through the last trading day of the "corrective disclosure." Und. Br. at 4-5, n.11. Asserting an ostensible negative causation affirmative defense, Underwriter Defendants will ultimately be saddled with a "heavy burden" of proof, *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 411 F. Supp. 2d 377, 383 (S.D.N.Y. 2006), to demonstrate that "the cause of the alleged loss is attributable to something other than the alleged misrepresentations [and omissions.]" *In re Dynegy, Inc. Sec. Litig.*, 339 F.Supp. 2d 804, 869 (S.D. Tex. 2004) ; *In re WRT Energy Sec. Litig.*, 2005 U.S. Dist. LEXIS 18701, *5 (S.D.N.Y. August 30, 2005). For purposes of this motion, however, the brevity of the "argument" of the footnote, with no discussion and mere citation to two cases, underlies the basic problem: this is a premature, fact-intensive inquiry improper for resolution at this stage and should be disregarded.

For these reasons and the additional reasons discussed below in detail, Defendants' motions to dismiss should be denied in their entirety.

## STATEMENT OF FACTS

**Background**

Xinhua is a diversified media company incorporated in the Cayman Islands and headquartered in Shanghai, China. ¶10.[3] On March 9, 2007, Xinhua completed the sale of 23,076,923 American Depositary Shares ("ADS") priced at $13.00 per share to raise proceeds of approximately $300 million. Of these shares, 17,307,923 were sold by the Company and 5,769,000 were sold by certain selling shareholders, including Defendant Bush, Chief Executive Officer and Chairman of the Board of Directors of Xinhua, and Defendant Singhal, Chief Financial Officer and a member of the Board of Directors of Xinhua. ¶¶11, 19.

Unbeknownst to investors, the Company's Registration Statement, issued in connection with the Company's initial public offering ("IPO"), failed to disclose a wide range of adverse, material associations between Defendant Singhal and other entities—including problematic related-party transactions with companies being investigated for fraud—and inadequately disclosed profits for Singhal from those related-party transactions. ¶22. Furthermore, Singhal owned—and also served as the investment banker in charge of—a securities firm known as Bedrock Securities which was investigated by the National Association of Securities Dealers (the "NASD") (now known as FINRA)[4] in an investigation that is still ongoing. ¶2. In April 2006, the NASD issued a cease and desist order against Bedrock Securities for the violation of SEC regulations which order remained in place until December 2006. ¶2. This information was

---

[3] All "¶___" references are to the Complaint unless otherwise noted.

[4] NASD is now known as the Financial Industry Regulatory Authority (FINRA), created in July 2007 through the consolidation of NASD and the member regulation, enforcement and arbitration functions of the New York Stock Exchange. FINRA, http://www.finra.org/AboutFINRA/CorporateInformation/index.htm (last accessed March 7, 2008).

omitted from the Registration Statement.

Moreover, the Registration Statement failed to disclose that the Internal Revenue Service ("IRS"), in filings with the U.S. Tax Court, claimed that Defendant Bush "fraudulently and with intent to evade tax" used loans, offshore entities, and conduits to purchase her interest in a Xinhua predecessor entity. ¶¶25(jj)-(kk), 76.[5] The IRS claimed that Bush failed to report a $1 million dividend connected with these transactions. ¶25(jj).

On Friday, May 18, 2007, Xinhua announced in a release that Singhal suddenly resigned as a result of "other priorities." ¶44. Curiously, the following day, Saturday, May 19, 2007 at 5:19am, when the markets were closed, (EST), Xinhua issued a second release that admitted that Singhal was the subject of a civil suit. ¶45. On May 21, 2007, *Barron's* published an exposé highlighting Singhal's associations with various companies that were either issued a cease-and-desist order by the NASD, involved in a civil racketeering action, or deemed "outrageous frauds," ¶46, as discussed more fully *infra*.

*Barron's* also reported that the head of research at the Company's wholly-owned subsidiary, Glass, Lewis & Co. ("Glass Lewis"), Lynn Turner, and its managing director and research editor, Jonathan Weil, had both resigned from the subsidiary in protest over Defendants' material omissions from the Registration Statement. ¶¶3, 4, 46, 55, 62, 76. Following publication of the *Barron's* article, the Company's shares dropped to a low of $8.31 per share, a decline of over 36% compared to the IPO price of $13.00 per share. It was only during this time that investors first learned that about Defendant Singhal's alarming past which Defendants had omitted from the Registration Statement. ¶¶4, 46, 50, 51, 76.

**The Bedrock Cease-and-Desist Order**

Also undisclosed in the Registration Statement were material facts about CFO Singhal's

---

[5] Defendant Bush also sold at least 1.5 million shares of her personally-held Xinhua ADS to reap over $19.5 million in gross proceeds. In addition, an entity named as Dragon Era Group Ltd.—reported to be owned by Bush's family trust—sold an additional 1.5 million IPO shares to reap an additional $19.5 million in connection with the IPO. ¶11(a).

wholly-owned Bedrock. The Registration Statement failed to disclose material information regarding the troublesome link between Bedrock, Xinhua, and Defendants Singhal and Bush. For example, Xinhua Finance Limited ("XFL"), the parent company of Xinhua, was Bedrock's primary client, and, therefore, any issue affecting Bedrock had a material relationship to XFL. ¶25(b). As noted above, between April 2006 and December 2006, prior to the IPO, the NASD imposed a cease-and-desist order on Bedrock for violating SEC regulations. This inquiry is ongoing. ¶¶2, 11.

Moreover, the following connection between Bush and Bedrock was also not disclosed. Sometime subsequent to April 2004, Bedrock set up a clearing relationship with UBS AG ("UBS") to sell XFL stock because Bedrock was restricted under its NASD license to trade in foreign stocks. ¶25(c). In February 2006, numerous shares of XFL stock owned by Defendant Bush were transferred into the name of Bedrock and then sold during several trading days when black-out periods were in effect for the stock. ¶25( c ). The total windfall of the trades was $13 million. Shortly thereafter, Bedrock sent a wire to Defendant Bush in the amount of $13 million minus Bedrock's commission. ¶25(b)-(c).

**Civil Racketeering Charges Against Singhal**

At the time of the Company's IPO, Defendants failed to reveal in the Registration Statement that Defendant Singhal was defending private charges of civil racketeering in a lawsuit in California. ¶¶2, 25(e)-(h).[6] The RICO case statement filed with the court on April 25, 2007, referred to Defendant Singhal as the "mastermind of the RICO activity" and stated that Defendant Singhal "failed to disclose [that he] owned personal shares of Perfisans stock so [that he] could 'pump and dump' [his] own personal shares." ¶(25(j). In addition, the case statement alleged that Singhal – through the use of SBI Enterprise – had allegedly been engaged in a

---

[6] The RICO Action, originally filed in state court in California approximately one month prior to the Company's IPO, includes RICO and conspiracy-to-commit securities fraud allegations against defendant Singhal and related parties. ¶12.

pattern of making illegal usurious loans in violation of the California Constitution, Article 15. ¶25(k). None of this information was disclosed in the Company's Registration Statement.

**Defendant Singhal's Association with Companies Deemed "Outrageous Frauds"**

Conspicuously absent from the Registration Statement is any reference to Defendant Singhal's close association with AremisSoft and ACLN, Ltd. ("ACLN"). Both entities had been labeled in the press as "outrageous frauds" and both companies have been sued for securities fraud in class action shareholder litigation. ¶25(m). Defendant Singhal's connections with AremisSoft and ACLN is telling. Prior to becoming an investor in Xinhua, Defendant Singhal was an investor in AremisSoft and was the lead investment banker for that company's IPO. ¶25(o). In fact, a former Glass Lewis researcher ("CW1") stated that Defendant Singhal's association with AremisSoft was among his/her top reasons for leaving Glass Lewis. **"This was a company that didn't exist; it was a total fraud. As the investment banker, I would expect him [Singhal] to have found that out."** ¶50 (emphasis added).

In addition, in April 1999, Defendant Singhal served as the lead investment banker in AremisSoft's IPO. ¶25(m). AremisSoft defrauded investors out of hundreds of millions of dollars through false financial reports and stock manipulation. ¶25(o). The AremisSoft fraud was uncovered in the summer of 2001. ¶25(w). Federal prosecutors stated that the company executives inflated revenue with bogus foreign contracts in India and Bulgaria and sold close to $300 million worth of their own shares before the company's stock plunged from $20 to $1 per share. *Id.*

**Singhal's Involvement with Other Entities Merited Full Disclosure**

The Registration Statement also failed to disclose that Singhal was Managing Director of Roth Capital Capital Partners, Inc. ("Roth Capital") (¶25(r)) when it was the subject of arbitration proceedings based on allegations of stock churning, breach of fiduciary duty, and fraud. ¶25(s). The firm was also engaged as co-underwriter and lead underwriter in several

highly problematic deals: (i) the Partsbase.com's IPO, (ii) the Metropolitan Mortgage & Securities, Co.'s offering, (iii) the AremisSoft's IPO, and (iv) the Suprema Specialties, Inc.'s secondary offering. [7] ¶25(u)-(x). All of the above offerings resulted in the filing and/or settlement of charges of civil securities violation or investigations and/or prosecution by the federal government.

The Registration Statement also failed to disclose to investors that Singhal served on the board of iMergent, which has been under an SEC investigation and is facing private and public lawsuits. In 2005, iMergent was forced to restate its financial data from 2002 to 2005. ¶25(aa). From 2001 to 2002, iMergent retained vFinance Investments, Inc. and SBI-E2 Capital USA Ltd—entities of which Defendant Singhal was a principal and managing director—to act as financial advisor and placement agent for a private placement of unregistered securities that closed during May 2002. ¶25(aa). iMergent has paid hundreds of thousands of dollars in refunds and legal expenses to defend itself against charges of deceiving customers in Texas, California, Indiana, and Australia. *Id.* iMergent is also facing a current suit by the Illinois Attorney General accusing the company of misleading clients. *Id.*

In October 2001, Chell Group Corporation ("Chell") announced it had retained Defendant Singhal's SBI E-2 Capital USA to provide corporate finance and M&A services to accelerate Chell's growth plans. By June 2002, Chell had been delisted by the NASDAQ. ¶¶25(bb)-(ff).

As noted above, the market reacted negatively to the *Barron's* exposé on the Company that ran on May 21, 2007, which detailed the questionable associations of Defendant Singhal with companies being investigated or seriously being scrutinized by authorities, as well as Defendant Bush's own tax dilemmas. The Company's shares plummeted to a low of $8.31 per share, a decline of over 36% compared to the IPO price of $13.00 per share. As a result of the

---

[7] In September 2007, Roth Capital along with other underwriters and Suprema's accounting firm agreed to pay $19 million to settle a class-action lawsuit. ¶25(x).

actions and inactions of Defendants, Xinhua's shareholders suffered considerable harm. This lawsuit followed.

**ARGUMENT**

## I.   Applicable Legal Standard on a Motion to Dismiss

When deciding a defendant's motion to dismiss under Rule 12(b)(6), a court must "accept as true all of the factual allegations contained in the complaint," *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1975 (2007), and "draw all inferences in the light most favorable to the non-moving party." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007). The court's task is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). Therefore, a motion to dismiss should only be granted if it appears that the plaintiffs can prove no set of facts in support of their claim that would entitle them to relief. *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984), *aff'd*, 865 F.2d 492 (2d Cir. 1989).

## II.  Plaintiffs' Claims Are Subject To Rule 8 Pleading Requirements

### A.   Plaintiffs' Securities Act Claims Are Governed By Fed. R. Civ. P. Rule 8

Defendants half-heartedly posit that "[b]ecause many of the Complaint's allegations sound in fraud, Federal Rule of Civil Procedure 9(b) governs[]" and the Complaint should therefore be dismissed as Plaintiffs fail to plead with adequate particularity as required by the rule. Co. Br. at 34. Unfortunately for Defendants, Plaintiffs are not required to plead their allegations in this Complaint with Rule 9(b) specificity and no bare assertion that 9(b) applies will bolster Defendants' position. In light of the very short shrift Defendants have given this argument (two sentences in all) (Co. Br. at 34), it is clear that Defendants themselves have put no stock whatsoever in the argument.

Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.

12

R. Civ. P. 9(b). The Complaint alleges violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933. ¶1. Under Section 11, a plaintiff "need only show a material misstatement or omission to establish his prima facie [Section 11] case." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Section 12(a)(2) holds any person liable who "offers or sells a security" by means of a materially false "prospectus or oral communication." *Laser Mortg. Mgmt. v. Asset Securitization Corp.*, No. 00 Civ. 8100 (NRB), 2001 U.S. Dist. LEXIS 13746, at *16 (S.D.N.Y. Sept. 6, 2001). As with the other sections of the Securities Act of 1933, Section 15 need only be pled with particularity when the allegations sound in fraud. Sections 11, 12, and 15 do not require pleading or proof that a defendant acted with intent to defraud or even knew that misrepresentations or omissions had been made. *In re Turkcell Iletisim Hizmetler*, 202 F. Supp. 2d 8, 12 (S.D.N.Y. 2001) (plaintiffs need not plead defendants' knowledge as there is no scienter requirement in Section 11).

The Second Circuit has held that the heightened pleading standard of Rule 9(b) only applies to Sections 11 and 12(a)(2) claims "insofar as the claims are premised on allegations of fraud." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). "Fraud is not an element or a requisite to a claim under Section 11 or Section 12(a)(2)." *Id.* In *Rombach*, the "gravamen of the complaint", *id.* at 171, citing *Anderson v. Clow (In re Stac Elecs. Sec. Litig.)*, 89 F.3d 1399, 1405 n.2 (9th Cir. 1996), was based in fraud and involved claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). In *Rombach*, there were no efforts made to distinguish the fraud allegations from the Section 11 and 12 allegations purportedly based in negligence. The claims were in fact inextricably intertwined. In the matter at bar, however, there are no 10(b) claims to muddy the waters. The Complaint alleges only violations of the Securities Act, and repeatedly and uniformly alleges Defendants' negligence as the basis of Plaintiffs' claims.

The Complaint alleges that material adverse facts were omitted from the Company's

Registration Statement. ¶25. Each of those facts relates to undisclosed information about Defendants Bush and Singhal. As noted above, in April 2006, the NASD issued a cease-and-desist order to Bedrock, owned and controlled by Defendant Singhal, for, as Defendants concede, "regulatory violations by Bedrock concerning the maintenance of current books and records, the keeping of sufficient net capital, and the holding of customers' margin securities and maintenance of sufficient reserve bank accounts." Co. Br. at 14. At the time of the order, Xinhua was Bedrock's primary client, and so the information about the order, not revealed in the Registration Statement, was doubly relevant to investors. ¶25(a-d).

At the time of the IPO, Defendant Singhal was also facing civil racketeering RICO charges brought by National Account Management, Inc. The circumstances of the lawsuit, detailed in the Complaint at ¶25(e-l), make it clear that Singhal was accused of a pump-and-dump scheme and market manipulation, both activities highly relevant to his fitness in any other business capacity. Prior to becoming involved in Xinhua, Defendant Singhal was also an investor in and lead investment banker for AremisSoft and ACLN, two businesses which have been described as outrageous frauds. ¶25(m-o). These facts were also not disclosed in the IPO.

Additionally, Defendant Singhal benefited from undisclosed related party transactions between Xinhua, XFL (the parent company of Xinhua), and Singhal's related companies. ¶25(p). Defendant Singhal was also managing director of Roth Capital at a time when it was fined hundreds of thousands of dollars for allegations ranging from stock churning to breach of fiduciary duty to fraud. ¶25(q-s). Singhal was involved in numerous transactions while with Roth Capital (or Cruttenden, the predecessor of Roth Capital) that give rise for concern. §25(t-x). For example, Singhal served as co-lead underwriter for a March 2000 IPO of Partsbase.com; the following year, a class action securities suit (in which Roth Capital was a named defendant) claimed that company made untrue statements in the prospectus. ¶25(u). The SEC has also alleged that Metropolitan Mortgage & Securities Company, on which Singhal served as lead

underwriter for their January 2000 offering, disguised the fact that it financed all or most of the purchase price of various real estate deals to improperly book the paper profits immediately. ¶25(v).

Defendant Singhal also had connections to iMergent, which is under an SEC investigation and facing public and private lawsuits. ¶25(y-aa). Singhal's involvement with Chell Group Corporation ("Chell") was also undisclosed and material as Chell faced allegations of criminal activity involving its top officers. ¶25(bb-ff). Defendant Singhal was also director and member of the compensation committee at Small World Kids, Inc. While the Registration Statement touted this experience, it omitted the material fact that Singhal benefited from his transactions with and partial ownership of Small World at a time when the company itself was in a major financial crisis and had a history of lack of profitability. ¶25(gg-ii).

In addition to the undisclosed material facts regarding Singhal and his business ventures, Defendant Bush's original investment in Xinhua drew scrutiny from the IRS for purportedly "fraudulently and with intent to evade tax" purchasing interest in Xinhua using "loans, offshore entities, and conduits." ¶25(jj). Defendant Bush's tax problems were never disclosed in the Registration Statement despite the fact that these problems constitute the type of information a reasonable investor would want to be aware of in making an investment decision regarding the Company. ¶25(jj-kk).

In addition to these undisclosed facts, the Complaint alleges material omissions that resulted in substantial benefits to insiders (¶¶26-31), and material misrepresentations in the Company's Registration Statement, including *inter alia* the Company's lack of independence of directors and conflicts of interest. ¶32-42. There are no allegations of knowledge, purposeful omission, collusion, secrets, schemes, or concealment in the Complaint. The Complaint does not sound in fraud.

Defendants' passing shot that Plaintiffs' claims sound in fraud falls flat. Defendants cite

no law and provide no examples, and instead simply make a bare assertion that 9(b) should apply. In order to sound in fraud, allegations must be premised on fraud. Absent that premise, Fed. R. Civ. P. 8 applies, which requires only a "short and plain statement of the grounds" and specifically admonishes that "each averment of a pleading shall be simple, concise, and direct." Plaintiffs easily meet this applicable standard.

### B. Alternatively, Plaintiffs' Section 11 and 12 Claims Meet the Requirements of 9(b)

In the alternative, in the event that the Court determines that Plaintiffs' Section 11 and 12 claims sound in fraud, Fed. R. Civ. P. 9(b) requires specificity with respect to the reasons that the statements are untrue and misleading, a standard which Plaintiffs have readily met here. *See, e.g., Rombach*, 2002 U.S. Dist. LEXIS 15754, *6 ("complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.") (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir. 1993)).

The Second Circuit has stated that it does "not require the pleading of detailed evidentiary matter in securities litigation," *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) and courts of this district have stated consistently that "the application of Rule 9(b) . . . must not abrogate the concept of notice pleading." *In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 327 (S.D.N.Y. 2003). Additionally, the PSLRA requires that an allegation made on information and belief "shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1). In the Second Circuit, "a complaint can meet this requirement by providing documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).

Plaintiffs have alleged twelve categories of untrue statements and omissions in the Company's Registration Statement, which allegations readily comply with the requirements of 9(b)—the *what*, *who*, *where*, *when*, and *why false* of the allegations. Plaintiffs' allegations are clear and supported by examples from the Registration Statement. For instance, Plaintiffs allege

that:

> A "Cease and Desist" Order was issued by NASD in April 2006 for violation of several SEC rules, related to Newport Beach, California based Bedrock. The order was not lifted until December 2006 and the regulatory inquiry is still ongoing. At the time the Registration Statement and Registration Statement for the IPO were filed, Defendant Singhal was simultaneously the Company's CFO and also owned and controlled Bedrock.

¶25(a). Plaintiffs allege that this material information was omitted to be disclosed in the Registration Statement. ¶25. The allegation details *what* (the Cease and Desist Order), *who* (Defendant Singhal), *where* (omitted from the Registration Statement), *when* (at the time of the IPO) and *why the omission was untrue* (because Singhal was closely involved in both the business of the Company and Bedrock, and the information was material). There can be no doubt that this allegation was pled with sufficient particularity to put Defendants on notice of the claims against them and ensure against scurrilous allegations.

> Likewise, Plaintiffs allege that:

> At the time of the IPO, defendant Singhal was defending against a lawsuit filed in California, *National Account Management Inc., et al v. Shelly S. Singhal et al*, 8:2007cv00333, which alleges that he had engaged in civil racketeering and organized corruption related to other, undisclosed investment activities. The lawsuit alleges that Singhal masterminded a "pump and dump" scheme in connection with penny stock, Perfisans Holdings Inc.

¶25(b). Plaintiffs allege that this material information was omitted to be disclosed in the Registration Statement. ¶25. The allegation details *what* (a lawsuit against Singhal alleging racketeering and corruption in investment activities), *who* (Defendant Singhal), *where* (omitted from the Registration Statement), *when* (at the time of the IPO) and *why the omission was untrue* (because the information was material). Every allegation of a material fact omitted from the Company's Registration Statement is pled with at least this level of detail and particularity. *See, e.g.,* ¶¶25(c-x).

> Furthermore, all of Plaintiffs' allegations are pled in great detail. In alleging material omissions that benefited outsiders, Plaintiffs allege *what*; that the Company acquired, and

17

sometimes overpaid for the acquisition of, other entities which were controlled by insiders. Plaintiffs allege *who* (Defendants Singhal and Bush), *where* (the Registration Statement), *when* (at the time of the IPO), and *why the omission was untrue* (because it benefited insiders without informing shareholders of the fact). All of Plaintiffs' allegations comport with Rule 9(b).

At no point does the Complaint set forth a bare assertion of fact without supplying all the relevant detail. Plaintiffs have specifically and in great detail alleged not only the falsity of Defendants' statements, but who made them, where or how they were made, when they were made, and why they were false. Therefore, Plaintiffs have complied with the pleading requirements of Fed. R. Civ. P. 9(b).

## III. The Complaint Adequately Alleges a Section 11 Claim

### A. Legal Standard

As noted above, Section 11 renders any signer, director of the issuer, or underwriter liable if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." 15 U.S.C. §77k(a); *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 754 (S.D.N.Y. 2001); *see also Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 227-28 (S.D.N.Y. 1999); *Degulis v. LXR Biotech., Inc.*, 1997 U.S. Dist. LEXIS 381 at *3 (S.D.N.Y. Jan. 21, 1997). ***Liability is "virtually absolute[,]"*** *Herman & MacLean*, 459 U.S. at 382) (emphasis added); *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 587 (S.D.N.Y. 2006) (same); *In re IPO Sec. Litig.*, 241 F. Supp. 2d at 343 (same), because the securities laws recognize that the issuers' disclosure of material information is "crucial in the context of a public offering, where investors typically must rely . . . on an offering price determined by the issuer and/or the underwriters of the offering[.]" *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1208 (1st Cir. 1996).[8]

---

[8] Defendants are held to a heightened duty to disclose with respect to a public offering. *See, e.g.*, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976). Indeed, "the disclosure requirements associated with a stock offering are more stringent than, for example, the regular periodic

Section 11 is the enforcement mechanism for the mandatory disclosure requirements of the Securities Act. 15 U.S.C. §77k. It ensures compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering. *Kronfeld v. TWA, Inc.*, 832 F.2d at 734-35 (citation omitted). This policy is further reinforced by imposing only a "relatively minimal burden on a plaintiff,' requiring simply that the plaintiff allege that he purchased the security and that the registration statement contains false or misleading statements concerning a material fact." *In re Twinlab*, 103 F. Supp. 2d at 201 (quoting *Herman & MacLean*, 459 U.S. at 381-82).

Xinhua, the Individual Defendants, and the Underwriter Defendants materially misstated or omitted material facts in the Company's Registration Statement. Each of the Individual Defendants also signed the Registration Statement. Under Section 11 of the Securities Act, each signer is *prima facie* liable to the purchasers of the securities for material misstatements and omissions. The Company is absolutely liable for all such statements and omissions. Liability for the remaining defendants is subject only to the affirmative defense of due diligence, which, while premature for purposes of this motion, cannot be proven at trial by any of the Defendants here. *See*, *e.g.*, ¶¶2, 14-16.

### B. Xinhua, as a Foreign Private Issuer, Cannot Hide Behind SEC Regulations To Excuse Violations of the Securities Laws

The fact that Xinhua is a foreign private issuer does not excuse Defendants from their failure to disclose material information in the Registration Statement in violation of Section 11. As noted above, under Section 11, a Registration Statement may not contain "an untrue statement of a material fact or omit[] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. §77k. As Defendants Xinhua, Bush, and Singhal note in their brief:

A material omission … is actionable if the omitted facts (1) were required by SEC

disclosures called for in the company's annual Form 10-K or quarterly Form 10-Q filings . . . ." *Shaw*, 82 F.3d at 1208.

regulations to be stated therein, or (2) were necessary to make the disclosures in the registration statement not misleading.

Co. Br. at 7 (quoting *In re N2K Inc. Sec. Litig.,* 82 F. Supp. 2d 204, 207 (S.D.N.Y 1999), *aff'd,* 202 F.3d 81 (2d Cir. 2000)(*per curiam)*; *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) ). Not only were the omitted statements necessary under Section 11 to make the Registration Statement not misleading, such disclosures were also required by SEC regulations. *See* Regulation C, 17 C.F.R. §230.408.

To register securities for their IPO, Defendants used Form-1, the Registration Statement under the Securities Act designated for the securities of foreign private issuers. Form F-1 is accompanied by instructions which explain the information that must be disclosed in the Company's Registration Statement. On the first page of instructions, Form F-1 directs the issuer's attention to "the General Rules and Regulations under the Securities Act, *particularly Regulation C*… [which] contains general requirements regarding the preparation and filing of registration statements." Form F-1, II.B (emphasis added). Section 230.408(a) of Regulation C requires "Additional Information" beyond that expressly required by Form F-1:

> In addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading.

**This explicit language parallels that of Section 11 and makes clear that compliance only with the requirements on Form F-1's face may be insufficient if statements within the Registration Statement are false or misleading.**

The Second Circuit makes clear in *DeMaria,* 318 F.3d at 180 (citing 17 C.F.R. §230.408; *In re N2K*, 82 F. Supp. 2d at 207-08)   that a defendants' purported compliance with an SEC Regulation is not sufficient to avoid liability where, as here, Defendants have omitted material facts:

> Although [the particular Regulation in this case] specifically sets forth circumstances under which stale financial information must be updated with interim data **it is not the only operative SEC regulation.** The SEC's general

20

regulations expressly provide that "**in addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading**."

318 F.3d at 180 (emphasis added) (citing 17 C.F.R. § 230.408; *In re N2K*, 82 F. Supp. 2d at 207-08). Thus, both explicit SEC disclosure requirements and the express language of Section 11 mandate the inclusion of any facts necessary to show investors the complete picture regarding the information presented in a Registration Statement. *See* 15 U.S.C. §77k; SEC Regulation C, 230.408(a).

### C. Purported Compliance with Form F-1 Does Not Excuse Defendants From Disclosing the Omitted Information

Purported compliance with Form F-1 does not excuse Defendants from their material omissions. While SEC regulations "answer the question as to what material facts are required to be stated in an issuer's registration statement and Registration Statement," (quoted at Co. Br. at 8) there "'shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading.'" *In re N2K Inc. Sec. Litig.*, 82 F. Supp. 2d at 207 (quoting 17 C.F.R. §240.12b-20 which the court notes parallels 17 C.F.R. §230.408 of Regulation C); *see also* 15 U.S.C. §77k.

Defendants' argument relies on the assertion that the "only provision that could potentially require disclosure of litigation involving officers and directors is Item 8.a.7 of Form 20-F." Defendants acknowledge that 8.A.7 "requires the company to provide, under the rubric "Financial Information" (item 8), information on 'any legal or arbitration proceedings… which may have, or have had in the recent past, significant effects on the company's financial position or profitability.'" Co. Br. at 8-9 (quoting Form 20-F, Item 8.A.7). As is evident from its appearance under the heading of "Financial Information," this requirement is geared towards alerting investors to the financial outlook of the company and the impact of litigation on a company's bottom line; the undisclosed litigation in this case does not speak to that concern, but

21

rather speaks to management capabilities, experience, and competence with regard to Xinhua.

As discussed below, the inclusion of such information about management capabilities and competence as management's strengths and experience, the backgrounds of Defendants Singhal and Bush, and information about the audit committee, triggered a duty to disclose the omitted information. *See* Section III-G.

### 1. Purported Compliance with Form S-1 Is a Red Herring that Does Not Excuse Defendants From Disclosure

Defendants go on for more than six pages about the requirements of and their purported compliance with Form S-1—a form which details disclosure requirements for domestic issuers and has no application to the case at bar. Co. Br. at 10-17. Defendants' lengthy technical argument about these inapplicable SEC requirements is an attempt to disguise Defendants' inability to excuse their material omissions. The two pages that Defendants Xinhua, Bush, and Singhal dedicate to F-1's disclosure requirements completely ignore Form F-1's requirement of compliance with Regulation C, discussed *supra*, and also fail to address that compliance with SEC requirements is insufficient to avoid Section 11 liability when, as here, the statements/omissions at issue are materially misleading.

Even if the S-1 applied, which Defendants concede it does not, that form also has explicit disclosure requirements under Regulation C. Defendants cherry pick a single disclosure requirement on the irrelevant Form S-1 (compliance with Item 401(f) of Regulation S-K) to vault itself into the six-page discussion of certain legal proceedings which should be disclosed in Registration Statements. Co. Br. at 13. Defendants fail to provide the Court with the full picture here. *Any* legal proceeding, even those outside the scope of 401(f), must be disclosed if necessary to make the Registration Statement not misleading under Section 11. Defendants ignore that Form S-1, like Form F-1, also states:

> Attention is directed to the General Rules and Regulations under the Securities Act, particularly those comprising Regulation C (17 CFR 230.400 to 230.494) thereunder. That Regulation contains general requirements regarding the preparation and filing of the registration statement.

Again, Regulation C requires any additional disclosures necessary to make the information provided in the Registration Statement not misleading.

### 2. The SEC's Inapplicable Policy Behind Rule 3a12-3(b) Regarding Section 14(a) Does Not Shield Defendants From Liability Here

As discussed above, Defendants cannot escape their liability for omissions and misleading statements in the Registration Statement merely by appealing to the formal requirements of filing Form F-1 for foreign investors. And in fact, the SEC's policy decision as to the disclosure requirements of foreign companies issuing stock in American markets offers Defendants no protection here.

Defendants' argument centers on *De Vries v. Tower Semiconductor Ltd.*, 2004 U.S. Dist. LEXIS 29921 (S.D.N.Y. August 19, 2004), a case which Defendants claim established an important hierarchy of policy for foreign investors. Co. Br. at 17-19, 22. Defendants argue that a foreign-issuer exception that applies exclusively to Section 14(a) of the Securities Exchange Act claims and is discussed in *De Vries*, should somehow be extended to Section 11 of the Securities Act. However, ***there is no exemption for Section 11 requirements and liability for foreign issuers***, and therefore no rules and no cases apply any such exemption.

Thus, the argument that the policy should be applied to Section 11 is unfounded, as the policies in question do not translate to Section 11 and the SEC and the Courts have not, despite ample opportunity, made such an application. Indeed, in the release cited in *De Vries* and cited by reference by Defendants, the SEC specifically noted that "[t]he proposed revisions to Form 20-F ***in no way decrease the amount or quality of information investors will receive***[]" and that "[a]dopting this approach would provide a means for expanding the investment opportunities available to U.S. investors, while ***still ensuring that they receive a high level of information comparable to that provided by U.S. companies***." International Disclosure Standards, Exchange Act Release No. 41014. This language expresses a clear intention that the disclosures required of foreign investors would be "comparable" to those required of domestic issuers, with the

paramount concern being investor protections.

In *De Vries*, a plaintiff brought suit alleging that defendants fraudulently induced plaintiffs to approve an amendment to an investor agreement that had the effect of diluting the value of plaintiffs' stock. The case was brought under Sections 14(a) and 20(a) of the Exchange Act. The Court found that Tower Semiconductor was a foreign issuer and therefore, pursuant to SEC Rule 3a12-3(b), exempt from Section 14(a) of the Exchange Act.

The goal of that rule, according to the court, was in accord with the SEC's "overarching goal of providing American investors with a wide range of foreign investment opportunities, while not sacrificing too greatly the protections that investors have come to expect." *Id.* at *13. The *De Vries* court took note that "[a]t the time this rule was adopted, the SEC noted that one factor that affected the decision to exempt foreign issuers from the rules pertaining to the solicitation of proxies was that there were 'relatively few stock issues of foreign issuers listed on American exchanges.' [citing International Disclosure Standards, Exchange Act Release No. 41014, 1999 WL 44076, at *2 (Feb. 2, 1999)]. Thus, the SEC adopted a 'realistic approach' in concluding that 'the interests of American investors will be best served by the continuance of these exemptions.' [citing *id.*]." *De Vries,* 2004 U.S. Dist. LEXIS 29921, *14. By necessity, if Tower was exempt from 14(a) the 20(a) claims would also be dismissed as no control person liability can exist in the absence of primary liability. ***SEC Rule 3a12-3(b) expressly exempts foreign issuers from Sections 14(a), 14(b), 14(c), 14(f) and 16 of the Exchange Act. There is no exemption for claims brought under Section 11 of the Securities Act.*** The *De Vries* case itself makes no mention of Section 11 whatsoever and does not apply thereto.

The *De Vries* court acknowledged that "the exemption is just one part of the SEC's overarching goal of providing American investors with a wide range of foreign investment opportunities, while not sacrificing too greatly the protections that investors have come to expect." In fact, the court emphasized that "***placing too few regulatory burdens on [foreign***

issuers] *would open the SEC up to criticism from Congress, would risk the protection of American investors, and would invite domestic companies to complain that the SEC accommodation of foreign companies hinders the ability of domestic companies to compete*." *Id.*, at *13, n.8 (emphasis added). Therefore, while applying a specific exemption from 14(a) and confirming that the SEC had the authority to make that exemption, the court noted the important policy considerations that prevent such exemptions from becoming wide-spread.

The SEC policy which Defendants attempt to persuade this Court applies to Section 11 claims absolutely does not, either in letter or in spirit. By the express language of the rule enacting the policy, it applies *only* to parts of Section 14 and to Section 16. At no point have either the courts or the SEC implied or stated that the rule should be broadened. Indeed, the provision of and content of proxy statements—the concern of Sections 14 and 16—is quite separate and apart from the question of disclosures for the issuance of stock. There is no basis for comparison and no reason supported by the legislative history to support the concept that the SEC intended the Rule 3a12-3(b) exemptions to be broadened to undermine the basic investor protections safeguarded by Section 11 of the Exchange Act. It did not.

Not only did Defendants abrogate *any* putative protection they might have enjoyed by raising the question of Director background and experience—obliging them to make disclosures which would make any related statements not misleading—but the policy of the SEC is not designed only with the convenience of foreign companies in mind. The SEC policy cited by Defendants encourages foreign companies to list in the United States by ensuring that they are not burdened merely for being foreign investors. But the SEC policy is, of course, also designed to protect investors who purchase on American exchanges, including those who invest in foreign private issuers.

The requirements of Form F-1 are the minimum *"general requirements"* (*see* Form F-1, II.B): they are accompanied by rules which mirror Section 11 (*see* "Additional Requirements" of

Section 230.408(a) of Regulation C), and the strictures of Section 11 are designed to protect investors and increase transparency in IPOs. Foreign issuers cannot escape the general policy reasons behind the disclosure requirements or the protective purpose of Section 11. The SEC policy encourages foreign issuers: it is not in place to give them unfair advantage or the ability to manipulate investors in American exchanges. Nothing exempts foreign issuers from compliance with the Federal laws which govern the securities markets in the United States.[9]

As noted above, under Section 11, an issuer has *absolute* liability for misstatements or omissions appearing in their registration materials. There is no exemption from liability under Section 11 of the Securities Act for foreign issuers and indeed several courts have found that a foreign issuer is subject to Section 11 liability where Section 11 violations can be shown. In *In re Elan*, 2004 U.S. Dist. LEXIS 9913, the court found that plaintiff had not properly alleged omissions and misstatements in the Registration Statement, but considered plaintiff's Section 11 claims against the foreign issuer in order to reach that conclusion. Defendants cite *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158 (S.D.N.Y. 2003), as dismissing a claim under

---

[9] Defendants cite *Platsis v. E.F. Hutton & Co.*, 642 F. Supp. 1277 (W.D. Mich. 1986), (Co. Br. at 31-32), ostensibly to support the view that Xinhua should not be held to a "more onerous standard, " on a theory that the disclosure the SEC required on Form S-1 should not extend to Form F-1 and therefore be construed as material information. However, *Platsis* dealt with an SEC rule exempting from publication information on oil and gas reserves for limited partnerships and its treatment of any exemption issue is effectively dicta. *Id.* at 1295. The case was ultimately decided on statute of limitations grounds. Nonetheless, a material difference in circumstances exists between *Platsis* and this case: plaintiff in *Platsis* was fully aware of the risks before investing and aware of the alleged omissions that formed the basis for his complaint. *Id.* at 1294. More importantly, unlike *Platsis*, there is no specific exemption here that requires or allows foreign private issuers to withhold information about the background and dealings of its principals. Furthermore, Xinhua's citation to *Gieger v. Solomon-Page Group, Ltd.*, 933 F. Supp. 1180 (S.D.N.Y. 1996), is not dispositive as to the issue of materiality of information that should have been supplied here. In fact, in *Geiger*, the court took pains to note that the allegedly material, omitted statement was of "plain unimportance." *Id.* at 1188. Contrary to Xinhua's contention, the absence of a requirement in an SEC regulation (as compared to a form which ranks as neither a regulation nor a statutory grant) to disclose the relationship between selling shareholders and underwriters, Co. Br. at 12, does not answer the key question in this case: namely, whether material facts about the Company's principals omitted from the Registration Statement are actionable under Section 11.

Section 14(a) and holding that SEC Rule 3a12-3(b) expressly exempts foreign private issuers from compliance with, and hence liability under Section 14(a). However, Defendants misleadingly omit to note that in *Vivendi* the court likewise considered plaintiff's Section 11 claims against the foreign issuer. The court did *not* hold that Section 11 claims are inapplicable to foreign issuers, nor did it in any way suggest that the Section 11 claims could somehow be trumped by SEC policy considerations. Instead the court merely deemed the Section 11 claims inadequate as pleaded because they did not identify which statement were false and why. *Id.* at 173. With a clear opportunity to extend the policy behind SEC Rule 3a12-3(b) to other sections of the Securities Act or the Exchange Act, the court declined to do so.

Because there is no foreign issuer exemption for Section 11 liability, Defendants' arguments here should be rejected.

### D. While F-1 Does Not Define Materiality For Foreign Private Issuers for Purposes of Section 11, Regulation C Nevertheless Incorporates Section 11 Requirements into the Form

Defendants make the tenuous suggestion that the omission of certain information from Form F-1 that is present in Form S-1 somehow supports the idea that the SEC has exercised its "discretion" to define materiality as to foreign private issuers and that said discretion should be afforded deference. Co. Br. at 17-22 (citing *Chevron, U.S.A. v. Natural Res. Def. Counsel, Inc*., 467 U.S. 837, 843-44 (1984)). As a preliminary matter, Congress did not delegate to the SEC authority with respect to whether Form F-1 delimits materiality for purposes of Section 11. *See* Section 11(a); 15 U.S.C. §77k(a) (allowing suit to be brought in a court of competent jurisdiction); *see also United States v. Mead*, 533 U.S. 218, 229-230 (2001) (citing cases).[10] In

---

[10] *Skidmore* deference is also unwarranted here. There has been no agency interpretation or ruling. Moreover, lack of requirements listed, as compared to Form S-1, is not the product of any interpretation whatsoever. "The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). To accept Defendants' argument for deference (or persuasiveness, *i.e.*, *Skidmore* deference) would be to say that silence is action; this is not so in the arena of administrative law where agency

any event, Defendants' argument wholly ignores the fact that, as noted above in Section III-B, *the SEC actually has spoken with respect to Form F-1, requiring compliance with Regulation C.* Form F-1, II.B. Defendants' attempt to escape the reach of what the SEC has said should be rejected.

In any event, the Second Circuit has recognized that there are two types of rules, legislative and interpretive:

> Legislative rules are those that "create new law, rights, or duties, in what amounts to a legislative act." Legislative rules have the force of law. Interpretive rules, on the other hand, do not create rights, but merely "clarify an existing statute or regulation."…. These rules do not have force of law, though they are entitled to deference from the courts.

*United States v. Yuzary*, 545 F.3d 47, 51 (2d Cir. 1995) (citations omitted). The issue posed by Defendants is whether Form F-1 suffices as a legislative or interpretive rule. It is, however, neither. There is quite plainly no express delegation of authority given by Congress in the Securities Act for the SEC to determine and define the scope of what shall be considered "material" for purposes of Section 11. Rather, Congress has seen fit to let the courts decide. On this basis alone, the Court should reject Defendants' attempt at invoking deference.

Nevertheless, in *Chevron,* 467 U.S. at 842-43, the Supreme Court outlined a two-step process for dictating whether a particular agency rule or regulation deserved judicial deference. First, the court must determine whether Congress has directly spoken to the precise question at issue. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* Under step two, "if the statute is silent or ambiguous with respect to the specific issue, the question for the

---

action is at the core. *See Mead,* 533 U.S. at 234-35 (citing cases explaining that some weight or some force could be accorded to informal agency interpretations; such is not an issue here because there is no interpretation by the SEC for the Court to even consider). Plaintiffs challenge whether Defendants even have standing to broach the so-called deference argument, when no agency is a party to these proceedings and the Court is being asked to make a deference ruling on an issue that has not been decided by the agency itself. *Dabit v. Merrill Lynch*, 395 F.3d 25, n.6 (2d Cir. 2005).

court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. In other words, under familiar principles of administrative law, courts defer to an agency's "permissible construction" or "reasonable interpretation" of ambiguous statutory terms. *Chevron,* 467 U.S. at 843-44. Where, as here, no such ambiguity in the statutory language is present, there is no need for judicial deference as the inquiry ends after step one. Of course, the judicial branch still serves as the final authority on issues of statutory construction and must reject administrative interpretations contrary to clear congressional intent. *Id.* at 843, n.9.

Defendants concede that there is no agency interpretation issue here: "[T]he SEC has amended Form F-1 *ten times*, but has never seen fit to add any requirement that a foreign private issuer disclose its officers' and directors' legal proceedings. Nor has Congress added such a requirement." Co. Br. at 20 (footnote omitted).[11] It is axiomatic that there must be an agency action in matters where deference is sought and an agency has "exercised its *own* judgment." *See, e.g., Phillips Petroleum Co. v. Federal Energy Regulatory Comm.,* 792 F.2d 1165, 1169 (D.C. Cir. 1986) (noting that the agency's promulgation of a rule pursuant to a federal court decision does not render the rule an agency decision).

Defendants appear to suggest that inaction or agency silence based on a generic form should be afforded deference, a proposition that finds no support under administrative law principles, either in statute or under judicial interpretation of the seminal administrative law cases. To the contrary, the SEC spoke with respect to Form F-1, requiring express compliance with Regulation C, a provision which Defendants conveniently ignore.

Agency pronouncements not promulgated pursuant to an explicit or implicit congressional delegation of law-making authority are also not entitled to *Chevron* deference. *United States v. Mead Corp.*, *supra,* 533 U.S. at 229. In other words, agency rulings or regulations are entitled to no deference when they are not made with a "lawmaking pretense."

---

[11] This makes sense in light of the plain language of Section 11 for "an untrue statement of a material fact or omitted to state a material fact required to be stated therein[.]"

*Id.; Delamota v. United States Dep't of Educ.*, 412 F.3d 71, 79 (2d Cir. 2005) (citing *Mead*). There is no suggestion that the form here is intended to have the force of law in defining what constitutes sufficient information for materiality purposes – other than to incorporate Regulate C which simply mirrors Section 11's own requirements. Quite simply, the form is just that. Foreign private issuers complete it and submit it to the SEC. The form makes no pronouncements, issues no rules, and interprets nothing—other than to mandate that foreign private issuers must comply with Regulation C, which mirrors the requirements of Section 11. It is left for the courts to adjudicate compliance with the plain language of Section 11 should the issue arise.[12]

Defendants cite liberally to *Devries v. Tower Semiconductor*, 2004 U.S. Dist. LEXIS 29921*, aff'd sub nom., Schiller v. Tower Semiconductor, Ltd,* 449 F.3d 286 (2d Cir. 2006), an Exchange Act case which invoked *Chevron* and a case, unlike here, in which the SEC promulgated an exemption (*i.e.*, acted) pursuant to a legislative grant of authority. Co. Br. at 17-22. The court concluded that "Congress has authorized the SEC to create certain exemptions through rules and regulations, so long as those exemptions are in the public interest and protect investors." *Id.* at *13. There is, as Defendants have conceded, no requirement here (unlike the issue in *Devries*) to exempt foreign private issuers from the reach of the Securities Act. For example, in 15 U.S.C. §77(c)(b), Congress sought fit to explicitly permit the SEC to issue exemptions "from time to time by its rules and regulations, and subject to such terms and conditions as may be prescribed therein, add any class of securities to the securities exempted as provided in this section[.]" Thus, *Devries* is thus readily distinguished from this case. Defendants seek the Court's imprimatur to accord deference to a standard form. There is no warrant for the Court to give any deference to a simple form, *i.e.*, the guise of "lawmaking pretense." Again, even to the extent that deference were appropriate, the application of Regulation C moots the

---

[12]    Further, there is no suggestion that the creation of the form (and whether it should define the sufficiency of the disclosures for foreign private issuers) was subject to any public scrutiny or deliberate consideration, either in a formal rulemaking or informal notice and comment procedure.

issue, reinforcing the application of Section 11.

The Tenth Circuit's decision in *Shikles v. Sprint/United Management Company*, 426 F.3d 1304, n.7 (10th Cir. 2005), is instructive. In *Shikles*, the plaintiff filed a charge of age discrimination against Sprint, when he was laid off due to a reduction in force. The EEOC took responsibility for investigating the charge. Shikles, however, never cooperated with the EEOC, canceling scheduled meetings and failing to return telephone calls. Shikles thus never provided the EEOC investigator with any information related to the claim of discrimination beyond that asserted in the charge. Ninety-one days after Shikles filed the charge, the EEOC issued a Dismissal and Notice of Rights to Sue form. Thereafter, Shikles sued Sprint, which moved for summary judgment for failure to exhaust administrative remedies. The district court granted the motion and Shikles appealed. Although ultimately affirming the case on jurisdictional grounds, the appellate court rejected the EEOC's position, as stated in an amicus brief, that its Dismissal and Notice of Rights form was entitled to great deference.

The appeals court found the EEOC's contention "without merit" because there was no "indication that the EEOC's form represents the sort of 'deliberative conclusions as to the meaning of [the] laws' the EEOC is charged with enforcing that would entitle such a form to deference." *Id.* (citation omitted). At bottom, *Shikles* illustrates the judiciary's reluctance to accord deference to a form that was not created with the purpose of enforcing a congressional mandate. The form at issue in this case, Form F-1, should suffer a similar fate as the *pro forma* notice at issue in *Shikles*. Form F-1 evinces absolutely no intent by the SEC, with any considered deliberation, to state the outer limits of what constitutes the extent of the obligation of foreign private issuers. Defendants' call for deference, and its failure to acknowledge Regulation C, should be rejected.

### E.  Plaintiffs Have Alleged Material Omissions

Defendants advance a fusillade of arguments in an effort to show that the Complaint insufficiently alleges misstatements or omissions of material fact. Co. Br. at 22-34. The four

corners of the Complaint, however, are clear. In the aggregate, they identify a wide range of misstatements and omissions of material fact in the Registration Statement.

It is well settled that "[a]n omission is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Halperin v. eBanker USA.COM, Inc.*, 295 F.3d 352, 357 (2d Cir.2002) (citation and internal quotations omitted). A misrepresentation or omission is material if there is a substantial likelihood that a reasonably prudent investor would consider it important in making a decision. *Basic Inc. v. Levinson*, 485 U.S. 224, 231, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976) ("There must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."); *Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 540-41 (2d Cir. 1996).

For example, the Registration Statement was rendered materially false and misleading in one respect by its stark failure to disclose the true, adverse facts concerning Defendant Singhal's background and close connections to numerous suspect public companies. Those companies in which Singhal was involved had been the subject of investigations and/or charges by government regulators, the SEC, or one or more attorneys general, or had been the subject of securities lawsuits. Nowhere in the Registration Statement is this important negative information identified. Instead, Defendants opted to paint a skeletal picture of Singhal's past and overall experience, conveniently omitting all aspects of that checkered past and experience that paint less than a rosy picture:

> Shelly Singhal has served as our Chief Financial Officer since September 2006, and has served as a director of our parent, Xinhua Finance Limited, since July 2004. Mr. Singhal will serve as our director, commencing from the Securities and Exchange Commission's declaration of effectiveness of our registration statement on Form F-1, of which this Registration Statement is a

part.

\*      \*      \*

> *Mr. Singhal has also served as a director and member of the Compensation Committee of Small World Kids Inc. since October 2004. Mr. Singhal owns Bedrock Securities, a NASD licensed broker dealer and its sister company, Bedrock China Futures, Ltd., which is an Asian securities trading company.*

¶32 (emphasis added).

In short, investors were left in the dark regarding important details of Defendant Signhal's experience, background, and integrity. Defendants further failed to disclose to investors that Singhal (the CFO of the Company) had close connections with numerous public companies that have been sued or been investigated by government regulators, the SEC, or one or more attorneys general, or had findings made against them made by the NASD. For a Chief Financial Officer to have questionable dealings with various public companies would certainly be material to a reasonable investor. Withholding such material information adversely impacted the investors' abilities to reasonably evaluate the risk. The Company candidly admits that it must rely on its executives' relationships with "business partners and regulators":

> *Our business depends substantially on the continuing efforts of our key executives*. Our business may be severely disrupted if we lose their services.
>
> \*      \*      \*
>
> *We rely on the expertise of our key executives in business operations and the advertising and media industries and on their relationships with our shareholders, business partners and regulators.*

¶40 (emphasis added). Any reasonable investor would consider how the executive has conducted business with partners and regulators to be a material fact. Xinhua has made it so, yet it has fundamentally failed to include details of such relationships.

The statement in the Registration Statement that *"[o]ur management team is one of our strongest assets"* (*see* ¶38) was materially misleading when made for several reasons. First, the Registration Statement failed to disclose that the Company's management team, included a

member (Singhal) with close ties with numerous public companies that have been sued or been investigated by government regulators, the SEC, or one or more attorneys general, or had findings made against them made by the NASD.. ¶25(a)-(ii).[13] Moreover, this statement was false and misleading because Defendants failed to disclose the extent to which Defendants Bush and Singhal personally profited from certain related party transactions. ¶¶25(p), 29, 30, 39. Indeed, this had a significant adverse impact on investors' ability to reasonably evaluate the purpose and effect of the Risk Disclosures contained in the Registration Statement. The risk disclosures that were directly impacted by these material omissions. ¶40.

When these facts are viewed collectively—as they must be—they provide plausible reasons why Defendants' statements were false and misleading when made. The circumstantial evidence adduced here demonstrates that Defendants **did not** have a reasonable basis for stating that **"[o]ur management team is one of our strongest assets"** (*see* ¶38).[14]

Lastly, at the motion to dismiss stage of litigation, doubts about materiality should be resolved in favor of the non-movant. *See In re Warnaco Group Sec. Litig.,* 388 F. Supp. 2d at 313 ("The question of materiality may be characterized as a mixed question of law and fact, and

---

[13] Defendants attempt, Co. Br. at 32 n. 33, to deflect Plaintiffs' allegations regarding the connection between Bedrock and the Company by claiming that Defendant Bush received shares and benefits from Xinhua's parent company and not Xinhua itself. This argument is specious. Plaintiffs' allegations at ¶25(c) regarding the benefit Bush derived from the arrangements between Bedrock and the Company go to the question of the materiality of the information that the Company and Bedrock are so closely linked, and the materiality of information regarding Bedrock and its CFO Defendant Singhal. Defendant Bush, CEO and Chairman of the Board of Xinhua, received significant financial benefit from a relationship between Xinhua's parent company and the troubled Bedrock, which was under the control of Defendant Singhal. ¶25. This tangled web of relationships was highly relevant to investor decisions to invest in the Company, one strand of that web connected to it by Defendants Bush and Singhal.

[14] The Underwriter Defendants' reliance on *Bell Atlantic Corp.*, 127 S. Ct. at 1965 (Und. Br. at 10 n. 32), is misplaced. Plaintiff has alleged wide-ranging circumstantial evidence providing a "plausible" —and not merely "speculative" —claim for relief. The Court in *Bell Atlantic Corp.* specifically noted that "plausible grounds were necessary, and "speculative" would not suffice, defining "plausible" as not imposing a probability requirement at the pleading stage, but calling for "enough fact to raise a reasonable expectation that discovery will reveal evidence." *Id.*

is generally inappropriate for determination at the pleading stage of litigation.")

### F. The Statements Regarding Xinhua Management Team Do Not Constitute Inactionable Puffery

Defendants claim that the statement regarding the Company's management team being one of its "strongest assets" is inactionable puffery.[15] *See* Und. Br. at 9-10. This is not correct. As an initial matter, as one court held, "whether a particular statement is mere puffery or actionable misstatement must be determined by looking not only to the challenged language itself, but also the context in which the statement was made." *Rosen v. Textron*, 321 F.Supp. 2d 308, 320 (D.R.I. 2004); *see, e.g.*, *In re Marsh & McLennan Co. Sec. Litig.*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006). Accordingly, the determination of materiality and puffery should be made by the trier of fact and not by the court at the motion to dismiss stage, for "factual disputes are not properly decided at this [motion to dismiss] stage of the proceedings." *Id.*, at 474.[16]

Nevertheless, the Underwriter Defendants argue that *In re New York Community Bancorp. Sec. Litig.*, 448 F. Supp. 2d 466, 478 (E.D.N.Y. 2006), supports the view that a statement touting that the corporation's "greatest asset was that it is risk-averse" is mere puffery and as such is inactionable. In *In re New York Community Bancorp.*, the court concluded that the

---

[15] "Puffery" means statements of "corporate optimism" that "are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997).

[16] In *Marsh & McLennan*, the court found actionable statements that "'[i]n a market where insurance rates are rising and coverage is more difficult to obtain, [a defendant insurance company] provides value to clients by developing the most cost-effective responses to the risks they face,' and that the company reached 'across markets to tap into risk capital wherever it exists, seeking the best terms, conditions, and prices. Our brokers' knowledge of the interests of insurers for different types of risk and their relationships with senior underwriters are an advantage for clients as well as underwriters.'" 501 F. Supp. 2d at 475. The court found these statements to be materially misleading to investors because they were "directly contradicted by the Complaint's allegations" of improper business practices at the company. *Id.*, at 475. The court also found statements that the defendant company had "'led the industry in terms of disclosure, and we think we will continue to lead the industry in terms of disclosure'" were actionable because the complaint had alleged that the company "'actively sought to prevent'" clients from discovering the allegedly illegal practices at issue. *Id.* at 476.

statement about the company's "greatest asset" was a generalization. *Id.* The court, however, further found that in that instance the "greatest asset" statement would not have been one relied upon by a reasonable investor because the corporation made quarterly disclosures regarding its heavy involvement in risky, mortgage-backed securities. *Id.* at 479. This point is crucial in the court's analysis. There is no question here and no assertion that Xinhua ever made an adequate disclosure with respect to investigations, lawsuits, background, and the dealings of its principals; never made any statement which could mitigate the effect of an assertion like "greatest assets." Xinhua instead opted to rely on the characterization of Xinhua's management team as one of its "strongest assets" (a statement couched amongst language in which the Company described the expertise and experience of both Singhal and Bush), without any accompanying mitigating or disclosing language.

Here, Plaintiffs need only plead that Defendants would have known of the falsity or the baselessness of the statement in question if they had exercised due care. *See In re Adams Golf Inc., Sec. Litig.*, 381 F.3d 267, 274 n.7 (3d Cir. 2004) (finding, in a Section 11 and 12(a)(2) case, that the plaintiff does not have to plead that alleged risk was known at time of the offering). A plain statement that Defendants **could have known** that the Company's management team was not one of its strongest assets suffices. *In re PMA Capital Sec. Litig.*, No. 03-6121, 2005 U.S. Dist. LEXIS 15696 at *16-*17 (E.D. Pa. July 27, 2005) (denying defendants' motion to dismiss with respect to statements regarding "underwriting and actuarial expertise" and "disciplined underwriting" practices).

Each of the facts alleged in the Complaint directly contradicts the Registration Statement's assertion regarding the Company's management team being its "strongest assets." *See Adams Golf*, 381 F.3d at 274 n.7. These facts offer more than enough to sustain the allegation, (¶¶38-39), that the statement about the Company's management team being one of its "strongest assets" was false or baseless when made. *See In re PMA Capital*, 2005 WL 1806503,

at *16-*17 ("If a company addresses the quality of a management practice, that company determines such representations to be material and is bound to speak truthfully about that practice") (citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992); *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 491 (3d Cir. 1994).

Defendants' reliance on *Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 58 (2d Cir. 1996) (*see* Und. Br. at 9-10), is equally unpersuasive. There, the Second Circuit held that the defendant's very general statement that "it would not compromise its financial integrity" in pursuing a diversification plan "did not guarantee, as plaintiffs contend, that its investment choices would yield increased future earnings." *Id.* at 58. In contrast, here, Defendants made specific statements about the Company's management team, but failed to disclose that Defendant Singhal had a very close connection with a wide range of companies accused of stock fraud, market manipulation, securities related abuses, and subject to regulatory actions. *See* ¶¶25(a)-(ii). In fact, a former Glass Lewis employee ("CW2") stated that he/she had left the firm because Singhal had actions pending against him, which he/she felt should have been disclosed in the Prospectus, especially because of their sensitive nature. *See* ¶51. Numerous courts have upheld challenges to misstatements far less specific than those identified in this Complaint.[17] As such, Defendants' statements and omissions regarding Xinhua management do not constitute puffery and are actionable under Section 11.

### G. Defendants Were Under a Duty To Disclose the Material Information that Plaintiffs Allege Was Omitted From the Registration Statement

Defendants suggest that Plaintiffs must allege "a legal obligation [*i.e.*, duty] to disclose the allegedly omitted information." Co. Br. at 7. To the contrary, "[t]he 1933 Act creates federal

---

[17] *See, e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (inventory levels "in good shape" or "under control" when defendants knew "the contrary was true"); *In re Computer Assocs. Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999) ("business is stronger than ever," "strong worldwide demand" and company "solidly positioned for growth" are actionable "in light of the alleged improper accounting and revenue inflating").

duties, particularly involving registration and disclosure, in connection with the public offering of securities." *In re Adams Golf,* 381 F.3d at 273. The Securities Act itself creates the legal obligations to those subject to it. Defendants recognize as much. They cite to (and rely heavily on) a string of cases applying Section 10(b) of the Exchange Act, which is animated by heightened pleading standards. Defendants then attempt to analogize that Section 11 and Section 12(a)(2) applies the same principles of pleading as Section 10(b). Co. Br. at 8. The Court should reject Defendants' whimsical notion that Plaintiffs must identify "an independent obligation triggering the duty of disclosure." *Id.* at 7. There is simply no warrant under the pleading requirements and the very wording of the Securities Act to impose such a requirement.

   "Where a company chooses to make a disclosure, it has a 'duty to make it complete and accurate.'" *Nanopierce Techs*, 2008 WL 250553, at *8 (quoting *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ 0767(LBS), 2003 WL 22882137, at *4 (S.D.N.Y. Dec. 4, 2003)).

   The Second Circuit and the district courts within the Southern District have found literally "true" but incomplete statements, such as those made by Defendants here, to be misleading. *See McMahan & Co. v. Wherehouse Entm't., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) ("statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers"); *Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 294 (S.D.N.Y. 2004) (technically accurate statement can be actionable when material omissions render the statement a "half-truth"); *Indep. Energy Holdings*, 154 F. Supp. 2d at 754 ("the central issue is not whether the . . . statements . . . were literally true, but whether [the] representations . . . would have misled a reasonable investor . . . . A Registration Statement will violate federal securities laws if it does not disclose material objective factual matters . . .")

(citing *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996)). *See also In re Worldcom*, 294 F. Supp. 2d at 431 ("Having chosen to speak . . . [defendants] had an obligation to communicate in good faith and to disclose material information. To the extent that there is a substantial likelihood that [full disclosure] . . . would have been considered by a reasonable person to be important when deciding . . . to buy or sell WorldCom securities, then the omission of that disclosure may be found by a fact finder to have been a material omission"); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) ("[O]ne circumstance creating a duty to disclose arises when disclosure is necessary to make prior statements not misleading") (citing *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992); *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d at 182 ("A defendant is not required to disclose all known information, but has a duty to disclose any information that is 'necessary to make other statements not misleading'") (quoting *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 369 n.13 (3d Cir. 1993)); *In re IPO*, 241 F. Supp. 2d at 380 (holding that "a speaker, having begun to speak, is obliged to do so completely and truthfully") (citing *Caiola v. Citibank, N.A.*, 295 F.3d 312, 329-31 (2d Cir. 2002). Based upon the plain language of Section 11, as further confirmed by the caselaw, Defendants were under a duty to make any and all disclosures in the Registration Statement complete and accurate, and to additionally disclose any information necessary to make the disclosures not misleading.

### 1. The NASD Investigation of Bedrock, the Cease and Desist Order, the RICO Action Against Defendant Singhal, and Defendant Bush's Income Tax Dispute

The Complaint alleges that Defendants' statements in the Registration Statement were neither complete nor accurate. *See* ¶¶32-41. Although Defendants argue that they did not have a duty to disclose the NASD Investigation into Bedrock, the cease-and-desist order against Bedrock, the RICO litigation pending against Defendant Singhal, and the tax disputes against Defendant Bush (*see* Und. Br. at 14-15), Section 11 requires that the information received by investors not be misleading. *See In re Worldcom,* 294 F. Supp. 2d at 431. Defendants chose to

extol the Company's management and its background in the Registration Statement without disclosing material information, including: (a) the fact that the NASD inquiry related to the cease-and-desist order (although lifted in 2006) was still ongoing; (b) when the Registration Statement for the IPO was filed, Singhal was simultaneously the Company's CFO and also owned and controlled Bedrock ¶25(a)-(d)[18]; (c) at the time of the IPO, Singhal was targeted by a lawsuit filed in California entitled *National Account Management Inc., et a1 v. Shelly S. Singhal et al*, 8:2007cv00333, alleging that Singhal engaged in civil racketeering and organized corruption related to other, undisclosed investment activities ¶25(e)-(l); and, (d) Bush's tax problems. ¶25(jj)-(kk).

The above adverse, concealed facts bear directly on the competency of the Company's management, and thus the Complaint sufficiently alleges a claim for a violation of Section 11. *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987) ("When a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate"); *U.S. S.E.C. v. Fehn*, 97 F.3d 1276, 1291 (9th Cir. 1996) (finding defendant liable for not disclosing past securities law violations, even where no lawsuits had yet been filed based upon those violations, because those violations could have spawned lawsuits that would have "represented a potentially large financial loss" for the company). Having spoken, Defendants may be held accountable for any material omissions in those statements. Indeed, those who choose to speak must speak honestly; not in half-truths, in bad faith, or without a reasonable basis for their statements. *See McMahan & Co.*, 900 F.2d at 579; *Fogarazzo*, 341 F. Supp. 2d at 294; *Indep. Energy Holdings*, 154 F. Supp. 2d at 754.

Defendants cite a number of 10(b) cases for the proposition that the securities laws do not

---

[18] NASD rule "violations may be considered relevant for purposes of §10(b) unsuitability claims." *GMS Group, LLC v. Benderson*, 326 F.3d 75, 82 (2d Cir. 2003); *Newman v. Rothschild*, 651 F. Supp. 160, 162-63 (S.D.N.Y. 1986). Accordingly, if a violation of a NASD rule, made with scienter, constitutes securities fraud, then, *a fortiori*, the violation of a NASD rule without scienter constitutes a violation of Sections 11 and 12 (since scienter is not necessary).

require defendants to disclose a fact simply because it is material. [19] Co. Br. at 7. These cases are

inapplicable. The Second Circuit has held that this 10(b) analysis regarding duty does not apply

to Section 11 cases:

> A two-step analysis… focusing first upon duty to disclose and thereafter on materiality, … is followed in the Section 10(b)/Rule 10b-5 area under the 1934 Act. [citing 10(b) cases]. **But it finds no support in the language of Section 11 of the 1933 Act, or in the few cases which have interpreted it. Section 11 of the 1933 Act provides an express civil remedy to one acquiring a security issued in connection with a registration statements "contain[ing] an untrue statement of a material fact or omit[ting] to state a material fact required to be stated therein or necessary to make the statements therein not misleading …."** 15 U.S.C. (S) 77k (1982). As the Supreme Court has stated: "If a plaintiff purchased a security issued pursuant to a registration statement, **he need only show a material misstatement or omission to establish his prima facie case…."**

*Kronfeld,* 832 F.2d at 730 n. 8 (emphasis added).

Despite the Second Circuit's clear statement that Section 11 does not support separate

inquiries of duty and materiality, Defendants Xinhua, Singhal, and Bush cite three cases, *Oxford*

*Asset Mgmt., Ltd. V. Jaharis, In re Alliance Pharmaceuticals Corporate Securities Litigation,*

and *Cooperman v. Individual Inc.,* that purportedly apply "this same [10(b) duty] principle" to

Section 11 and Section 12(a)(2) claims. Co. Br. at 8. Each of these cases makes clear that while

there is no duty to disclose every single fact that could be material to the Registration Statement

(at the risk of burying important facts and hiding them from investors), there *is* a clear duty to

disclose those facts necessary to make other statements in the Registration Statement not

---

[19] *Glazer v. Formica Corp.* 964 F.2d 149 (2d Cir. 1992) (finding no duty to disclose in a 10(b) case where no public statements were made other than that the company would entertain any acquisition proposal which was not materially false or misleading); *Chiarella v. United States*, 445 U.S. 222, 235 (1980) (finding that a financial printer who was a "complete stranger" with no relationship with the seller had no duty to disclose); *Basic v. Levinson*, 485 U.S. at 239 n. 17 ("silence, *absence a duty to disclose¸* is not misleading") (emphasis added); *Backman v. Polaroid Corp.,* 910 F.2d 10, 12 (1st Cir. 1990) (finding no failure to disclose when information provided was not false or misleading); *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000) (stating that duty to disclose may arise when there is a statute requiring disclosure or an inaccurate, incomplete or misleading prior disclosure.")

misleading. *See, e.g., Oxford Asset Mgmt., Ltd. V. Jaharis,* 297 F.3d 1182, 1190 (11th Cir. 2002) (cited in Co. Br. at n. 10). *Oxford Asset Management* clarifies that while not *all* material information needs to go in the Registration Statement, Defendants can only avoid liability if they include all material information required by the securities laws *and* if that information is not misleading in any respect:

> Section 11(a) only makes actionable the omission of a material fact *required to be stated in the Registration Statement or necessary to make the statements in the Registration Statement not misleading*.… [T]o require *all* material information to appear in the Registration Statement would, like setting the threshold for materiality too low, result in registrants burying the 'shareholders in an avalanche of trivial information - a result that is hardly conducive to informed decisionmaking.'.… If the Registration Statement contains all of the *material* information specifically required by the securities laws, does not contain an untrue statement of a material fact and if the statements therein are not materially misleading in any respect, there has been no material misrepresentation or material omission." (citations omitted))

*Id.*

*In re Alliance Pharm. Corp. Sec. Litig.,* 279 F. Supp. 2d 171, 182 (S.D.N.Y. 2003), (Co. Br. at 8), states that "[a] defendant is not required to disclose all known information, **but has a duty to disclose any information that is 'necessary to make other statements not misleading.'"** (citation omitted)(emphasis added). Likewise, *Cooperman v. Individual Inc.,* 171 F.3d 43 (1st Cir. 1999) (Co. Br. at 8) also demonstrates a clear duty to disclose:

> Although in the context of a public offering there is a **strong affirmative duty of disclosure**, it is clear that an issuer of securities owes no absolute duty to disclose all material information. … We [] look to the explicit language of section 11 to determine whether it imposes on defendants a "specific obligation" to disclose.…

> The *Digital* court set out **the circumstances in which section 11 imposes a duty of disclosure:**

>  "Section 11 by its terms provides for the imposition of liability if a registration statement, as of its effective date**: (1) 'contained an untrue statement of material fact'; (2) 'omitted to state a material fact required to be stated therein'; or (3) omitted to state material fact 'necessary to make the statements therein not misleading.'"**

(emphasis added).

Defendants' statements about management's strengths and experience (¶42), Defendant Singhal's background and role with the Company (¶¶36-42), Defendant Bush's background (¶¶31, 47), and the composition of the audit committee (¶32-35, 38-39), as discussed *infra*, triggered a duty to disclose any related material facts necessary to make those statements in its Registration Statement not misleading.

### 2.  Statements Regarding Managements' Background and Competence

Over forty years ago, the SEC concluded that management's integrity is "always a material factor." *In re Franchard Corp.*, Release No. 33-4710, 42 S.E.C. 163, 172 (SEC July 31, 1964). Disclosures relevant to an evaluation of management are particularly important where securities "are sold largely on the personal reputation of a company's controlling person." *Id.*, at *5.

Given the Registration Statement's emphasis on the importance of Defendant Singhal's reputation and background, only the finder of fact would be able to find integrity and credibility immaterial here. Further, an evaluation of the quality of management is an "essential ingredient of informed investment decision[s] . . . [and] [a] need so important cannot be ignored." *Id.* at *6. This seems especially so where, as here, the Registration Statement highlighted Defendant Singhal as a person the Company could not get along without.[20]

---

[20]  Defendants' citation to *Cooperman v. Individual Inc.*, 171 F.3d 43 (1st Cir. 1999), is misplaced. Co. Br. at 24-25. In *Cooperman*, plaintiffs alleged that various statements made in the Registration Statement were misleading because they failed to disclose a disagreement between the CEO and a majority of the Board of the company (a disagreement which eventually led to the CEO's resignation). The First Circuit held that there was no duty to disclose the disagreement because the specific statements contained in the Registration Statement were "complete and accurate" –they represented the current business plan that was supported by a majority of the board. *See id.* at 51. Thus, according to the court, the failure to disclose that a distinct minority of a multi-member board opposed that strategy did not render the statements misleading. By contrast here, the statements made by Defendants concerning defendant Singhal's background and management being the Company's "strongest asset" were not "complete and accurate" in light of the disturbing, material associations between defendant Singhal and other companies, including problematic related party transactions involving companies being investigated and profits for defendants Singhal and Bush that were not adequately disclosed.

The defendant in *Franchard*, like Defendants Singhal and Bush here, was key to the company, and the company's securities were offered "largely predicated" on the defendant's reputation and abilities. *Id.*, at *3 ("He exercised a dominant role in the management of the registrant's affairs[.]") and *Id.*, at *7 ("As we have noted, registrant's public offerings were largely predicated on [the culprit's] reputation as a successful real estate investor and operator"), with Complaint ¶32, 38 (touting Singhal's and Bush's—the management team's—background). *Franchard* is not alone in its view of management's credibility as a material factor. *See Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830 (8th Cir. 2003) (reversing dismissal of securities fraud action and holding "[m]anagement's integrity would probably be important to investors"); *Zell v. InterCapital Income Sec., Inc.*, 675 F.2d 1041, 1047-48 (9th Cir. 1982) (reversing grant of summary judgment, holding that information bearing significantly upon the financial stability, integrity, and management skills of company's affiliated corporations was material to stockholders).

Given the Registration Statement's emphasis on Defendant Singhal's importance to the Company's success, a reasonable investor would believe—and the finder of fact could determine—that the Registration Statement's omissions about Defendant Singhal's related party transactions, about Defendant Singhal's close connection with many companies accused of stock fraud, market manipulation, securities related abuses and subject to regulatory actions, and about Defendant Singhal's enrichment at the expense of the shareholders, was indeed material.

Defendants argue that Plaintiffs' allegations boil down to a claim that the undisclosed entities with which Defendant Singhal was associated impacted Defendant Singhal's integrity and competence to serve as an officer and director of Xinhua, and as a matter of law, the Second Circuit rejects this claim. *See* Co. Br. at 26-30. Defendants contend that *GAF Corp. v. Heyman*, 724 F.2d 727 (2d Cir. 1983), a case dealing with a contentious proxy battle, requires no disclosure of "unproven allegations" in an unrelated lawsuit. Co. Br. at 26. *GAF Corp.* is

inapposite, however, because the litigation at issue there, what the Second Circuit dubbed "an unrelated intrafamily dispute…surrounding a family loan transaction", *id.* at 738, is entirely different from the legal and other proceedings directly involving Singhal and Bush. The civil RICO actions, the investigations of companies in which Singhal has had significant involvement, and even Bush's tax problems undeniably constitute material information on which a shareholder would rely in assessing the abilities or business acumen of a principal in a corporation. Defendants created a material hazard by failing to disclose the background information on Singhal and Bush. Defendants should have alerted potential investors: They did not, and by failing to do so, placed the investors at great risk.[21]

Furthermore, Defendants' reliance on *United States v. Matthews*, 787 F.2d 38 (2d Cir. 1986), also misses the mark. In *Matthew*s, the general counsel of Southland Corporation was charged with conspiring to bribe members of the New York State Tax Commission and for failing to disclose his criminal conduct in a proxy statement in violation of Section 14(a) of the Securities Exchange Act, 15 U.S.C. §78n(a). Matthews was acquitted on the conspiracy count, but was convicted on the Section 14(a) violation. The Second Circuit reversed the conviction. On

---

[21] Defendants' citations to *In re Computervision Corp. Sec. Litig.*, 869 F. Supp. 56 (D. Mass. 1994) and *Elfenbein v. American Financial Corp.*, 487 F. Supp. 619 (S.D.N.Y. 1980), do not apply here. In *In re Computervision*, the court found that the allegation of "diversion of management's attention from the day-to-day operations of the Company to the Offering" fell outside the bounds of a cognizable federal securities claim. *Id.* at 62. *Elfenbein* similarly concluded that the failure to disclose a potential $8 million tax liability, which the Court found to have been an action taken in good faith and for the legitimate purposes of the corporation, did not present a violation of Sections 11 or 12(2) of the Securities Act. These cases merely stand for the mundane proposition that legitimate, day-to-day business decisions (in which the principals act in good faith and with proper advice) may provide no basis for a federal securities action. "The United States Supreme Court has held that the federal securities laws do not regulate 'transactions which constitute no more than internal corporate mismanagement.'" *Haft v. Eastland Fin. Corp.*, 755 F.Supp. 1123, 1131 (D.R.I. 1991) (citations omitted). Such decisions are afforded deference, for example, under the business judgment rule. *See Elfenbein, supra.* at 627. By contrast here, the gravamen of the Complaint is not mismanagement of Xinhua but rather the failure of the Company to provide material information concerning the background and dealings of its principals. Such failure to disclose created a hazard to its shareholders, and left them out of the information loop.

the facts of the case, the Court of Appeals noted that the evidence of the existence of a conspiracy to bribe tax officials was thin; therefore, it was difficult to conclude that any "true" facts were actually omitted from the proxy statement. 787 F.2d at 45-46. Second, the Court remarked upon the uncertainty that existed over corporate management's obligation to disclose "qualitative" information relating to management ability and integrity. At the time, efforts by the SEC to expand upon the minimum disclosure requirement of Schedule 14A to include greater amounts of qualitative information were ultimately abandoned because of the controversy the proposal engendered. *Id.* at 47-48.

The important distinction between *Matthews* and this case is the purely qualitative nature of the information concerning wrongdoing that was withheld from investors. *Matthews*, first of all, involved the dealings of a general counsel, unlike CFO Singhal or CEO Bush who held executive level positions in the Company and had charge of the daily business operations. Nor is this case like *GAF*, which involved a purely personal family issue. Here, by contrast, the Complaint alleges that Defendants made misstatements and omissions that directly related to Xinhua's operations, business, controls, and foreseeable prospects. Within the Registration Statement, Defendants repeatedly emphasized the ability of the Company to provide high-quality management and further stated that this was one of the key strengths of Xinhua's operations. *See* ¶60. Further, the role of Defendant Singhal as a member of the Board of Directors and the Company's oversight Committees (*i.e.*, Audit, Compensation, and Corporate Governance Committees) was critical to investors. ¶¶34-37. Information going directly to the financial well being of a company falls squarely within the range of information for which there is a "substantial likelihood that a reasonable shareholder would consider . . . important in deciding [whether to invest]." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 439 (1976). The omitted information here is material, *see Gladwin v. Medfield Corp.*, 540 F.2d 1266, 1268-69 (5th Cir. 1976) (information concerning negotiations for repayment of substantial medicaid overpayments

deemed material), and ought to have been disclosed in order to render Defendant's public statements concerning the Company's management not misleading.

### 3. The Xinhua Financial Network Financing and the Freestar Transaction

Defendants argue that there was no legal obligation on their part to disclose in the Registration Statement the fees that XFL (the parent company of Xinhua) paid to Defendant Singhal in connection with the transactions that transpired in 2003; that both the Xinhua Financial Network financing and the Freestar transaction were publicly disclosed; and, that "the 1933 Act does not impose any duty to disclose information which is publicly available." *See* Und. Br. at 9.[22] Defendants' arguments miss the mark. Under the circumstances of this case, the affirmative statements in the Registration Statement (*e.g.*, ¶¶32, 28, and 40) were rendered false and misleading as a result of Defendants' failure to inform shareholders of the windfall Defendant Singhal made as a result of the 2003 transactions. While the announcement of these 2003 transactions was publicly disclosed in a November 2003 press release, it does not follow that Defendants were absolved of their duty to inform investors that Defendant Singhal profited handsomely from such transactions. This fact was not addressed in the November 2003 press release, nor was it disclosed in the Registration Statement. Since Defendant Singhal gained massive profits in the above-referenced transactions, as the Managing Director of SBI, this information was material to Plaintiffs. ¶25(p), 31.

### 4. The Upper Step and Accord Transactions

Defendants argue that the Registration Statement disclosed all the relevant information concerning the Upper Step and Accord transactions. *See* Und. Br. at 7-8; Co. Br. at 32-34. Defendants are mistaken. The Registration Statement omitted facts that made the statements regarding Upper Step and Accord materially false and misleading. Defendants had a duty to

---

[22] Xinhua and XFL engaged in a number of related party transactions with SBI, in which Singhal was the Managing Director. These transactions include: (i) Xinhua Financial Network financing of $20 million with the assistance of SBI and (ii) a deal on behalf of Freestar Technology Corporation to have Xinhua distribute its Internet credit card payment processing products to banks, financial institutions and Internet merchants. ¶31.

disclose the true and complete facts regarding Upper Step and Accord in order to make statements regarding these two entities not false and misleading. Plaintiffs allege that Defendant Singhal generated $54 million in stock and cash for Sino Investment LLC—an investment company he controlled—*via* the sale of equity stakes in two development-stage media enterprises to the Company. ¶29. On Sept. 22, 2006, according to the Registration Statement, Sino Investments sold to Xinhua a 37 percent stake in Upper Step and 61 percent of Accord Group for a total of $9.1 million in cash, 6.92 million class A shares, and 4.1 million warrants. These transactions had the effect of enriching insiders—Defendants Singhal and Bush—and "stepping up" the value of those assets when they finally reached the Company's balance sheet. By passing a television business through an entity called Upper Step, the Company in essence gave $19 million to Defendant Singhal and a long-time business partner of Bush's named Dennis L. Pelino. ¶26. Moreover, these transactions also enriched Defendant Bush because every time the Company makes an acquisition or issues shares, She received the equivalent of 3% of the value of the new share or acquisition in new shares. ¶30.

This information was never disclosed in the Registration Statement. *See In re Globalstar Sec. Litig.*, No. 01 Civ. 1748 (SHS), 2003 U.S. Dist. LEXIS 22496 at *10 (S.D.N.Y. Dec. 15, 2003) (a Registration Statement violates Section 11 if it fails to disclose "'material objective factual matters' or 'buries those matters beneath other information, or treats them cavalierly'") (quoting *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) ); *see also Credit Suisse First Boston Corp. v. Arm Fin. Group*, 2001 U.S. Dist. LEXIS 3332 (S.D.N.Y. Mar. 28, 2001) (Pauley, J.) (denying defendants' motion to dismiss and holding plaintiff had adequately pled critical omissions of fact in a Registration Statement relating to the magnitude of risks related to company's products and that such omissions were material).

Thus, contrary to the contention of Defendants, they were responsible for disclosing in the Registration Statement all material information (including Defendant Singhal's related party

transactions and the profits he made). Plaintiffs allege that they did not do so and are therefore liable.

In short, because Plaintiffs' claims are pleaded with sufficient specificity, because Defendants had a duty to disclose the material information which Plaintiffs allege was omitted from the Registration Statement, and because Defendants cannot evade that duty by misplaced appeal to SEC forms and policies, Plaintiffs' Section 11 Claims are adequately pleaded.

## IV.   Underwriter Defendants' Due Diligence Argument Is a Red Herring

Plaintiffs have stated a claim against Underwriter Defendants based on the Section 11 allegations averred in the Complaint, *i.e.*, the multiple untrue, misleading, or omitted statements of material fact. While liability for untrue and misleading statements and omissions in the Registration Statement is absolute against Xinhua, the Underwriter Defendants may only evade liability by (at a later stage of the litigation) pleading and proving the affirmative due diligence defense. *See* Section 11(b); *Funke v. Life Fin. Corp.*, 237 F. Supp. 2d 458, 475 (S.D.N.Y. 2002) (noting also that "[s]ince the due-diligence defense (and related defenses found in Section 11(b) are not elements of the plaintiffs' case, there is no requirement that the plaintiffs anticipate the invocation of such defenses in their complaint.").[23]

In other words, the Underwriter Defendants can escape liability for materially false and misleading statements only if they can prove that "[they] had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not

---

[23] Of course, here, Plaintiffs have anticipated this potential defense. ¶¶2, 15, 77, 79. The thoroughness of the Complaint, however, cannot be turned against Plaintiffs as the Underwriter Defendants attempt to do. Underwriter Defendants suggest somewhat oddly that Plaintiffs' meritorious allegations of lack of due diligence cannot provide a "cause of action" or "serve as the basis for a violation of Sections 11 or 12(a)(2)." Und. Br. at 18-19. Plaintiffs recognize that "due diligence" is an affirmative defense and quite plainly do not seek to advance lack of due diligence as an independent and separate cause of action.

misleading." Section 11(b)(3)(A); *Chris-Craft Indus. v. Piper Aircraft Corp.*, 480 F.2d 341, 370 (2d Cir. 1973); *In re Worldcom*, 346 F. Supp. 2d at 663 (noting an additional due diligence defense when a defendant relies on the opinion of an expert, citing 15 U.S.C. §77k(b)(3)(C)).

Such a defense, to be clear, is not—and certainly cannot—be a basis for dismissal at this stage. Underwriter Defendants' putative defense to Plaintiffs' well-pled allegations that Underwriter Defendants, among others, failed to exercise due diligence, *see, for example*, ¶¶2, 15, 77, and 79, comes into play only at a later stage of the proceedings (at summary judgment or at trial) if the defense is raised. *In re Cendant Litig.*, 60 F. Supp. 2d at 365 (concluding that it is inappropriate to dismiss claims based on affirmative defense before summary judgment stage because contents of documentary evidence cannot be considered for truth of content beforehand); *see also In re International Rectifier Sec. Litig.*, 1997 U.S. Dist. LEXIS 23966, at *19 (C.D. Cal. Mar. 31, 1997) ("To the extent that the underlying facts are undisputed, the adequacy of the diligence may be appropriately decided on summary judgment.").

## V. The Underwriter Defendants' Premature Loss Causation Footnote Provides No Basis for Dismissal

In a footnote before their legal argument section even begins, Underwriter Defendants submit that they "clearly are not liable" for the stock drop prior to the May 21 publication of the *Barron's* article.  Und. Br. at 4, n.11.  They provide no factual explanation in support of this position, nor can they at this stage, as the issue is a fact-intensive affirmative defense that provides no basis for dismissal at this stage of the litigation.

There is no loss causation element required to properly plead a Section 11 or a Section 12 claim under the Securities Act. 15 U.S.C § 77k; 15 U.S.C. § 77l. In fact, Plaintiffs are not obligated to plead or prove negative causation in a Section 11 case because causation is presumed.  *Levine v. Atricure, Inc.*, 508 F.Supp. 2d 268, 273 (S.D.N.Y. 2007) (denying defendant' motion to dismiss); *In re: WRT Energy Sec. Litig.*, *supra* at *4, *6-*7 (S.D.N.Y.

2005) (same).   Thus, the issue vaguely mentioned in the Underwriter Defendants' footnote provides no basis for dismissal and is not properly addressed at this stage of the litigation.  *See In re: Dynegy, Inc. Sec. Litig.*, 339 F.Supp. 2d 804, 869 (S.D. Tex. 2004) (rejecting the argument that Section 11 claims should be dismissed because the pleadings established only that the entity alleged to have purchased securities related to the debt offering sold them ten months before the date of disclosure of falsified financial statements).

Section 11(e) expressly allows Plaintiffs to recover damages for violations of Section 11 by all Defendants in this action and further provides an affirmative defense:

> Provided, That if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.

15 U.S.C. § 77k(e). If and when Underwriter Defendants attempt to raise this affirmative defense at a later stage in the litigation, they will be saddled with a "heavy burden" of proof, *In re: Flag Telecom Holdings, Ltd. Sec. Litig.*, 411 F.Supp. 2d 377, 383 (S.D.N.Y. 2006), to demonstrate that "the cause of the alleged loss is attributable to something other than the alleged misrepresentations [and omissions.]"  *In re: Dynegy, Inc.*, *supra*, 339 F.Supp. 2d at 869; *In re: WRT Energy Sec. Litig.*, 2005 U.S. Dist. LEXIS, *5 (S.D.N.Y. 2005).

Underwriter Defendants rely on *Akerman v. Oryx*, 810 F.2d 336 (2nd Cir. 1987), in support of their position on this issue.   However, *Akerman* is a summary judgment decision made after "extensive discovery" and consideration of "statistical studies."  *Id*. at 342.  Plaintiffs in that case purchased shares through an IPO.  The registration statement allegedly contained an erroneous, unaudited financial statement; Oryx incorrectly posted a substantial transaction of its subsidiary in the wrong month, thus overstating earnings.  Oryx and its underwriters moved for

**summary judgment** on the ground that, *inter alia*, the misstatement did not cause the price decline. *Id.* at 338.

The district court granted summary judgment for defendants on this point and the Second Circuit affirmed after "extensive discovery" and the consideration of "statistical studies." *Id.* at 342. The appeals court concluded that the defendants met their burden to show that the erroneous misstatement in the registration statement was "barely material." *Id.* at 343. The court found convincing the fact that the stock price rose after the disclosure of the error and also because Oryx painted a pessimistic forecast in the Registration Statement of the performance of its subsidiary. *Id.* at 341. Not only is *Akerman* inapplicable here as that case involved a motion for summary judgment but also there is no allegation in the Complaint at bar that the Company's stock price rose after the disclosure.

Moreover, as explained in *In re: WRT Energy Sec. Litig.,* 2005 U.S. Dist. LEXIS (S.D.N.Y. 2005), even if the defendant meets the burden on the affirmative defense, the burden necessarily shifts back to the plaintiff to come forward with evidence to show that the price decline resulted from the misstatement or omission. The Second Circuit contemplates that adjudication of the affirmative defense under Section 11(e) is not appropriate at the motion to dismiss phase and better suited for the summary judgment or trial stage. *See Levine v. Atricure, Inc.*, 508 F.Supp. 2d 268, 272-73 (S.D.N.Y. 2007) ("Because an analysis of causation is often fact-intensive, negative causation is generally established by a defendant on a motion for summary judgment or at trial.").

Underwriter Defendants also cite *In re: Merrill Lynch & Co., Inc. Research Reps. Sec. Litig.*, 272 F.Supp. 2d 243 (S.D.N.Y. 2003), Underwriter Br. at n.11, to support the view that Section 11 claims can be disposed of on a motion to dismiss. In *In re: Merrill Lynch,* the

plaintiff (a shareholder in the Merrill Lynch Global Technology Fund) alleged omissions of material information from the registration statement concerning investment banking conflicts, misleading research reports on the stocks in the fund, and investment in companies at market prices inflated by the misleading research reports. *In re: Merrill Lynch*, 272 F. Supp. 2d at 246. The suit arose after the New York Attorney General's investigation and *ex parte* proceedings of the practices of various Wall Street securities firms. *Id.* at 254. The court found that the losses that were incurred had actually been sustained prior to the April 8 disclosure (*i.e.*, the *ex parte* proceedings). *Id.* The court further found that the decline in the Fund's net asset value per share was in an amount proportional to the decline in the technology sector overall. *Id.* Plaintiff's shares had dropped 76.5% in value from March 27 to April 5 (before the claimed date of disclosure), whereas the sector stocks based on the Dow Jones World Technology Index dropped 69.3% over the same period. Therefore, the court ostensibly ruled that something other than the claimed omissions caused the stock price decline and the defendants' motions to dismiss were granted. The court never allowed plaintiffs the opportunity to rebut defendants' invocation of the affirmative defense.

While the better view is to follow *Akerman* and wait until a motion for summary judgment or trial, the *Merrill Lynch* facts, involving a sector-wide stock plunge, are not analogous to the case at bar. Indeed, *Levine v. Atricure, Inc.*, 508 F.Supp. 2d 268, 272-73 (S.D.N.Y. 2007), a Section 11 case in which the court denied defendants' motion to dismiss is instructive. *Levine* found that *In re: Merrill Lynch* involved an operative fact, *e.g.*, a finding of a decline in stock price mimicking a general decline sector-wide. *Id.* at 273. *Levine* further held that a Section 11(e) defense, with its shifting burdens, was not appropriate for decision at the pleading stage. *Accord, In re: Dynegy, Inc. Sec. Litig.*, 339 F.Supp. 2d 804, 869-70 (S.D. Tex.

2004) (denying motions to dismiss and distinguishing *In re: Merrill Lynch* as plaintiff alleging recovery for losses that matched the price decline in the market at large).

Underwriter Defendants' attachment of a purported price history, Holland Decl. Ex. A at 11, is unavailing. In *In re: Flag Telecom*, 411 F.Supp. 2d at 384, the court noted that a chart reflecting the drop in price of Flag Telecom stock failed to demonstrate that the decline was not due at least in part to the misrepresentations. The chart attached to Underwriter Defendants' motion to dismiss should not escape the same treatment; such a fact-intensive inquiry cannot be resolved via an impermissible chart that does nothing to appropriately illuminate or demonstrate any possibility that the losses incurred by the Class resulted from any other factor than the conduct alleged in the Complaint.

In sum, essentially acknowledging the prematurity of their argument by relegating it to a footnote of unalloyed brevity, Defendants' loss causation footnote is premature and improper and provides no basis for dismissal.

## VI. The Complaint States a Claim Under Sections 12 and 15 of the Securities Act

### A. Plaintiffs Purchased Xinhua Common Stock in the IPO and Have Standing to Assert a Claim Under Section 12(a)(2)

Defendants assert that to the extent that shareholders allege, as here, merely that they bought shares "traceable to" or "in connection with" the IPO, they lack standing, and the Complaint to that extent must be dismissed. *See* Co. Br. at 34-35; Und. Br. at 19-20. A plaintiff has standing to sue under Section 12(a)(2) where it is alleged that he or she purchased pursuant to or traceable to a public offering. *See Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 789 (S.D.N.Y. 1997) ("[B]ecause plaintiffs have alleged that they purchased securities 'pursuant to or traceable to' a public offering, they have sufficiently alleged that they purchased their shares in the public offering at issue'"); *In re U.S.A. Classic Sec. Litig.*, No. 93 Civ. 6667 (JSM), 1995 WL 363841, at *3 (S.D.N.Y. June 19, 1995) (finding standing under Section 12(a)(2) where the

plaintiffs alleged purchase "pursuant to" a Registration Statement). Here, the Complaint clearly alleges that the claims under Section 12(a)(2) are brought on behalf of purchasers in Xinhua shares who bought pursuant and/or traceable to the Registration Statement. ¶¶1, 9, 68.

Further, for purposes of determining standing, the Court must accept as true all material allegations set forth in the Complaint and must construe those allegations in favor of Plaintiffs. *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) ("For purposes of determining standing, we "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party"). Moreover, "[i]n a world in which the 'shares' purchased by a stockholder might be merely electronic entries in a brokerage firm' books, tracing may be impracticable; at a minimum, as the Third Circuit more recently noted, '[b]efore discovery takes place, [it may be] impossible for plaintiffs to know whether their shares were newly issued or were purchased in the secondary market.'" *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 208 (S.D.N.Y. 2003) (citation omitted); *accord, In re Seebeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1171-72 (C.D. Cal. 2003) ("The Court acknowledges the defendants' argument that it may be difficult or impossible to trace the stock purchased [in a secondary offering] by the plaintiff, but the plaintiff should be provided the opportunity to prove its allegation in this respect.").[24] Plaintiffs here have asserted facts which

---

[24] The Underwriter Defendants' reliance on *American High-Income Trust v. Allied Signal*, 329 F. Supp. 2d 534, 543 (S.D.N.Y. 2004) (Swain, J.), is wholly misplaced. In *American High-Income*, the defendants argued that they were not liable under Section 12(a)(2) because they did not offer to sell any securities by means of a Registration Statement. In short, the defendants argued (and this Court agreed) that there were no allegations that the defendants were involved in the preparation of the Registration Statement, and that the Offering Memorandum pertained solely to the Private Placement, and thus was not a Registration Statement as defined in *Gustafson*. Unlike this case, this Court found that offerings under 144A are non-public, and offering memoranda distributed in connection with such offerings cannot give rise to Section 12(a)(2) liability. Further, the Underwriter Defendants' reliance on *Komanoff v. Mabon, Nugent & Co.*, 884 F. Supp. 848 (S.D.N.Y. 1995), is also misplaced. In *Komanoff*, the court held that the plaintiffs' complaint referred to "post-distribution" transactions. *Id.* at 857. Unlike here, the plaintiffs in *Komanoff* never alleged that they purchased stock pursuant to an initial public offering. In addition, the Underwriter Defendants contend that *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995), controls the standing issue. However, *Gustafson* neither involved a Section 11 claim nor a public

support their standing, and until such time as discovery permits Plaintiffs access to information necessary to ultimately prove their standing, nothing further is required.

###### B.    The Complaint States Section 12(a)(2) Claims Against Defendants

The Underwriter Defendants argue that the Section 12(a)(2) claims asserted against them should be dismissed because the Complaint purportedly fails to allege that they "offered or sold" securities pursuant to a Registration Statement. *See* Und. Br. at 21-22. This argument should be rejected.

Plaintiffs' allegations are sufficient to state a claim against the Underwriter Defendants under Section 12(a)(2). *See, e.g.*, *Pinter v. Dahl*, 486 U.S. 622, 642 (1988); *Gustafson*, 513 U.S. at 582); *In re WorldCom Inc. Sec. Litig,* 219 F.R.D. 267, 283 (S.D.N.Y. 2003). In the face of these well-pled allegations, the Underwriter Defendants mistakenly assert that Plaintiffs do not state a viable Section 12(a)(2) claim against them because they fail to allege that they purchased Xinhua shares directly from any of the Underwriter Defendants and/or in the IPO.[25] Und. Br. at

---

offering. The sole issue before the court was whether a private agreement to sell securities constituted a "Registration Statement" for purposes of Section 12(2). Thus, *Gustafson* has nothing to do with public offerings, as here, and thus, "tracing" is permitted. *See generally Adair v. Bristol Tech. Sys., Inc.*, 179 F.R.D. 131 (S.D.N.Y. 1998). Second, Plaintiffs alleged that they acquired their securities "pursuant and/or traceable to" (¶9) the offering. The weight of authority permits Plaintiffs to proceed on their Section 11 claim. Indeed, several appellate courts to address the issue ruled that *Gustafson* does not apply to Section 11 claims and that "aftermarket purchasers" have standing to sue. *Lee v. Ernst & Young, LLP*, 294 F.3d 969, 978 (8th Cir. 2002*); Joseph v. Wiles*, 223 F.3d 1155, 1161 (10th Cir. 2000); *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1081-82 (9th Cir. 1999); *Milman v. Box Hill Sys. Corp*, 192 F.R.D 105, 108 (S.D.N.Y. 2000) ("the plain language of Section 11 clearly demonstrates that standing to sue under the statute is not limited to initial purchasers. First , the enabling language of Section 11 is broad in scope. By its terms, the statute applies to '*any person* acquiring such security.' 15 U.S.C. Section 77k(a)…Second, the statute provides that: 'if such person acquired the security after the issuer has made generally available to its security holders and earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery…shall be conditioned on proof [of reliance]...[t]hird, the statute's damages provision, Section 11(e), states that damages are to be calculated based on the 'difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and … the value thereof as of the time…suit was brought.'").

[25] The Underwriter Defendants refer, for instance, to *DeMaria v. Andersen*, 153 F. Supp. 2d 307 (S.D.N.Y. 2001) and *Dartley v. Ergobilt Inc.*, 2001 U.S. Dist. LEXIS 4154 (N.D. Tex. Mar. 29,

21-22. These assertions simply ignore the allegations of the Complaint. The Complaint repeatedly alleges that Defendants (including the Underwriter Defendants) "sold" the securities at issue to class members pursuant and/or traceable to a Registration Statement containing untrue statements and omissions. *See, e.g.*, ¶¶1, 9, 59, 68, 85; *Pinter*, 486 U.S. at 642 (defendant liable as "seller" under Section 12(a)(2) if it "passes title, or other interest in the security, to the buyer for value," or "successfully solicits the purchases, motivated at least in part by a desire to serve his own financial interests or those of the securities owner").

Moreover, it is well-established that "[a]s underwriters in a firm commitment underwriting become the owners of any unsold shares, they may be liable as sellers for direct sales to the public." *WorldCom*, 346 F. Supp. 2d. at 659 (denying summary judgment on Section 12(a)(2) claim against underwriters); *see also In re Prestige Brands Holding, Inc.*, No. 05-06924 (CLB), 2006 U.S. Dist. LEXIS 46667 at *10 (S.D.N.Y. July 10, 2006) (underwriters in a "firm commitment" offering "pass title" of securities to plaintiffs and therefore liable under Section 12(a)(2)).

Defendants' 12(a)(2) argument that they had no duty to disclose the facts set forth in the Complaint fares no better. *See* Co. Br. at 34-35. As the Complaint alleges, each Defendant failed to conduct an adequate due diligence investigation into the Company prior to the IPO and failed to reveal the true material facts that, at the time of the IPO, would have entirely undermined the market's confidence in the Company's senior officers and directors. For example, undisclosed in the Registration Statement was that Defendant Singhal was simultaneously an owner and investment banker in charge of Bedrock Securities and, that between April 2006 through December 2006, prior to the IPO, Bedrock Securities had been under a "Cease-and-Desist" order by the NASD for violating SEC regulations. ¶¶2, 25(a), 25(kk), 46. At the time of the IPO,

---

2001). Unlike these cited cases, the Complaint here does allege that Plaintiffs are purchasers of Xinhua ADSs in connection with or traceable to the IPO and that the Underwriter Defendants were sellers, offerors, or solicitors of the Xinhua ADSs pursuant to the IPO. ¶84-85; *see also,* ¶¶1, 9, 59, 68.

Defendants also failed to reveal, *inter alia*, that Defendant Singhal was defending private charges of civil racketeering in a lawsuit in California, and that he had previously been an inside investor in and/or lead investment banker for several other companies that had been sued by investors and/or had been subject to regulatory or governmental inquiries or investigations. ¶¶2, 25(a), 25(m), 25(r), 25(s). Furthermore, Defendant Singhal failed to disclose that he had close connections with many companies accused of stock fraud, market manipulation, and securities related abuses, and subject to regulatory actions. ¶25(a)-(ii). Nevertheless, by misrepresenting the Company's business and prospects, and by failing to reveal the true background of Defendant Singhal, Defendants presented a misleading image of Xinhua's operations, business, controls, and foreseeable prospects.

Within the Registration Statement, Defendants repeatedly emphasized the ability of the Company to provide high-quality management and further stated that this was one of the key strengths of the Xinhua operations. ¶38. These claims caused and maintained the artificial inflation in Xinhua's ADSs at the time of the IPO, and thereafter until the truth about the Company was ultimately revealed to investors. "Where a company chooses to make a disclosure, it has a 'duty to make it complete and accurate.'" *Nanopierce Tech.*, 2008 WL 250553, at *8 (S.D.N.Y. Jan. 29, 2008) (quoting *Nanopierce Techs., Inc.*, 2003 WL 22882137, at *4.[26]

### C. Plaintiffs Have Adequately Alleged Control Person Claims Against the Individual Defendants Under Section 15 of the Securities Act

Defendants take issue with Plaintiffs' control person allegations. In a four line footnote, the Xinhua Defendants argue that Plaintiffs' Section 15 claims fail because its Sections 11 and 12 (a)(2) claims fail. *See* Co. Br. at 35, n.38. However, for the reasons discussed above, Plaintiffs have adequately pleaded primary violations of Sections 11 and 12(a)(2). Section 15 imposes liability on:

> Every person who, by or through stock ownership, agency, or otherwise,

---

[26] *See also McMahan & Co.*, 900 F.2d at 579; *Fogarazzo*, 341 F. Supp. 2d at 294; *Indep. Energy Holdings*, 154 F. Supp. 2d at 754.

> or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 11 or 12 [], shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

The SEC further defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a [violator], whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. §240.12b-2 (1995). In order to plead a Section 15 claim, Plaintiffs need only allege a "primary violation by the controlled person". *Rombach v. Chang*, 355 F.3d 164, 178 (S.D.N.Y. 2004) (citing *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996).

Plaintiffs allege in their Complaint that the Individual Defendants controlled Xinhua through their direct involvement in the day-to-day management of the Company: (i) Defendants were high-level executives at the Company during the Class Period (¶¶17, 18); (ii) by virtue of their responsibilities and activities as senior officers and directors of the Company, they were privy to and participated in the Company's various SEC filings, press releases and other public statements pertaining to the Company at the time of the IPO (*id.*); and (iii) they were aware of the Company's dissemination of information to the investing public. *Id. See also In re Regeneron Pharm., Inc., Sec. Litig.*, No. 03 Civ. 311(RWS), 2005 U.S. Dist. LEXIS 1350 at *23-*24 (S.D.N.Y. Feb. 1, 2005); *In re IPO Sec. Litig.*, 241 F. Supp. 2d at 394-95; *In re Emex Corp. Sec. Litig.*, 2002 U.S. Dist. LEXIS 17528 at *9 (S.D.N.Y. Sept. 18, 2002) (stating that "at the motion to dismiss stage, plaintiffs need only plead facts supporting a reasonable inference of control"). Moreover, Plaintiffs have adequately plead that Defendants acted as culpable participants. *See In re Check Point Software Techs. Ltd. Sec. Litig.*, 2006 U.S. Dist. LEXIS 24317 *5 (S.D.N.Y. Apr. 26, 2006).

As part of their duties as directors and high ranking officers of the Company, Defendants

Bush and Singhal were required to conduct, prior to the IPO, a due diligence investigation of the Company. Thus, Plaintiffs have alleged sufficient facts demonstrating a "power to direct or cause the direction of [Xinhua] management." *See*, *e.g.*, *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 828 (S.D. Tex. 2004) (denying motion to dismiss underwriters' control person claims under Securities Act).

## CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that the Xinhua Defendants' and the Underwriter Defendants' Motions to Dismiss the Consolidated Amended Complaint be denied in full.


Dated: March 11, 2008                  Respectfully Submitted,

                                       ____/s/ Kim E. Miller_____

                                       **KAHN GAUTHIER SWICK, LLC**
                                       Kim E. Miller
                                       12 East 41st Street,12th Floor
                                       New York, NY 10017
                                       Telephone: (212) 696-3730
                                       Facsimile: (504) 455-1498

                                       - and -

                                       Lewis S. Kahn
                                       650 Poydras Street, Suite 2150
                                       New Orleans, LA 70130
                                       Telephone: (504) 455-1400
                                       Facsimile: (504) 455-1498

                                       **BERNSTEIN LIEBHARD & LIFSHITZ, LLP**
                                       U. Seth Ottensoser
                                       Gregory M. Egleston
                                       10 East 40th Street, 22nd Floor
                                       New York, NY 10016
                                       Telephone: (212) 779-1414
                                       Facsimile: (212) 779-3218

                                       *Co-Lead Counsel for Plaintiff & the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Motion was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on March 11, 2008.

<u>/s/ Kim E. Miller</u>
Kim E. Miller

61