UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

IN RE XINHUA FINANCE MEDIA, LTD.
SECURITIES LITIGATION

                              MASTER FILE
                              No.  07 Civ. 3994 (LTS)(AJP)

This Document Relates To:

All Actions
-------------------------------------------------------x

### OPINION AND ORDER

APPEARANCES:

| | |
|---|---|
| KAHN GAUTHIER SWICK, LLC<br>By:  Kim Elaine Miller, Esq.<br>12 East 41st Street, 12th Floor<br>New York, NY 10017 | WILSON SONSINI GOODRICH & ROSATI<br>By:   Douglas J. Clark, Esq.<br>      Gideon A. Schor, Esq.<br>1301 Avenue of the Americas, 40th Floor<br>New York, NY 10019<br><br>*Attorneys for Defendants Xinhua Finance*<br>*Media Limited, Fredy Bush and Shelly Singhal* |
| BERNSTEIN LIEBHARD & LIFSHITZ, LLP<br>By:  U. Seth Ottensoser, Esq.<br>     Gregory M. Egleston, Esq.<br>10 East 40th St, 22nd Floor<br>New York, NY 10016 | CLIFFORD CHANCE US LLP<br>By:   Mark Holland, Esq.<br>31 West 52nd Street<br>New York, NY 10019 |
| LEWIS S. KAHN, ESQ.<br>650 Poydras Street, Suite 2150<br>New Orleans, LA 70130<br><br>*Attorney for Lead Plaintiffs* | *Attorney for Defendants JP Morgan Securities,*<br>*Inc., UBS AG, CIBC World Markets Corp. and*<br>*W.R. Hambrecht + Co., LLC* |

LAURA TAYLOR SWAIN, United States District Judge

_____Lead Plaintiffs Leo Yen, James O'Callaghan, Shaokai Li and Wu Lin ("Plaintiffs"), who assert that their purchases of the stock of Defendant Xinhua Finance Media, Ltd. ("Xinhua"), were made pursuant to and/or were traceable to the prospectus issued in connection with Xinhua's March 2007 initial public offering (the "IPO"), bring this putative class action against Xinhua, individuals who were directors of Xinhua at all relevant times, and the underwriters of Xinhua's IPO (collectively, "Defendants"), alleging violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933. The Court has jurisdiction of Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78v.

Xinhua, the individual defendants and the underwriter defendants move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the Consolidated Amended Class Action Complaint ("CAC") for failure to state a claim. The Court has considered thoroughly the arguments and submissions of the parties in connection with these motions. For the reasons that follow, Defendants' motions to dismiss the CAC are granted.

BACKGROUND

_____The following facts alleged in the CAC are taken as true for purposes of resolving Defendants' motions to dismiss.

Defendant Xinhua is a diversified media company organized under the laws of the Cayman Islands and headquartered in China. (CAC ¶ 10.) On March 9, 2007, Xinhua filed a registration statement and accompanying prospectus (see Decl. of Mark Holland dated May 16, 2008 ("Holland Decl. II"), Ex. A) with the SEC for an IPO of about 23 million American Depository Shares ("ADS's") priced at $13 per share. (CAC ¶ 19.) Defendant Loretta Fredy Bush ("Bush") was the CEO and Chairman of the Board of Xinhua at all relevant times, and Defendant

Shelly Singhal ("Singhal") was the CFO and a director of Xinhua at the time of the IPO. (Id. ¶ 11.) Defendants J.P. Morgan Securities, Inc., UBS AG, CIBC World Markets Corp. and WR Hambrecht & Co., LLC, (the "Underwriter Defendants") served as underwriters of Xinhua's IPO. (Id. ¶ 12.)

Plaintiffs are purchasers of Xinhua ADS's whose acquisitions were made pursuant to and/or are traceable to the IPO prospectus (CAC ¶ 9) and claim to represent a putative class of all persons who purchased or acquired Xinhua ADS's from March 9 to May 21, 2007, inclusive, as well as a putative subclass of all persons who purchased Xinhua ADS's in connection with and traceable to the IPO. (Id. ¶¶ 1, 68, 84.)

On Friday, May 18, 2007, Xinhua's stock closed at $9.94 per share. (Decl. of Mark Holland dated Dec. 21, 2007 ("Holland Decl. I"), Ex. A.)[1] After the close of trading that day, Singhal resigned from all management positions and as a director of Xinhua. (CAC ¶¶ 11, 45.) On Monday, May 21, 2007, Barron's magazine published an article implicating Singhal in various stock manipulation and corruption charges that had been levied against numerous companies with which Singhal was involved. (CAC ¶¶ 23, 46.) On this news, the share price reached a record low of $8.31 per share (id. ¶ 24), rebounding slightly to close at $8.76 per share that day. (Holland Decl. I Ex. A.) The various actions that have been consolidated under the caption In re Xinhua Finance Media, Ltd. Securities Litigation were commenced soon thereafter, alleging that the prospectus issued on March 9, 2007, was misleading.

*Omissions Alleged to Have Rendered Prospectus Misleading*

The CAC alleges that the prospectus was misleading because it failed to include

---

[1] The Court may take judicial notice of public quotations of stock prices on a motion to dismiss. See Ganino v. Citizens Utils. Co., 228 F.3d 154, 167 n.8 (2d Cir. 2000).

certain information. The omissions were enumerated in the CAC as follows:

Singhal was an owner and investment banker who was "in charge of" and "controlled" Bedrock Securities ("Bedrock"). Between April and December 2006, Bedrock was under a cease-and-desist order by the National Association of Securities Dealers ("NASD") for violating various SEC rules, and a regulatory inquiry was still ongoing at the time of the IPO. (CAC ¶ 2, 25(a).)

Singhal was the defendant in a civil RICO lawsuit in California, which alleged, <u>inter alia</u>, that Singhal masterminded a "pump and dump" scheme, manipulated the market for his own gain, improperly converted stock that was entrusted to him as an escrow agent, and illegally made usurious loans. (CAC ¶¶ 2; 25(e)-(l).)

Singhal was an inside investor, a lead investment banker, a manager or an underwriter for several other companies that had been sued by investors or were subject to regulatory or governmental actions or investigations, for charges including stock fraud, market manipulation, and other securities-related abuses. (CAC ¶ 2.) Singhal was the lead investment banker for AremisSoft and ACLN, Ltd., companies that were sued for securities fraud litigation. In March 2002, the SEC shut down trading in shares of ACLN, which the SEC described as being a "complete fraud," and AremisSoft was prosecuted by the United States government for fraud. In connection with AremisSoft's IPO in April 1999, AremisSoft defrauded investors out of hundreds of millions of dollars through false financial reports and stock manipulation and was later prosecuted. (CAC ¶¶ 25(m)-(o), (w).)

Singhal was a manager of Roth Capital Partners Bridge Fund, which had a history of nine regulatory events and 29 arbitration proceedings. From 1995 to 2000, Singhal was also a managing director of Roth Capital Partners LLC ("Roth Capital"), and during that time, hundreds

of thousands of dollars of fines were assessed against it in arbitration proceedings and regulatory sanctions were imposed for various improprieties. While at Roth Capital, Singhal was a co-lead underwriter for the IPO of Partsbase.com ("Partsbase"); the following year, Partsbase was sued on the basis that the prospectus was allegedly false. Singhal was also a lead underwriter to Metropolitan Mortgage & Securities, Co.'s ("Metropolitan") January 2000 offering; Metropolitan filed for bankruptcy in February 2004 after the SEC alleged that Metropolitan had improperly booked certain profits, and a securities class action had been filed against it. (Id. ¶¶ 25(p)-(v).) Roth Capital, along with other investment banks, underwrote a $41.5 million secondary offering for Suprema Specialties, Inc. ("Suprema"), which "almost immediately unraveled" amid allegations that it had inflated sales to the tune of $560 million; Roth Capital thereafter agreed to pay $19 million to settle a class-action lawsuit filed against it. (Id. ¶ 25(x).)

Singhal was a financial advisor to and director of iMergent, but in May 2002 Singhal resigned from that directorship for reasons that were not publicly disclosed. In the following years, iMergent was forced to restate its financial data, paid hundreds of thousands of dollars in refunds and legal expenses, and is being investigated or prosecuted by the state attorneys general of Illinois, Florida, Oregon and Maryland. (Id. ¶¶ 25(y)-(aa).) In July 2001, Singhal was elected to the board of Chell Group Corporation ("Chell"), and in October of that year, Singhal's investment bank was hired to provide finance and mergers and acquisitions services. In June 2002, Chell was delisted by the NASDAQ, and Canadian and U.S. authorities filed various charges against one of Chell's directors. (Id. ¶¶ 25(bb)-(ff).)

In October 2004, Singhal was appointed to the board of Small World Kids, Inc. ("Small World"), and he owned approximately 25-32% of Small World in late 2006. The CAC alleges that Singhal "benefited from his transactions with Small World amid a severe financial

crisis at the company and a history of a lack of profitability" (id. ¶ 25(ii)), presumably by arranging a loan of $1 million to Small World from a lender with which Singhal appeared to be affiliated. In August 2007, Small World filed for bankruptcy. (Id. ¶¶ 25(gg)-(ii).)

According to the CAC, the prospectus also omitted facts about Defendant Bush. According to court filings by the IRS in connection with U.S. Tax Court litigation, Bush invested in Xinhua using money from offshore accounts and loans for tax evasion purposes, and failed to report a $1 million dividend. In July 2007, Bush admitted, in connection with a settlement reached with the IRS, that she had understated her tax liability by 97%. (CAC ¶ 25(jj).)

Plaintiffs further allege that the prospectus omitted information regarding Xinhua corporate transactions that had enriched Singhal and Bush. In 2006, Xinhua created a pass-through entity called "Upper Step," which was owned by Bush and others, for the purpose of making various acquisitions. The prospectus described Upper Step as "having no operations" until it entered into some "strategic partnerships." The CAC alleges, without further explanation, that the acquisitions "stepp[ed] up" the value of the acquired assets; the allegation appears to be that the acquired assets' values were artificially inflated. Moreover, through these transactions, "Xinhua effectively gave $19 million to Singhal and a long time business partner of Bush's named Dennis Pelino." (CAC ¶ 26.) Pelino co-founded Xinhua or its parent company[2] with Bush, but this was not disclosed in the prospectus, nor was the relationship between Pelino and Bush disclosed. (Id.) Xinhua also purchased equity stakes in Upper Step and another company from Sino Investment LLC, an investment company controlled by Singhal, at a price that was higher than those

---

[2] The CAC uses the term "Xinhua Finance," but it is unclear whether the term refers to Defendant Xinhua Finance Media Ltd., or its parent company, Xinhua Finance Limited.

companies were worth. (Id. ¶ 29.) Bush also benefitted from these purchases, as she received the equivalent of 3% of the value of such acquisitions. (Id. ¶ 30.) Xinhua also repeatedly entered into various investment transactions with investment banks run by Singhal. (Id. ¶ 31.) Singhal's shareholdings and compensation package with respect to Xinhua were second only to Bush's, and the personal earnings reaped by both Singhal and Bush from the IPO were substantial. (Id. ¶¶ 27, 42.)

*Allegedly Misleading Statements in the Prospectus*

Plaintiffs identify several statements in the prospectus that they allege were rendered materially misleading as a result of the aforementioned omissions. The prospectus contained the following statements about Singhal's background and experience:

> Shelly Singhal has served as our Chief Financial Officer since September 2006, and has served as a director of our parent, Xinhua Finance Limited, since July 2004. Mr. Singhal will serve as our director, commencing from the Securities and Exchange Commission's declaration of effectiveness of our registration statement on Form F-1, of which this prospectus is a part.
>
> Mr. Singhal sits on the Compensation Committee, Audit Committee and Investment Committee of our parent. Mr. Singhal founded the SBI Group, an investment company, in June 2001, serving as its Managing Director until December 2003, and as Chairman and CEO since that time. Mr. Singhal has also served as a director and member of the Compensation Committee of Small World Kids Inc. since October 2004. Mr. Singhal owns Bedrock Securities, a NASD licensed broker dealer and its sister company, Bedrock China Futures, Ltd., which is an Asian securities trading company. Mr. Singhal worked for SBI-E2 Capital, a member of Softbank Investment Group, from 2001 to 2003. Mr. Singhal holds a B.S. degree in Business Administration from Seaver College at Pepperdine University.

(CAC ¶ 32; see Holland Decl. II Ex. A at 156-57.) This biography was listed alongside five other biographies of Xinhua directors. Plaintiffs allege that this biography was materially misleading because it failed to note Singhal's "background and close connections to numerous public

companies that have been plundered, sued, and/or have been investigated by government regulators, the SEC, or one or more attorneys general, or had findings made against them made by the NASD." (CAC ¶ 33.)

The prospectus also identified Singhal as serving on the Audit Committee, the Compensation Committee, and the Corporate Governance and Nominating Committee of Xinhua itself.[3] (CAC ¶ 34; Holland Decl. II Ex. A at 159-61.) Plaintiffs allege that Singhal's ability to adequately carry out his committee duties would have been called into question had investors been aware of the above mentioned omissions. (CAC ¶¶ 35-37.)

Plaintiffs further point to the statement in the prospectus that one of Xinhua's key strengths was its "strong and experienced management team":

> **Our Strengths**
>
> We believe we have the following competitive strengths: . . .
>
> ***Strong and experienced management team***
>
> Our management team is one of our strongest assets. Our management team has a mix of Chinese cultural experience and international media operational skills, and brings international standards to our content offerings. Ms. Fredy Bush, our Chief Executive Officer and the Chairman of our Board, has 20 years of experience building businesses in Asia. In 2006, Ms. Bush received CNBC's Asia Entrepreneur of the Year Award. Ms. Bush, together with our management team, focuses on innovative business and strategic initiatives and the execution of our business model. In addition, we employ experienced and capable managers to run our business groups and operations.

(CAC ¶ 38; see Holland Decl. II Ex. A at 100-01.) The CAC alleges that this statement was

---

[3] Paragraphs 35-37 of the CAC recount the prospectus's explanation of the responsibilities of each committee. As would be expected, generally speaking the Audit Committee was in charge of financial reporting, the Compensation Committee reviewed and approved executive compensation plans, and the Corporate Governance and Nominating Committee reviewed regularly the performance of the directors and recommended nominees for board elections.

materially misleading because Singhal was on Xinhua's management team and was involved in the above mentioned troubled companies, and also because Bush and Singhal "personally profited from certain related party transactions" (CAC ¶ 39), as described above.

The prospectus also included numerous risk disclosure statements, which Plaintiffs allege were misleading because, while the statements warned of various contingencies, they failed to disclose Singhal's associations with companies implicated in various civil and criminal actions, as described above. (CAC ¶¶ 40-41.)  The CAC quotes the following risk disclosure statement from the prospectus:

> Our business depends substantially on the continuing efforts of our key executives.  Our business may be severely disrupted if we lose their services.
>
> Our future success heavily depends upon the continued services of our key executives, particularly Fredy Bush, who is the Chief Executive Officer of our company.  Our Chief Executive Officer also serves as the Chief Executive Officer of our parent company and will be required to devote a substantial amount of time in that capacity.  We rely on the expertise of our key executives in business operations and the advertising and media industries and on their relationships with our shareholders, business partners and regulators.  If one or more of our key executives are unable or unwilling to continue in their present positions, we may not be able to replace them easily or at all.  Therefore, our business may be severely disrupted, our financial condition and results of operations may be materially and adversely affected and we may incur additional expenses to recruit and train personnel.  In addition, if any of these key executives joins a competitor or forms a competing company, we may lose customers and business partners, and our operating results may be adversely affected.  Each of our executive officers has entered into an employment agreement with us that contains confidentiality and non-competition provisions.  If any disputes arise between our executive officers and us, these agreements may not be enforced effectively.
>
> Our senior management and employees have worked together for a short period of time, which may make it difficult for you to evaluate their effectiveness and ability to address challenges.

(Id. ¶ 40; see Holland Decl. II Ex. A at 24.)

Plaintiffs seek damages, alleging on behalf of themselves and the putative class or

subclass that all Defendants have violated Sections 11 and 12(a)(2) of the Securities Act and that Defendants Bush and Singhal are also liable under Section 15 of that Act. Plaintiffs assert that the omissions catalogued in the CAC were material and rendered certain statements in the prospectus misleading.

## DISCUSSION

On a motion to dismiss a complaint, the Court accepts the factual allegations in the complaint as true, and draws all reasonable inferences in the plaintiff's favor. See Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007). The complaint must plead "enough facts to state a claim to relief that is plausible on its face." Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008) (quoting Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007)). In addition, the Court may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit, such as the prospectus. See Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).

> Section 11 of the Securities Act provides, in relevant part:
>
> In case any part of the registration statement,[4] when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security . . . may . . . sue --- (1) every person who signed the registration statement; (2) every person who was a director of (or person performing similar functions) . . . the issuer at the time of the filing . . . [and] (5) every underwriter with respect to such security.

15 U.S.C.A. § 77k(a) (West 1997). Section 12(a)(2) of that Act provides, in relevant part:

---

[4] The prospectus was part of the registration statement. (See, e.g., Holland Decl. II Ex. A at 156 (prospectus recites that it is part of the registration statement).)

> Any person who . . . (2) offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading . . . , shall be liable, . . . to the person purchasing such security from him, who may sue . . . to recover the consideration paid for such security . . . .

15 U.S.C.A. § 77l(a)(2) (West 1997).

Plaintiffs do not claim that the prospectus contained untrue statements of fact or failed to comply with any specific disclosure requirements. Rather, Plaintiffs' Section 11 and 12(a)(2) claims are both premised on the contention that Defendants' failure to include the above-listed facts constituted the omission of material facts that were necessary to make statements that were included in the prospectus not misleading. "The central inquiry in determining whether a prospectus is materially misleading is whether the representations therein, taken together and in context, would have misled a reasonable investor." In re Ultrafem Inc. Sec. Litig., 91 F. Supp. 2d 678, 695 (S.D.N.Y. 2000) (citing I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., 936 F.2d 759, 761 (2d Cir. 1991)). "A defendant is not required to disclose all known information, but has a duty to disclose any information that is necessary to make other statements not misleading." In re Alliance Pharmaceutical Corp. Sec. Litig., 279 F. Supp. 2d 171, 182 (S.D.N.Y. 2003) (citation and quotation omitted); see also Cooperman v. Individual, Inc., 171 F.3d 43, 49 (1st Cir. 1999) ("it is clear that an issuer of securities owes no absolute duty to disclose all material information. The issue, rather, is whether the securities law imposes on defendants a 'specific obligation' to disclose information of the type that plaintiffs claim was omitted," such as the statutory requirement that the prospectus not omit to state a material fact "necessary to make the statements therein not misleading").

Having considered thoroughly the information disclosed in the prospectus in relation

to the allegedly material omissions cited in the CAC, the Court concludes that Plaintiffs have failed to state a claim upon which relief can be granted. They have failed plausibly to allege the omission of material information that was necessary to make Xinhua's prospectus disclosures not misleading.

Plaintiffs assert that disclosure of the information regarding Singhal's other business connections and the performance of other companies with which he has been affiliated was necessary to make the biographical sketch that was included in the prospectus not misleading, because the sketch "emphasi[zed] the importance of Defendant Singhal's reputation and background." (Opp'n at 43.) However, the sketch is merely a brief listing of the various managerial positions that Singhal held in Xinhua-related and other companies in the past. Singhal's sketch and similarly brief biographies of five other directors comprise a total of one and a half pages of the prospectus. (See Holland Decl. II Ex. A at 156-57.) No statements are made touting any specific aspect of any director's managerial abilities, and no statements are made concerning whether other companies in which the directors were involved faced any regulatory actions, how those companies performed, or whether those companies were ever sued.

Viewing Singhal's brief biography in the context of the other biographies and the entire prospectus, there is no suggestion that the companies with which Singhal was involved succeeded in specific ways under Singhal's management. Beyond conclusory assertions of materiality in the CAC and their opposition papers, Plaintiffs have failed to plead facts demonstrating the basis of their claim that the omission of the information regarding Singhal rendered the biographical disclosure misleading. Nor do they point to any other part of the prospectus that, when considered together with the biography, would be misleading in light of the omissions. See, e.g., J & R Marketing, SEP v. Gen. Motors Corp., 519 F.3d 552, 561 (6th Cir.

2008) ("plaintiffs claim that when GMAC raised the issue of GM's performance being important to GMAC, GMAC was then required to disclose all 'material, non-public, adverse' information it knew about GM. This is surely not the law. A company has to disclose additional information only when what it has disclosed would be rendered misleading without that additional information."); cf. United States v. Matthews, 787 F.2d 38, 48 (2d Cir. 1986) (rejection of Section 14(a) claim alleging that representation in proxy statement was misleading because it failed to include information that defendant was engaged a bribery conspiracy, where representation "gave only basic information concerning each candidate," including defendant's past officer positions).

Plaintiffs also allege that the committee information was misleading because the problems faced by the companies under Singhal's management call into question Singhal's ability to adequately serve on those committees. However, the statements in question are similar to the biographies in that they are simply a listing of the Board committees, the directors assigned to each committee, and descriptions of the committees' respective responsibilities. (See Holland Decl. II Ex. A at 159-61.) The prospectus's mere mention that Singhal served on those committees, in the context of this section and the prospectus as a whole, in no way connoted anything about Singhal's association with, or ability to manage, past companies that may or may not have faced various legal problems. Therefore, the pleadings fail to establish a plausible claim that the committee information was materially misleading because of the omissions.

Plaintiffs also fail to allege plausibly the basis for their conclusory assertion that the prospectus's statement regarding Xinhua's "strong and experienced management team," in the context of the prospectus as a whole, was misleading in light of the omissions. The statement as a whole focused on the experience that Bush and the rest of the team had with international media operations skills, and none of the omissions call into question this aspect of the management team's

experience.

        To the extent that Plaintiffs' allegation focuses on the adjectives used to describe the management team, such as "strong," "experienced," and "capable," these soft adjectives are nothing more than puffery, which is not actionable under the securities laws. See Rombach v. Chang, 355 F.3d at 174 (addressing allegation that integration was "well underway" and "progressing smoothly," noting that "expressions of puffery and corporate optimism do not give rise to securities violations. Up to a point, companies must be permitted to operate with a hopeful outlook . . . [and] they can be expected to be confident about their stewardship and the prospects of the business that they manage.") (citations and quotations omitted); Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996) (statement that company "would not compromise its financial integrity" and that touted company's "commitment to create earnings opportunities" was inactionable puffery); Grossman v. Novell, Inc., 120 F.3d 1112, 1119 (10th Cir. 1997) (puffing consists of "generalized statements of optimism that are not capable of objective verification. Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions").

        With respect to the omission of information regarding profits that Bush and Singhal allegedly reaped personally from certain transactions involving Xinhua or its parent, the CAC's only attempt to explain why omitting this information was misleading was in connection to the "strong and experienced management team" statement in the prospectus. Because the Court concludes that this statement was inactionable puffery, it is not necessary to address the CAC's explanation. Moreover, even if the CAC had sought to explain why any of the other prospectus statements were misleading in light of the omission concerning personal profits, Plaintiffs would still fail to plausibly state a cause of action, since none of the other statements could be construed as representing that neither Bush nor

Singhal ever personally profited from Xinhua's transactions.

Lastly, the CAC fails to plead a plausible cause of action premised on the risk disclosure statements. The risk disclosure statements focus on the negative impact that would likely result if any executive were to leave Xinhua, and neither the statements nor the risk disclosure section of the prospectus as a whole suggests that every conceivable possibility of a negative event would be discussed in the prospectus. The statement adds that it would be difficult to evaluate the effectiveness of senior management because they had only worked together for a short period of time. The fact that Singhal and Bush managed companies that had various problems is not inconsistent with that statement, nor does it render misleading the statement's emphasis on the experience of management in working with one another as a major factor in evaluating management's effectiveness.[5] Therefore, no plausible Section 11 or 12(a)(2) cause of action premised on the risk disclosure statement has been stated.[6]

Because Plaintiffs fail to plausibly identify any statement in the prospectus that, when considered in context of the prospectus as a whole, was rendered misleading by any of the

---

[5]   In their opposition papers, Plaintiffs additionally suggest that this risk disclosure statement implicitly emphasized the importance of Singhal's value to Xinhua, and that this emphasis on his value was misleading because of the omissions. (See Opp'n at 43 ("the Registration Statement highlighted Defendant Singhal as a person the Company could not get along without".) The risk disclosure statement, however, never singles out Singhal, and it is not even clear whether Singhal was one of the indispensable "key executives" referred to in the statement. Moreover, the statement explicitly hedges its claims of indispensability by noting it was difficult to evaluate management's effectiveness since they had only worked with one another for a short period of time. Therefore, Plaintiffs' contention that the risk disclosure statement was rendered misleading because of its emphasis on Singhal's value fails to provide the requisite support for their causes of action.

[6]   Because the Court concludes that Plaintiffs fail to put forth pleadings that could plausibly satisfy the material omission element of their Section 12(a)(2) claim, it is unnecessary to address the standing, due diligence or "direct purchase" arguments raised by the Underwriter Defendants.

alleged omissions, Plaintiffs fail to state a claim under Sections 11 or 12(a)(2).  As a result, they have also failed to plead an underlying primary violation of the securities law necessary to state a claim under Section 15.  <u>See</u> <u>In re Independent Energy Holdings PLC Sec. Litig.</u>, 154 F. Supp. 2d 741, 769 (S.D.N.Y. 2001).  Accordingly, Defendants' motions to dismiss Plaintiffs' CAC are granted in their entirety.

The Court has reviewed thoroughly the parties' other arguments.  Because the Court concludes that Plaintiffs have failed to plead the omission of material facts that were necessary to make the prospectus not misleading, it is unnecessary to address them.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss the Consolidated Amended Class Action Complaint pursuant to Fed. R. Civ. P. 12(b)(6) are granted.  Because Plaintiffs have neither proffered additional facts that would be sufficient to render their claims viable nor requested leave to amend the complaint, the Clerk of Court is respectfully requested enter judgment accordingly, terminate Docket Entry Nos. 27 and 35, and close this case.  The Clerk of Court is also respectfully requested to terminate the following related or member actions, and to

terminate all pending motions filed in such actions: 07 Civ. 4046, 07 Civ. 4144, 07 Civ. 4443, 07 Civ. 4719, 07 Civ. 4727 and 07 Civ. 6145.

SO ORDERED.

Dated: New York, New York
February 25, 2009

/s/ Laura Taylor Swain

LAURA TAYLOR SWAIN
United States District Judge